# **Exhibit 1**

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE

SUPERIOR COURT DIVISION

Docket No. _____

COMMON CAUSE; NORTH CAROLINA
DEMOCRATIC PARTY; PAULA ANN CHAPMAN;
HOWARD DUBOSE; GEORGE DAVID GAUCK; JAMES
MACKIN NESBIT; DWIGHT JORDAN; JOSEPH
THOMAS GATES; MARK S. PETERS; PAMELA
MORTON; VIRGINIA WALTERS BRIEN; JOHN MARK
TURNER; LEON CHARLES SCHALLER; REBECCA
HARPER; LESLEY BROOK WISCHMANN; DAVID
DWIGHT BROWN; AMY CLARE OSEROFF; KRISTIN
PARKER JACKSON; JOHN BALLA; REBECCA
JOHNSON; AARON WOLFF; MARY ANN PEDEN-
COVIELLO; KAREN SUE HOLBROOK; KATHLEEN
BARNES,

          Plaintiffs,

     v.

REPRESENTATIVE DAVID R. LEWIS, IN HIS
OFFICIAL CAPACITY AS SENIOR CHAIRMAN OF
THE HOUSE SELECT COMMITTEE ON
REDISTRICTING; SENATOR RALPH E. HISE, JR., IN
HIS OFFICIAL CAPACITY AS CHAIRMAN OF THE
SENATE COMMITTEE ON REDISTRICTING;
SPEAKER OF THE NORTH CAROLINA HOUSE OF
REPRESENTATIVES TIMOTHY K. MOORE;
PRESIDENT PRO TEMPORE OF THE NORTH
CAROLINA SENATE PHILIP E. BERGER; THE STATE
OF NORTH CAROLINA; THE NORTH CAROLINA
STATE BOARD OF ELECTIONS AND ETHICS
ENFORCEMENT; ANDY PENRY, CHAIRMAN OF THE
NORTH CAROLINA STATE BOARD OF ELECTIONS
AND ETHICS ENFORCEMENT; JOSHUA MALCOLM,
VICE-CHAIR OF THE NORTH CAROLINA STATE
BOARD OF ELECTIONS & ETHICS ENFORCEMENT;
KEN RAYMOND, SECRETARY OF THE NORTH
CAROLINA STATE BOARD OF ELECTIONS & ETHICS
ENFORCEMENT; STELLA ANDERSON, MEMBER OF
THE NORTH CAROLINA STATE BOARD OF
ELECTIONS & ETHICS ENFORCEMENT; DAMON
CIRCOSTA, MEMBER OF THE NORTH CAROLINA
STATE BOARD OF ELECTIONS & ETHICS



**COMPLAINT**

(Three-Judge Court Pursuant to
N.C. Gen. Stat § 1-267.1)

ENFORCEMENT; STACY "FOUR" EGGERS IV,
MEMBER OF THE NORTH CAROLINA STATE BOARD
OF ELECTIONS & ETHICS ENFORCEMENT; JAY
HEMPHILL, MEMBER OF THE NORTH CAROLINA
STATE BOARD OF ELECTIONS & ETHICS
ENFORCEMENT; VALERIE JOHNSON, MEMBER OF
THE NORTH CAROLINA STATE BOARD OF
ELECTIONS & ETHICS ENFORCEMENT; JOHN
LEWIS, MEMBER OF THE NORTH CAROLINA STATE
BOARD OF ELECTIONS & ETHICS ENFORCEMENT,

Defendants.

Plaintiffs, complaining of Defendants, say and allege:

## INTRODUCTION

1.     Partisan gerrymandering is an existential threat to our democracy, and nowhere more so than in North Carolina.  Republicans in the North Carolina General Assembly have egregiously rigged the state legislative district lines to guarantee that their party will control both chambers of the General Assembly regardless of how the people of North Carolina vote.  This attack on representative democracy and North Carolinians' voting rights is wrong.  It violates the North Carolina Constitution.  And it needs to stop.

2.     In 2011, as part of a national movement by the Republican Party to entrench itself in power through redistricting, North Carolina Republicans' mapmaker manipulated district boundaries with surgical precision to maximize the political advantage of Republican voters and minimize the representational rights of Democratic voters.  And it worked.  In the 2012, 2014, and 2016 elections, Republicans won veto-proof super-majorities in both chambers of the General Assembly despite winning only narrow majorities of the overall statewide vote.

3.     In 2017, after federal courts struck down some of the 2011 districts as illegal racial gerrymanders, Republicans redoubled their efforts to gerrymander the district lines on partisan grounds.  They instructed the same Republican mapmaker to use partisan data and prior election results in drawing new districts.  The results should outrage anyone who believes in democracy.  In both the state House and state Senate elections in 2018, Democratic candidates won a majority of the statewide vote, but Republicans still won a substantial majority of seats in each chamber.  The maps are impervious to the will of the voters.

4.     It gets worse.  Because North Carolina is one of the few states in the country where the Governor lacks power to veto redistricting legislation, the General Assembly alone

1

will control the next round of redistricting after the 2020 census. Accordingly, as things currently stand, the Republican majorities in the General Assembly elected under the current maps will have free reign to redraw both state legislative and congressional district lines for the next decade. This perpetuates a vicious cycle in which representatives elected under one gerrymander enact new gerrymanders both to maintain their control of the state legislature and to rig congressional elections for ten more years. Only the intervention of the judiciary can break this cycle and protect the constitutional rights of millions of North Carolinians.

    5.    The North Carolina Constitution prohibits partisan gerrymandering. This State's equal protection guarantees provide more robust protections for voting rights than the federal constitution. Specifically, "[i]t is well settled in this State that the right to vote *on equal terms* is a fundamental right." *Stephenson v. Bartlett*, 562 S.E.2d 377, 394 (N.C. 2002). There is nothing "equal" about the "terms" on which North Carolinians vote for candidates for the General Assembly. North Carolina's Constitution also commands that "all elections shall be free"—a provision that has no counterpart in the federal constitution. Elections to the North Carolina General Assembly are not "free" when the outcomes are predetermined by partisan actors sitting behind a computer. And the North Carolina Constitution's free speech and association guarantees prohibit the General Assembly from burdening the speech and associational rights of voters and organizations because the General Assembly disfavors their political views.

    6.    No matter how the U.S. Supreme Court resolves longstanding questions about partisan gerrymandering under the federal constitution, North Carolina's Constitution independently secures the rights of North Carolina citizens. This State's courts should not hesitate to enforce North Carolina's unique protections here. This Court should invalidate the 2017 Plans and order that new, fair maps be used for the 2020 elections.

2

## PARTIES

**A.    Plaintiffs**

7.    Common Cause brings this action on its own behalf and on behalf of its members who are registered voters in North Carolina whose votes have been diluted or nullified under the districting plans enacted by the General Assembly in 2017 for the North Carolina House of Representatives and North Carolina Senate (the "2017 Plans"). Common Cause is a non-profit corporation organized and existing under the laws of the District of Columbia. It is a nonpartisan democracy organization with over 1.2 million members and local organizations in 35 states, including North Carolina. Common Cause has members in every North Carolina House and Senate district. Since its founding by John Gardner in 1970, Common Cause has been dedicated to fair elections and making government at all levels more representative, open, and responsive to the interests of ordinary people. "For the past twenty-five years, Common Cause has been one of the leading proponents of redistricting reform." Jonathan Winburn, The Realities of Redistricting p. 205 (2008). The 2017 Plans frustrate Common Cause's mission to promote participation in democracy and to ensure open, honest, and accountable government. The 2017 Plans burden Common Cause's ability to convince voters in gerrymandered districts to vote in state legislative elections and communicate with legislators. The 2017 Plans also burden Common Cause's ability to communicate effectively with legislators and to influence them to enact laws that promote voting, participatory democracy, public funding of elections, and other measures that encourage accountable government.

8.    The North Carolina Democratic Party ("NCDP") brings this action on its own behalf and on behalf of its members who are registered voters in North Carolina whose votes have been diluted or nullified as a result of the gerrymandering of the 2017 Plans. The NCDP is a political party as defined in N.C. Gen. Stat. § 163-96. Its purposes are (i) to bring people

3

together to develop public policies and positions favorable to NCDP members and the public generally, (ii) to identify candidates who will support and defend those policies and positions, and (iii) to persuade voters to cast their ballots for those candidates. The NCDP has members in every North Carolina House and Senate district. The partisan gerrymanders under the 2017 Plans discriminate against the NCDP's members because of their past votes, their political views, and their party affiliations. The gerrymanders also discriminate against the NCDP itself on the basis of its viewpoints and affiliations, and the plans frustrate and burden NCDP's ability to achieve its essential purposes and to carry out its core functions, including registering voters, attracting volunteers, raising money in gerrymandered districts, campaigning, turning out the vote, and ultimately electing candidates who will pursue policies favorable to NCDP members and the public generally in the North Carolina General Assembly. The NCDP must expend additional funds and other resources than it would otherwise to combat the effects of the partisan gerrymanders under the 2017 Plans, and even then, the 2017 Plans make it impossible for Democrats to win a majority in either chamber of the legislature.

9.     Plaintiff Paula Ann Chapman is a retired small business owner residing in Charlotte, North Carolina, within House District 100 and Senate District 40. Ms. Chapman is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly. House District 100 and Senate District 40 are both packed Democratic districts. In 2018, the Democratic candidate won these districts with over 70% and 75% of the vote.

10.     Plaintiff Howard DuBose is a retired school teacher and Army veteran residing in Hurdle Mills, North Carolina, within House District 2. Mr. DuBose is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly. Democratic

voters in House District 2 are cracked from Democratic voters in House District 32. In 2018, the Republican candidate won House District 2 with roughly 55% of the vote.

11. Plaintiff George David Gauck is a retired software engineer residing in Southport, North Carolina, within House District 17 and Senate District 8. Mr. Gauck is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly. House District 17 is adjacent to the packed Democratic House District 18. In 2018, the Republican candidate won House District 17 with over 63% of the vote. A heavily Democratic area in Wilmington is extracted from Senate District 9 and placed in Senate District 8 to make Senate District 9 as competitive as possible for Republicans. As a result, in 2018, Senate District 9 was a near tie, while Republicans won Senate District 8 by a comfortable margin.

12. Plaintiff James Mackin Nesbit is a retired kindergarten teacher residing in Wilmington, North Carolina, within House District 19 and Senate District 9. Mr. Nesbit is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly. House District 19 borders the packed Democratic House District 18. The Republican candidate has won every election in House District 19 since the 2011 redistricting, running unopposed in 2014 and 2016. A heavily Democratic area in Wilmington is extracted from Senate District 9 and placed in Senate District 8 to make Senate District 9 as competitive as possible for Republicans. As a result, in 2018, the election in Senate District 9 was a near tie.

13. Plaintiff Dwight Jordan is a customer support professional residing in Nashville, North Carolina, within House District 25 and Senate District 11. Mr. Jordan is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly. House District 25 is a packed Democratic district that was constructed to ensure that neighboring House District 7 would elect a Republican, which occurred in 2018. The county cluster

5

encompassing Senate District 11 cracks Democratic voters across its three districts (10, 11, and 12). In 2018, the Republican candidate won Senate District 11 with roughly 56% of the vote.

14. Plaintiff Joseph Thomas Gates is a former Colonel in the Air Force and a retired information technology project manager residing in Weaverville, North Carolina, within Senate District 49. Mr. Gates is registered as unaffiliated and has consistently voted for Democratic candidates for the General Assembly. Senate District 49 is a packed Democratic district. In 2018, the Democratic candidate won Senate District 49 with over 63% of the vote.

15. Plaintiff Mark S. Peters is a retired physician assistant residing in Fletcher, North Carolina, within Senate District 48. Mr. Peters is registered as unaffiliated and has consistently voted for Democratic candidates for the General Assembly. Senate District 48 was drawn to avoid the Democratic areas in and around Asheville to ensure that the district would lean Republican. In 2018, the Republican candidate won Senate District 48 by roughly 13 points.

16. Plaintiff Pamela Morton is a retired professional in the financial industry residing in Charlotte, North Carolina, within House District 100 and Senate District 37. Ms. Morton is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly. House District 100 and Senate District 37 are both packed Democratic districts. In 2018, the Democratic candidates won these districts with over 70% and 78% of the vote.

17. Plaintiff Virginia Walters Brien is a sales manager residing in Charlotte, North Carolina, within House District 102 and Senate District 37. Ms. Brien is a registered unaffiliated who has consistently voted for Democratic candidates for the General Assembly. House District 102 and Senate District 37 are both packed Democratic districts. In 2018, the Democratic candidates won these districts with over 83% and 78% of the vote.

6

18.     Plaintiff John Mark Turner is a Navy veteran and a system administrator residing in Raleigh, North Carolina, within House District 38 and Senate District 15. Mr. Turner is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly. House District 38 and Senate District 15 are both packed Democratic districts. In 2018, the Democratic candidates won these districts with over 81% and 73% of the vote.

19.     Plaintiff Leon Charles Schaller is a retired safety and fire protection engineer residing in Burlington, North Carolina, within House District 64. Mr. Schaller is registered as an unaffiliated voter but has consistently voted for Democratic candidates for the General Assembly. The county cluster that contains House Districts 63 and 64 was not changed in the 2017 Plans and retains the same district lines enacted in 2011. In constructing the cluster, the General Assembly cracked Democratic voters in Burlington across the two districts. Republican candidates have won every election in House District 64 since the 2011 redistricting—with over 58% of the vote in 2012 and 2018, and running unopposed in 2014 and 2016.

20.     Plaintiff Rebecca Harper is a real estate agent residing in Cary, North Carolina, within House District 36 and Senate District 17. Ms. Harper is registered as a Democrat and has consistently voted for Democratic candidates for the General Assembly. The General Assembly packed several districts surrounding House District 36 with Democratic voters to make House District 36 as Republican as possible. In 2018, the Democratic candidate won House District 36 with barely over 50% of the two-party vote. The General Assembly similarly packed several districts surrounding Senate District 17 to make Senate District 17 as competitive for Republicans as possible. In 2018, the Democratic candidate narrowly won Senate District 17.

21.     Plaintiff Lesley Brook Wischmann is a semi-retired writer and historian residing in Holly Ridge, North Carolina, within House District 15. Ms. Wischmann is registered as a

7

Democrat and has consistently voted for Democratic candidates for the General Assembly. The General Assembly cracked Democratic voters across House Districts 14 and 15. In 2018, the Republican candidate won House District 15 with roughly 66% of the vote.

22. Plaintiff David Dwight Brown is a semi-retired computer systems analyst residing in Greensboro, North Carolina, within House District 58. Mr. Brown is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly. House District 58 is a packed Democratic district. In 2018, the Democratic candidate won House District 58 with over 76% of the vote.

23. Plaintiff Amy Clare Oseroff is a teacher residing in Greenville, North Carolina, within House District 8. Ms. Oseroff is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly. The General Assembly packed Greenville's most heavily Democratic areas into House District 8 to create a strongly Democratic district, ensuring that nearby House Districts 9 and 12 would favor Republicans. In 2018, the Democratic candidate won House District 8 with over 64% of the vote.

24. Plaintiff Kristin Parker Jackson is a paralegal residing in Matthews, North Carolina, within House District 103 and Senate District 39. Ms. Jackson is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly. The General Assembly packed Democrats into the districts surrounding House District 103 to make House District 103 as Republican-leaning as possible. In 2018, House District 103 was a virtual tie. Senate District 39 is a Republican-leaning district that borders packed Democratic districts. In 2018, the Republican candidate won Senate District 39 with roughly 53% of the vote.

25. Plaintiff John Balla is a digital marketing strategist residing in Raleigh, North Carolina, within House District 34 and Senate District 16. Mr. Balla is a registered Democrat

8

who has consistently voted for Democratic candidates for the General Assembly in every election since he moved to North Carolina. House District 34 and Senate District 16 are both packed Democratic districts. In 2018, the Democratic candidates won both districts with over 65% of the vote.

26.     Plaintiff Rebecca Johnson is a retired educator residing in Winston-Salem, North Carolina, within House District 74 and Senate District 31. Ms. Johnson is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly. House District 74 adjoins two packed Democratic districts, allowing House District 74 to favor Republicans. In 2018, the Republican candidate won House District 74 with more than 54% of the vote. Senate District 31—which cradles Senate District 32, a packed Democratic district—leans Republican. In 2018, the Republican candidate won Senate District 31 with over 61% of the vote.

27.     Plaintiff Aaron Wolff is a veterinarian residing in Holly Springs, North Carolina, within House District 37 and Senate District 17. Mr. Wolff is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly. The General Assembly packed as many Democrats as possible into the districts surrounding House District 37 and Senate District 17 to make these districts as favorable to Republicans as possible. In 2018, Democratic candidates won both districts with bare majorities.

28.     Plaintiff Mary Ann Peden-Coviello is a writer and editor residing in Winston-Salem, North Carolina, within House District 72 and Senate District 32. Ms. Peden-Coviello is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly. House District 72 is a packed Democratic district. In 2018, the Democratic candidate won House District 72 with 79% of the vote. Senate District 32 is a packed Democratic district

9

that was drawn to ensure that neighboring Senate District 31 would elect a Republican. In 2018, the Democratic candidate won Senate District 32 with 72% of the vote.

29.     Plaintiff Kathleen Barnes is the owner of a small publishing company who resides in Brevard, North Carolina, within House District 113 and Senate District 48. Ms. Barnes is a registered Democrat and has consistently voted for Democratic candidates for the North Carolina General Assembly. The Democrats who reside in House District 113, like Ms. Barnes, were strategically placed in a different district from the Democratic voters around Hendersonville to ensure that Republicans were favored in both districts. In the 2018 elections, the Republican candidate won the House District 113 election with over 57% of the vote. Senate District 48 was similarly cracked, splitting the Democratic voters in Brevard from the strong base of Democratic voters in nearby Asheville so that Senate District 48 was Republican-leaning. In 2018, the Republican candidate won Senate District 48 with over 56% of the vote.

30.     Karen Sue Holbrook is a retired psychology professor residing in Southport, North Carolina, within House District 17 and Senate District 8. Ms. Holbrook is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly. In the county cluster containing House District 17, the General Assembly packed Democratic voters into House District 18 to make House District 17 and the other districts in the cluster lean Republican. In 2018, the Republican candidate won House District 17 with over 63% of the vote. With respect to Senate District 8, a heavily Democratic area in Wilmington is extracted from Senate District 9 and placed in Senate District 8 to make Senate District 9 as competitive as possible for Republicans. As a result, in 2018, Senate District 9 was a near tie, while Republicans won Senate District 8 with a comfortable margin.

**B.     Defendants**

31.     Defendant David R. Lewis is a member of the North Carolina House of Representatives who represents House District 53. In 2017, Representative Lewis served as Senior Chairman of the House Select Committee on Redistricting that oversaw the creation of 2017 Plans. Defendant Lewis is sued in his official capacity only.

32.     Defendant Ralph E. Hise, Jr. is a member of the North Carolina Senate, representing Senate District 39. In 2017, Senator Hise served as Chairman of the Senate Committee on Redistricting that oversaw the creation of the 2017 Plans. Defendant Hise is sued in his official capacity only.

33.     Defendant Timothy K. Moore is the Speaker of the North Carolina House of Representatives. Defendant Moore is sued in his official capacity only.

34.     Defendant Philip E. Berger is the President Pro Tempore of the North Carolina Senate. Defendant Berger is sued in his official capacity only.

35.     Defendant the State of North Carolina has its capital in Raleigh, North Carolina.

36.     Defendant North Carolina State Board of Elections and Ethics Enforcement is an agency responsible for the regulation and administration of elections in North Carolina.

37.     Defendant Andy Penry is the Chairman of the North Carolina State Board of Elections and Ethics Enforcement. Mr. Penry is sued in his official capacity only.

38.     Defendant Joshua Malcolm is the Vice Chair of the North Carolina State Board of Elections and Ethics Enforcement. Mr. Malcolm is sued in his official capacity only.

39.     Defendant Ken Raymond is the Secretary of the North Carolina State Board of Elections and Ethics Enforcement. Mr. Raymond is sued in his official capacity only.

11

40.     Defendant Stella Anderson is a member of the North Carolina State Board of Elections and Ethics Enforcement.  Ms. Anderson is sued in her official capacity only.

41.     Defendant Damon Circosta is a member of the North Carolina State Board of Elections and Ethics Enforcement.  Mr. Circosta is sued in his official capacity only.

42.     Defendant Stacy "Four" Eggers IV is a member of the North Carolina State Board of Elections and Ethics Enforcement.  Mr. Eggers is sued in his official capacity only.

43.     Defendant Jay Hemphill is a member of the North Carolina State Board of Elections and Ethics Enforcement.  Mr. Hemphill is sued in his official capacity only.

44.     Defendant Valerie Johnson is a member of the North Carolina State Board of Elections and Ethics Enforcement.  Ms. Johnson is sued in her official capacity only.

45.     Defendant John Lewis is a member of the North Carolina State Board of Elections and Ethics Enforcement.  Mr. Lewis is sued in his official capacity only.

## JURISDICTION AND VENUE

46.     This Court has jurisdiction of this action pursuant to Articles 26 and 26A of Chapter 1 of the General Statutes.

47.     Under N.C. Gen. Stat. § 1-81.1, the exclusive venue for this action is the Wake County Superior Court.

48.     Under N.C. Gen. Stat. § 1-267.1, a three-judge court must be convened because this action challenges the validity of redistricting plans enacted by the General Assembly.

## FACTUAL ALLEGATIONS

**A.      National Republican Party Officials Target North Carolina For Partisan Gerrymandering Prior to the 2010 Elections**

49.     In the years leading up to the 2010 decennial census, national Republican leaders undertook a sophisticated and concerted effort to gain control of state governments in critical

12

swing states such as North Carolina. The Republican State Leadership Committee (RSLC) codenamed the plan "the REDistricting Majority Project" or "REDMAP." REDMAP's goal was to "control[] the redistricting process in . . . states [that] would have the greatest impact on determining how both state legislative and congressional district boundaries would be drawn" after the 2010 census. The RSLC's REDMAP website explained that fixing these district lines in favor of Republicans would "solidify conservative policymaking at the state level and maintain a Republican stronghold in the U.S. House of Representatives for the next decade."

50. North Carolina was a key REDMAP "target state." REDMAP aimed to flip both chambers of the North Carolina General Assembly from Democratic to Republican control.

51. To spearhead its efforts in North Carolina, the RSLC enlisted the most influential conservative donor in North Carolina, Art Pope. The RSLC and Pope targeted 22 races in the North Carolina House and Senate. Pope helped create a new non-profit organization called "Real Jobs NC" to finance spending on the races, and the RSLC donated $1.25 million to this new group. Pope himself made significant contributions; in total, Pope, his family, and groups backed by him spent $2.2 million on the 22 targeted races. This represented three-quarters of the total spending by all independent groups in North Carolina on the 2010 state legislative races.

52. The money was well spent. Republicans won 18 of the 22 races the RSLC targeted, giving Republicans control of both the House and Senate for the first time since 1870.

**B. Republican Mapmakers Create the 2011 Plans from Party Headquarters**

53. After taking control of both chambers of the General Assembly, Republicans set out to redraw district lines to entrench Republicans in power. The RSLC's President and CEO, Chris Jankowski, sent a letter to officials in Republican-controlled states (including North Carolina) offering the RSLC's assistance with the upcoming redistricting. Jankowski explained that the RSLC had "taken the initiative to retain a team of seasoned redistricting experts," and

the RSLC would happily make this team "available to" the Republican state officials. Jankowski noted that RSLC's expert "redistricting team" was "led by Tom Hofeller," who had been the principal redistricting strategist for the Republican Party for decades.

54. Republicans leaders in the North Carolina General Assembly took Jankowski up on his offer. The drawing of the new North Carolina House and Senate plans (the "2011 Plans") was not done by any committee or subcommittee of the General Assembly. Instead, it was primarily done by four Republican Party operatives: (1) Hofeller; (2) John Morgan, another national Republican mapmaker and longtime associate of Hofeller, (3) Dale Oldham, an attorney who served as counsel to the Republican National Committee; and (4) Joel Raupe, a former aide to several Republican representatives in the North Carolina Senate. A newly created shadow organization known as "Fair and Legal Redistricting North Carolina" paid for Morgan's and Raupe's work, while Hofeller was paid with a combination of state funds and money from the RSLC's non-profit arm the State Government Leadership Foundation.

55. Hofeller and his team worked out of the basement of the state Republican Party headquarters on Hillsborough Street in Raleigh. They did not use a government computer to create the new plans. Rather, they created the new plans using computers owned by the Republican National Committee and software licensed by the state Republican Party.

56. The map-making process was shielded from public view. Only a small group of individuals that included Hofeller's team and Republican leaders in the General Assembly saw the first drafts of the maps before they were publicly released in June 2011.

57. One person who was allowed to directly participate in the map-drawing process was mega-donor Art Pope. Despite not being a practicing lawyer, Pope served as "pro bono" counsel to the state legislature and met several times with Hofeller and his team at Republican

Party headquarters while they were working on the new plans. Pope even proposed specific changes to certain districts.

58.     Although Republicans drew their maps in secret, their intentions were clear as day. Their goal was to maximize the number of seats Republicans would win in the General Assembly through whatever means necessary.

59.     Hofeller later admitted that, in creating the 2011 Plans, his team used past election results in North Carolina to predict the "partisan voting behavior" of the new districts. Republican leaders in the General Assembly likewise later admitted in court filings that "[p]olitical considerations played a significant role in the enacted [2011] plans," and that the plans were "designed to ensure Republican majorities in the House and Senate." *Dickson v. Rucho*, No. 201PA12-3, 2015 WL 4456364, at *16, 55 (N.C. July 13, 2015). The Republican leaders asserted that they were "perfectly free" to engage in partisan gerrymandering, and that they had done just that in constructing the 2011 Plans. *Dickson v. Rucho*, No. 201PA12-2, 2013 WL 6710857, at *60 (N.C. Dec. 9, 2013).

## C.     Republicans Enact the 2011 Plans To Entrench Their Party's Political Power

60.     The General Assembly adopted the Hofeller-drawn plans in July 2011, designated HB 937 and SB 45 respectively. Not a single Democrat in the General Assembly voted for either plan, and only one Republican representative voted against them.

61.     Shortly thereafter, legislators learned that certain census blocks were not assigned to any district in the enacted plans. In November 2011, the General Assembly passed curative House and Senate plans, designated HB 776 and SB 282 respectively, to add the previously omitted blocks. No Democrat voted for either curative plan.

**D.    The 2011 Plans Gave Republicans Super-Majorities That Were Grossly Disproportionate to Republicans' Share of the Statewide Vote**

62.    The 2011 Plans achieved exactly the effect that Republicans in the General Assembly intended. In the 2012 election, the parties' vote shares for the North Carolina House of Representatives were nearly evenly split across the state, with Democrats receiving 48.4% of the two-party statewide vote. But Democrats won only 43 of 120 seats (36%). In other words, Republicans won a veto-proof majority in the state House—64% of the seats (77 of 120)—despite winning just a bare majority of the statewide vote. Further, because of the rigging of district lines, 53 of the 120 House races were uncontested.

63.    In the 2012 Senate elections, Democrats won nearly half of the statewide vote (48.8%), but won only 18 of 50 seats (36%). Republicans thus won a veto-proof majority in the Senate while winning only a tiny majority of the total statewide vote.

64.    In 2014, Republican candidates for the House won 54.4% of the statewide vote, and again won a super-majority of seats (74 of 120, or 61.6%). Over half of the House seats, 62 of 120, went uncontested in 2014.

65.    In the 2014 Senate elections, Republicans won 54.3% of statewide vote and 68% of the seats (34 of 50). There were 21 uncontested elections in the Senate in 2014, with Republicans winning 12 uncontested districts and Democrats winning 9.

66.    In 2016, Republicans again won 74 of 120 House seats, or 62%, this time with 52.6% of the statewide vote. Nearly half of all of the House seats were uncontested (59 of 120).

67.    In the 2016 Senate elections, Republicans won 55.9% of the statewide vote and 70% of the seats (35 of 50). Republicans held 12 uncontested seats compared to 6 for Democrats, for a total of 18 uncontested races.

68.    The below charts summarizes the election results under the 2011 Plans:

16

| | House | | Senate | |
|---|---|---|---|---|
| Year | Republican Percentage of Statewide Vote | Republican Percentage of Seats Won | Republican Percentage of Statewide Vote | Republican Percentage of Seats Won |
| 2012 | 51.6% | 64.2% (77 of 120) | 51.2% | 64.0% (32 of 50) |
| 2014 | 54.4% | 61.6% (74 of 120) | 54.3% | 68.0% (34 of 50) |
| 2016 | 52.6% | 61.6% (74 of 120) | 55.9% | 70.0% (35 of 50) |

### E. A Federal Court Strikes Down Many Districts as Racially Gerrymandered

69.     The 2011 Plans led to substantial litigation, including the federal lawsuit styled *Covington v. North Carolina*, No. 1:15-CV-00399 (M.D.N.C.). In *Covington*, the plaintiffs challenged 19 districts in the North Carolina House (5, 7, 12, 21, 24, 29, 31, 32, 33, 38, 42, 43, 48, 57, 58, 60, 99, 102, and 107) and 9 districts in the North Carolina Senate (4, 5, 14, 20, 21, 28, 32, 38, and 40). They alleged that race predominated in the drawing of these districts, in violation of the federal Equal Protection Clause. In August 2016, the federal district court found for the plaintiffs as to all of the challenged districts, but permitted the General Assembly to wait until after the November 2016 elections to enact remedial plans. *Covington v. North Carolina*, 316 F.R.D. 176, 176-78 (M.D.N.C. 2016). The U.S. Supreme Court summarily affirmed this decision. 137 S. Ct. 2211 (2017).

70.     In a subsequent order, the district court gave the General Assembly a deadline of September 1, 2017 to enact new House and Senate plans remedying the racial gerrymanders the court had found. *Covington v. North Carolina*, 267 F. Supp. 3d 664 (M.D.N.C. 2017).

### F. The General Assembly Enacts the 2017 Plans To Dilute the Voting Power of Democratic Voters and Maximize the Political Advantage of Republicans

71.     The General Assembly began developing new House and Senate plans in June 2017. On June 30, 2017, Senator Berger appointed 15 senators—10 Republicans and 5 Democrats—to the Senate Committee on Redistricting. Senator Hise was appointed Chair.

72. Also on June 30, 2017, Representative Moore appointed 41 House members—28 Republicans and 13 Democrats—to the House Select Committee on Redistricting. Representative Lewis was appointed Senior Chair.

73. At a July 26, 2017 joint meeting of the House and Senate Redistricting Committees, Representative Lewis and Senator Hise disclosed that Republican leadership would again employ Dr. Hofeller to draw the new House and Senate plans. When Democratic Senator Terry Van Duyn asked whether Hofeller would "be available to Democrats and maybe even the Black Caucus to consult," Representative Lewis answered "no." Joint Comm. Hr'g, July 26, 2017, at 22-23. Representative Lewis explained that, "with the approval of the Speaker and the President Pro Tem of the Senate," "Dr. Hofeller is working as a consultant to the Chairs," *i.e.*, as a consultant only to Representative Lewis and Senator Hise. *Id.* at 23.

74. In overseeing the 2016 redrawing of North Carolina's congressional districts, Representative Lewis had previously explained that Hofeller is "very fluent in being able to help legislators translate their desires" into the district lines, and that Representative Lewis' "desires" are to elect as many Republicans as possible. Representative Lewis said about the newly created congressional districts: "I think electing Republicans is better than electing Democrats. So I drew this map in a way to help foster what I think is better for the country."

75. On August 4, 2017, at another joint meeting of the House and Senate Redistricting Committees, Representative Lewis and Senator Hise advised Committee members that the *Covington* decision invalidating 28 districts on federal constitutional grounds had rendered a large number of additional districts invalid under the Whole County Provision of the North Carolina Constitution, and those districts would also have to be redrawn.

76.     At this meeting, the Committees allowed 31 citizens to speak for two minutes each about the manner in which the House and Senate maps should be redrawn. All speakers urged the members to adopt fair maps free of partisan bias. The Committees ignored them.

77.     At another joint meeting on August 10, 2017, the House and Senate Redistricting Committees voted on criteria to purportedly govern the new plans.

78.     Representative Lewis proposed as one criterion: "election data[:] political consideration and election results data may be used in drawing up legislative districts in the 2017 House and Senate plans." Joint Comm. Hr'g, Aug. 20, 2017, at 132. Representative Lewis provided no further explanation or justification for this criterion in introducing it, stating only: "I believe this is pretty self-explanatory, and I would urge members to adopt the criteria." *Id.*

79.     Democratic members repeatedly pressed Representative Lewis for details on how Hofeller would use the elections data and for what purpose. Senator Clark asked, for instance: "You're going to collect the political data. What specifically would the Committee do with it?" *Id.* at 135. Representative Lewis answered that "the Committee could look at the political data as evidence to how, perhaps, votes have been cast in the past." *Id.* When Senator Clark inquired why the Committees would consider election results if not to predict *future* voting behavior, Representative Lewis offered no substantive answer, stating only that "the consideration of political data in terms of election results is an established districting criteria, and it's one that I propose that this committee use in drawing the map." *Id.* at 141.

80.     The House and Senate Committees adopted the "election data" criterion on a party-line vote. *Id.* at 141-48. No Democrat on the Committees voted for the criterion, but all 32 Republican members of the Committees did. *Id.*

81.     Representative Lewis disclosed that the specific election results that Hofeller would use were the U.S. Senate election in 2010, the elections for President, Governor, and Lieutenant Governor in 2012, the U.S. Senate election in 2014, and the elections for President, U.S. Senate, Governor, Lieutenant Governor, and Attorney General in 2016. *Id.* at 137-38.

82.     Senator Clark proposed an amendment that would prohibit the General Assembly from seeking to maintain or establish a partisan advantage for any party in redrawing the plans. *Id.* at 166-67. Representative Lewis opposed the amendment without explanation, stating only that he "would not advocate for [its] passage." *Id.* at 167. The Committees rejected Senator Clark's proposal on a straight party-line vote. *Id.* at 168-74.

83.     As a further criterion, Representative Lewis proposed incumbency protection. Specifically, he proposed that "reasonable efforts and political considerations may be used to avoid pairing incumbent members of the House or Senate with another incumbent in legislative districts drawn in 2017 House and Senate plans." *Id.* at 119.

84.     Representative Darren Jackson objected to protecting incumbents who were elected under the unconstitutional prior maps. *Id.* at 120. Senator Van Duyn likewise stated that new districts "should represent the voters and not elected officials," and therefore she "fundamentally believe[d] that incumbency should not be a criteria." *Id.* at 123.

85.     The House and Senate Committees adopted the incumbency-protection criterion on a straight-party line vote. *Id.* at 125-32. All 32 Republican members of the Committees voted in favor, and all 18 Democratic members voted against. *Id.*

86.     The Committees also adopted as criteria, along straight party-line votes, that the Committees would make "reasonable efforts" to split fewer precincts than under the 2011 Plans,

and that the Committees "may consider municipal boundaries" in drawing the new districts. *Covington, id.* at 66, 79, 98-104, 112-19.

87.     As a final criterion, Representative Lewis proposed that the Committees be prohibited from considering racial data in drawing the new House and Senate plans. *Covington,* ECF 184-9 at 148. Representative Lewis and other Republican leaders thus explicitly asserted that no districts would be drawn with the goal of complying with Section 2 of the Voting Rights Act. *See id.* at 157. Republican leaders added in a later court filing that, "[t]o the extent that any district in the 2017 House and Senate redistricting plans exceed 50% BVAP, such a result was naturally occurring and the General Assembly did not conclude that the Voting Rights Act obligated it to draw any such district." *Covington,* ECF No. 184 at 10.

88.     The full criteria adopted by the Committees for the 2017 Plans read as follows:

Equal Population. The Committees shall use the 2010 federal decennial census data as the sole basis of population for drawing legislative districts in the 2017 House and Senate plans. The number of persons in each legislative district shall comply with the +/- 5 percent population deviation standard established by *Stephenson v. Bartlett,* 355 N.C. 354, 562 S.E. 2d 377 (2002).

Contiguity. Legislative districts shall be comprised of contiguous territory. Contiguity by water is sufficient.

County Groupings and Traversals. The Committees shall draw legislative districts within county groupings as required by *Stephenson v. Bartlett,* 355 N.C. 354, 562 S.E. 2d 377 (2002) (*Stephenson I*), *Stephenson v. Bartlett,* 357 N.C. 301, 582 S.E.2d 247 (2003) (*Stephenson II*), *Dickson v. Rucho,* 367 N.C. 542, 766 S.E.2d 238 (2014) (*Dickson I*) and *Dickson v. Rucho,* 368 N.C. 481, 781 S.E.2d 460 (2015) (*Dickson II*). Within county groupings, county lines shall not be traversed except as authorized by *Stephenson I, Stephenson II, Dickson I,* and *Dickson II.*

Compactness. The Committees shall make reasonable efforts to draw legislative districts in the 2017 House and Senate plans that improve the compactness of the current districts. In doing so, the Committees may use as a guide the minimum Reock ("dispersion") and Polsby-Popper ("perimeter") scores identified by Richard H. Pildes and Richard G. Neimi in *Expressive Harms, "Bizarre Districts," and Voting Rights: Evaluating Election-District Appearances After Shaw v. Reno,* 92 Mich. L. Rev. 483 (1993).

21

Fewer Split Precincts. The Committees shall make reasonable efforts to draw legislative districts in the 2017 House and Senate plans that split fewer precincts than the current legislative redistricting plans.

Municipal Boundaries. The Committees may consider municipal boundaries when drawing legislative districts in the 2017 House and Senate plans.

Incumbency Protection. Reasonable efforts and political considerations may be used to avoid pairing incumbent members of the House or Senate with another incumbent in legislative districts drawn in the 2017 House and Senate plans. The Committees may make reasonable efforts to ensure voters have a reasonable opportunity to elect non-paired incumbents of either party to a district in the 2017 House and Senate plans.

Election Data. Political considerations and election results data may be used in the drawing of legislative districts in the 2017 House and Senate plans.

No Consideration of Racial Data. Data identifying the race of individuals or voters shall not be used in the drawing of legislative districts in the 2017 House and Senate plans.

*Covington*, ECF No. 184-37.

89.    Republican leaders in the General Assembly "did not introduce any evidence regarding what additional instructions, if any, Representative Lewis or Senator Hise provided to Dr. Hofeller about the proper use and weighting of the various criteria." *Covington v. North Carolina*, 283 F. Supp. 3d 410, 418 (M.D.N.C. 2018). "Nor did they offer any evidence as to how Dr. Hofeller weighted or ordered the criteria in drawing the proposed remedial maps, either in general or as to any particular district." *Id.*

90.    As in 2011, no committee or subcommittee of the General Assembly participated in drawing the new maps. Instead, Hofeller again drew the maps in secret, under the direction of Representative Lewis and Senator Hise. Representative Lewis would admit that he "primarily . . . directed how the [House] map was produced," and that he, Hofeller, and Representative Nelson

Dollar were the only "three people" who had even "seen it prior to its public publication." N.C. House Floor Session Hr'g, Aug. 28, 2017, at 40.

91.     And as in 2011, Hofeller did not use a government computer in creating the new districts. On information and belief, he used a personal computer instead.

92.      Representative Lewis and Senator Hise released the proposed House and Senate plans on August 21, 2017.

93.     At a Senate Redistricting Committee hearing three days later, Senate Van Duyn asked Senator Hise how the prior elections data had been used in drawing the proposed maps. Senator Hise admitted that they "did make partisan considerations when drawing particular districts." Senate Comm. Hr'g, Aug. 24, 2017, at 26.

94.     Outside expert analyses confirmed that the proposed maps were gerrymandered to favor Republicans. The Campaign Legal Center calculated the "efficiency gap" of the proposed plans. The efficiency gap measures how efficiently a party's voters are distributed across districts. For each party, the efficiency gap calculates that party's number of "wasted" votes, defined as the number of votes cast for losing candidates of that party (as a measure of cracked votes) plus the number of votes cast for winning candidates in excess of 50% (as a measure of packed votes). The lower each of these numbers, the fewer wasted votes and the more likely a party is to win additional seats. The efficiency gap equals the difference in the total wasted votes between the two parties, divided by the total number of votes cast in the election. Using the same elections data that the Committees used to develop the proposed maps, the Campaign Legal Center calculated that the proposed House plan had an efficiency gap of 11.98% in Republicans' favor, and the proposed Senate plan had an efficiency gap of 11.87% in Republicans' favor.

23

*Covington*, ECF No. 187-3 at 2. The Campaign Legal Center explained that, "[b]y historical standards, these are extraordinarily large figures, revealing an enormous Republican edge." *Id.*

95.    Other statistical analyses found the same. Dr. Gregory Herschlag, a professor of mathematics at Duke University, created tens of thousands of alternative, non-partisan Senate districting configurations within Wake, Mecklenburg, Cumberland, and Guilford Counties. Dr. Herschlag created these simulated districting plans using the traditional districting criteria of equal population, compactness, avoiding splitting precincts, and contiguity. *Covington*, ECF No. 187-3 at 10 ¶ 6. Dr. Herschlag then compared the expected outcomes under these simulated districts with those under the Republican leaders' proposed districts in the same counties. Dr. Herschlag found that, using the votes cast in the 2012 and 2016 Presidential elections, the 2014 and 2016 U.S. Senate elections, the 2012 and 2014 U.S. House of Representatives elections, and the 2016 Governor election to predict partisan outcomes, the Republicans leaders' proposed districts were more favorable to Republicans than 99.9% of the non-partisan simulations. *Id.* ¶ 12. Plaintiffs in this case will show that similar results hold across the state.

96.    The extreme partisan bias of the proposed plans was also apparent from the elections data that the House and Senate Redistricting Committees themselves released with the proposals. The Committees provided data on the partisan breakdown of each proposed district using the state and federal elections that the Committees considered in drawing the districts.

97.    The chart below shows the number of House districts Republicans would be expected to win under the Committees' House plan when overlaying the results of each election the General Assembly considered. These expected seats approximate the number of seats Republicans actually won under the 2011 House plan (77 in 2012, 74 in 2014, and 74 in 2016).

| Election | Expected Republican Seats Under Committees' House Plan |
|---|---|
| 2010 U.S. Senate | 82 |
| 2012 Lieutenant Governor | 74 |
| 2012 Governor | 72 |
| 2012 President | 78 |
| 2014 U.S. Senate | 76 |
| 2016 Attorney General | 77 |
| 2016 Lieutenant Governor | 79 |
| 2016 Governor | 72 |
| 2016 U.S. Senate | 79 |
| 2016 President | 76 |

98.     The following chart shows the number of Senate districts Republicans would be expected to win under the Committees' Senate plan when overlaying the results of each of the elections that the General Assembly considered.  These expected Republican seats approximate the number of seats Republicans actually won under the 2011 Senate plan (which were 32, 34, and 35 seats in 2012, 2014, and 2016 respectively).

| Election | Expected Republican Seats Under Committees' Senate Plan |
|---|---|
| 2010 U.S. Senate | 35 |
| 2012 Lieutenant Governor | 31 |
| 2012 Governor | 33 |
| 2012 President | 33 |
| 2014 U.S. Senate | 33 |
| 2016 Attorney General | 31 |
| 2016 Lieutenant Governor | 34 |
| 2016 Governor | 32 |
| 2016 U.S. Senate | 34 |
| 2016 President | 33 |

99.     Thus, for example, overlaying the results of the 2014 U.S. Senate election over the Committees' proposed districts, Republicans would win 76 of the 120 proposed House districts and 33 of the 50 proposed Senate districts.  Republicans would win these massive landslides in both chambers even though the 2014 U.S. Senate election was nearly a tie statewide—the Republican candidate won by only 1.5 percentage points.

100.    Of the roughly 4,300 public comments received by the General Assembly about the 2017 redistricting process, more than 99% reflected opposition to gerrymandering. For example, the author of the first written comment submitted to the Committees said: "I strongly encourage the North Carolina General Assembly to adopt new maps that are fair and open, that avoid racial or partisan gerrymandering, and that allow voters to pick their political representatives, not the other way around." Other comments made the same plea.

101.    But the Committees ignored the will of the people and forged ahead. On August 24, 2017, on a straight party-line vote, the Senate Redistricting Committee adopted the Senate map crafted by Hofeller without modification. The next day, the House Redistricting Committee adopted Hofeller's proposed House plan without modification, also on a straight party-line vote.

102.    On August 28, 2017, during a House floor debate on the proposed House map, an amendment modifying some districts in Wake County was approved by a largely party-line vote.

103.    On August 31, 2017, the General Assembly passed the House plan (designated HB 927) and the Senate plan (designated SB 691), with a few minor modifications from the versions passed by the Committees. No Democratic Senator voted in favor of either plan. The sole Democratic member of the House who voted for the plans was Representative William Brisson, who switched to become a Republican several months later.

104.    The 2017 Plans passed by the General Assembly altered at least 106 of the 170 total House and Senate districts from the 2011 Plans. *Covington*, 283 F. Supp. 3d at 418.

### G.    The *Covington* Court Appoints a Special Master To Redraw Several Districts in the 2017 Plans That Remained Racially Gerrymandered

105.    The *Covington* plaintiffs objected to the new plans, arguing that the plans did not cure the racial gerrymanders in two House districts (21 and 57) and two Senate districts (21 and 28). *Covington*, 283 F. Supp. 3d at 429. The court agreed. *Id.* at 429-42. The court further held

that the General Assembly's changes to five House districts (36, 37, 40, 41, and 105) violated the North Carolina Constitution's prohibition on mid-decade redistricting. *Id.* at 443-45.

106. The *Covington* plaintiffs also stated that the new plans were blatant partisan gerrymanders. But given the remedial stage of the case, the plaintiffs did not "raise any partisan gerrymandering objections," and the court "[did] not address whether the 2017 Plans are unconstitutional partisan gerrymanders." *Covington*, 283 F. Supp. 3d at 429 n.2.

107. The court appointed Dr. Nathaniel Persily as a Special Master to assist in redrawing the districts for which the court had sustained the plaintiffs' objections. To cure the racially gerrymandered districts, the Special Master needed to adjust not only those districts, but also certain districts adjoining them. In his recommended remedial plans submitted to the court on December 1, 2017, the Special Master made material adjustments to House Districts 22, 59, 61, and 62 in redrawing House Districts 21 and 57, and made material adjustments to Senate Districts 19, 24, and 27 in redrawing Senate Districts 21 and 28. *Covington*, ECF No. 220 at 30-55. The court adopted the Special Master's recommended changes to all of these districts.

108. The Special Master also restored the districts that the court had found were redrawn in violation of the ban on mid-decade redistricting to the 2011 versions of those districts. *Covington*, ECF No. 220 at 56-66. The court adopted these changes as well.

109. On June 28, 2018, the U.S. Supreme Court affirmed the lower court's adoption of the Special Master's remedial plans for House Districts 21 and 57 (and the relevant adjoining districts) and Senate Districts 21 and 28 (and the relevant adjoining districts). *North Carolina v. Covington*, 138 S. Ct. 2548, 2553-54 (2018). But the U.S. Supreme Court reversed the district court's adoption of the Special Master's plans for the districts allegedly enacted in violation of the mid-decade redistricting prohibition, finding that the district court had exceeded its remedial

27

authority in rejecting newly enacted districts on this basis. *Id.* at 2554-55. Plaintiffs do not challenge in this case any district materially redrawn by the Special Master that remains in effect.

110.    On February 17, 2018, the North Carolina State Conference of NAACP Branches and other plaintiffs filed a new action in Wake County Superior Court challenging four of the House Districts (36, 37, 40, and 41) allegedly redrawn in violation of the North Carolina Constitution's prohibition on mid-decade redistricting. *N.C. State. Conf. of NAACP Branches v. Lewis*, 18 CVS 2322 (N.C. Super.). On November 2, 2018, the Superior Court granted summary judgment to the plaintiffs and ordered the General Assembly to "remedy the identified defects and enact a new Wake County House District map for use in the 2020 general election."

**H.    The 2017 Plans Pack and Crack Plaintiffs and Other Democratic Voters To Dilute Their Votes and Maximize the Political Advantage of Republicans**

111.    To maximize the number of Republican seats in the General Assembly, the 2017 Plans meticulously "pack" and "crack" Democratic voters. Packing and cracking are the two primary means by which mapmakers carry out a partisan gerrymander. "Packing" involves concentrating one party's backers in a few districts that they will win by overwhelming margins to minimize the party's votes elsewhere. "Cracking" involves dividing a party's supporters among multiple districts so that they fall comfortably short of a majority in each district.

112.    The sections below set forth some of the examples of packing and cracking of Democratic voters in each of the 2017 Plans.

**1.    The 2017 House Plan Packs and Cracks Democratic Voters**

House Districts 2 and 32

113.    House Districts 2 and 32 are within a county cluster of Person, Granville, Vance, and Warren Counties.

28



114.    As shown in the image above,[1] in drawing the two districts within this cluster, the
General Assembly packed the Democratic voters in and around Oxford with the Democratic
voters in Henderson and in municipalities east of Henderson such as Warrenton and Norlina.
This packing made House District 32 an overwhelmingly Democratic district in order to ensure
that House District 2 would be a Republican-leaning district.

House Districts 4, 14, and 15

115.    House Districts 4, 14, and 15 are within a county cluster containing Duplin and
Onslow Counties.

---

[1] All precinct-level partisanship data in the images that follow are based on the precinct-level
election results from the 2014 U.S. Senate election in North Carolina.



116.    The General Assembly split Jacksonville across House District 14 and 15,

cracking its Democratic voters across the two districts and placing its most Democratic precincts

in House District 15 with otherwise heavily Republican areas.  The General Assembly also made

sure to keep Jacksonville's Democratic voters in separate districts from the Democratic-leaning

cities of Warsaw and Kenansville.  This cracking allowed all three districts to lean Republican.

House Districts 7 and 25

117.    House Districts 7 and 25 are within a county cluster of Franklin and Nash

Counties.



118.    The General Assembly constructed this cluster to make sure that one of the two

districts, House District 7, would favor Republicans, rather than risk that both districts could

elect Democrats.  To accomplish this, the General Assembly caused House District 7 to wrap

around the southwestern edge of House District 25, allowing House District 7 to pick up deep

red communities in southern Nash County.

House Districts 8, 9 and 12

119.    House Districts 8, 9, and 12 are within a county cluster consisting of Pitt and

Lenoir Counties.

31



120.    The General Assembly split Greenville nearly in half across separate districts in

this cluster, even though Greenville is the county seat of Pitt County and has a population that is

just slightly more than the target population for a single district.  But the General Assembly

carefully placed Greenville's most Democratic areas in House District 8, packing these

Democratic voters with others in the surrounding areas to create an overwhelmingly Democratic

district.  The General Assembly placed the more moderate and Republican-leaning areas of

Greenville in House District 9 with other Republican areas, ensuring that this district would elect

a Republican.  The General Assembly similarly constructed House District 12 to favor

Republicans by avoiding the Democratic precincts in and around Greenville.

32

<u>House Districts 10, 26, 28, 51, and 53</u>

121.    House Districts 10, 26, 28, 51, and 53 are part of a seven-county cluster spanning

Greene, Wayne, Sampson, Bladen, Johnston, Harnett, and Lee Counties.  This cluster also

includes House Districts 21 and 22, which were redrawn by the special master in *Covington* and

are not challenged in this case.



122.    The General Assembly cracked the Democratic pockets of Johnston, Harnett, and

Lee Counties into four separate districts (House Districts 26, 28, 53, and 51), so that none of

these four districts would lean toward Democrats.

<u>House Districts 11, 33, 34, 35, 36, 37, 38, 39, 40, 41, and 49</u>

123.    House Districts 11, 33, 34, 35, 36, 37, 38, 39, 40, 41, and 49 are all located within

Wake County.

33



124.    The General Assembly packed Democrats into House Districts 11, 33, 34, 38, 39, and 49 in order to maximize the number of districts within Wake County that would be competitive for Republicans.  Based on the 2014 U.S. Senate results, for example, House Districts 35, 36, 37, and 40 all favor Republicans.  Under a non-partisan map, these districts would be more Democratic-leaning.

<u>House Districts 16, 46, and 47</u>

125.    House Districts 16, 46, and 47 are within a county cluster of Pender, Columbus, and Robeson Counties.

34



126. The General Assembly split Lumberton across two separate districts in this cluster. It placed the Democratic areas of Lumberton in House District 47 with other heavily Democratic areas, while placing the more Republican parts of Lumberton into House District 46. The General Assembly then cracked the Democratic voters of Whiteville (in House District 16) from those in and around Chadbourn (just to the west of Whiteville in House District 46). Through these choices, the General Assembly created two districts that moderately favor Republicans using the statewide election results that the General Assembly considered (House District 16 and 46) and one overwhelmingly Democratic district (House District 47).

House Districts 17, 18, 19, and 20

127. House Districts 17, 18, 19, and 20 are within a county cluster of New Hanover and Brunswick Counties.

35



128.     The General Assembly manipulated this county cluster to create one packed

Democratic district (House District 18) and three Republican-leaning districts (House Districts

17, 19, 20).  The General Assembly split Wilmington across three different districts to

accomplish this feat.  It placed Wilmington's most Democratic areas in House District 18, where

these Democratic voters were joined with the Democratic voters in and around Leland, while

Wilmington's more Republican-leaning and swing precincts were placed in House Districts 19

and 20.  In 2018, Republican candidates won House Districts 17, 19, and 20 with 64%, 51%, and

53% of the two-party vote respectively.

House Districts 42, 43, 44, and 45

129.     House Districts 42, 43, 44, and 45 are all within Cumberland County.



130.    The General Assembly placed almost all of the most Democratic areas of Cumberland County into three of the four districts in this cluster, House District 42, 43, and 44. The General Assembly packed these Democratic voters to create a Republican-leaning district in Cumberland County, House District 45.  Under a non-partisan map, this district would be more Democratic-leaning.

House Districts 55, 68, and 69

131.    House Districts 55, 68, and 69 are within a county cluster of Anson and Union Counties.

37



132.    The General Assembly cracked the Democratic voters throughout this cluster to ensure that all three districts would favor Republicans. As part of this cracking, the General Assembly split Monroe across the three districts, and split Monroe's most Democratic areas between House Districts 68 and 69.

### House Districts 58, 59, and 60

133.    House Districts 58, 59 and 60 are three of the six House districts within Guilford County. The other three districts—House Districts 57, 61, and 62—were redrawn by the special master in the federal Covington lawsuit and are not challenged in this case.[2]

---

[2] The special master made minor changes to House District 59, but Plaintiffs challenge this district in this case.



134.    The General Assembly packed House Districts 58 and 60 with heavily

Democratic areas, enabling House District 59 to favor Republicans.

<u>House Districts 63 and 64</u>

135.    House Districts 63 and 64 are both located within Alamance County.



39

136.    The General Assembly caused both House Districts 63 and 64 to favor

Republicans by cracking Burlington and its Democratic voters in half across the two districts.

<u>House Districts 66, 67, 76, 77, 82, and 83</u>

137.    House Districts 66, 67, 76, 77, 82, and 83 are part of a county cluster that covers

Richmond, Montgomery, Stanly, Cabarrus, Rowan, and Davie Counties.



138.    The General Assembly meticulously distributed the Democratic voters in these

counties across all five districts in the cluster, such that Republicans have majorities in all five

districts based on the statewide elections the General Assembly considered.  For instance, the

General Assembly put Albemarle into House District 67, wasting the votes of Albemarle's

40

Democratic voters in House District 67 to make House District 66 more competitive for Republicans. The General Assembly wasted Salisbury's Democratic votes in House District 76 by grouping the city with deep red areas. The General Assembly also cracked Concord in half between House Districts 82 and 83, and it splintered Kannapolis and its Democratic voters into three different districts (House Districts 77, 82, and 83).

House Districts 71, 72, 73, 74, and 75

139.    House Districts 71, 72, 73, 74, and 75 are within a county cluster of Forsyth and Yadkin Counties.



140.    The General Assembly packed Democrats into House Districts 71 and 72 so that the other three districts—House Districts 73, 74, and 75—would all favor Republicans. The General Assembly split the City of Winston-Salem across all five districts in the cluster as part of this scheme, even though Winston-Salem's population could fit within just three districts.

41

House Districts 88, 92, 98, 99, 100, 101, 102, 103, 104, 105, 106, and 107

141.    House Districts 88, 92, 98, 99, 100, 101, 102, 103, 104, 105, 106, and 107 are all

within Mecklenburg County.



142.    Mecklenburg County is the pinnacle of packing.  The General Assembly packed

as many Democratic voters as possible into seven Mecklenburg County districts (House Districts

88, 92, 99, 100, 101, 106, and 107), in order to create four districts in the county that are

competitive for Republicans (House Districts 98, 103, 104, and 105).  Under a non-partisan map,

these districts would all be more Democratic-leaning.

House Districts 108, 109, 110, and 111

143.    House Districts 108, 109, 110, and 111 make up a county cluster of Gaston and

Cleveland Counties.

42



144.    The General Assembly split the Democratic stronghold of Gastonia across three different districts (House Districts 108, 109, and 110), and cut the Democratic city of Shelby in half (in House Districts 110 and 111). The General Assembly similarly distributed the Democratic voters north of Shelby across House District 110 and 111. The result of all of this cracking is that all four districts in the cluster have comfortable Republican majorities: the Republican vote share in all four districts is around 60% using the 2014 U.S. Senate results.

<u>House Districts 113 and 117</u>

145.    House Districts 113 and 117 are within a county cluster of Transylvania, Henderson, and Polk Counties.

43



146.     The General Assembly cracked the Democratic voters in and around Hendersonville from the Democratic voters in and around Brevard, ensuring that both districts in this cluster would elect Republicans.

### 2.     The 2017 Senate Plan Packs and Cracks Democratic Voters

<u>Senate Districts 8 and 9</u>

147.     Senate Districts 8 and 9 are within a county cluster of Bladen, Pender, Brunswick, and New Hanover Counties.



Piece of Wilmington transferred to Senate District 8

148.    Although almost all of New Hanover County falls in Senate District 9, the General Assembly appended a small, heavily Democratic piece of New Hanover County to Senate District 8.  Specifically, the General Assembly split off a small portion of Wilmington— the "Wilmington Notch"—transferring thousands of voters in Wilmington's most heavily Democratic area from Senate District 9 to 8.  The loss of these Democratic voters causes Senate District 9 to lean Republican rather than Democratic using the 2014 U.S. Senate election results.

45



Senate Districts 10, 11, and 12

149.    Senate Districts 10, 11, and 12 span a six-county cluster of Sampson, Duplin, Johnston, Nash, Lee, and Harnett Counties.



150.    The General Assembly cracked the Democratic areas of the six counties in this cluster across the three districts that the cluster contains.  For instance, the General Assembly dispersed the Democratic voters in and around Rocky Mount, Clinton, and Sanford across Senate Districts 10, 11, and 12, respectively.  As a result, all three districts favor Republicans.

Senate Districts 14, 15, 16, 17, and 18

151.    Senate Districts 14, 15, 16, 17, and 18 are within a county cluster of Wake and Franklin Counties.



152.    The General Assembly packed as many Wake County Democrats as possible into three districts within this cluster (Senate District 14, 15, and 16).  This packing was done to make Senate Districts 17 and 18 as Republican-leaning as possible.

153.    To carry out this scheme, the General Assembly split Raleigh across four districts (Senate District 14, 15, 16, and 18), even though Raleigh's population could fit almost entirely within two Senate districts.  The General Assembly dissected Raleigh to put its only Republican-

47

leaning areas, in north and northwest Raleigh, in Senate District 18. Specifically, Senate District 18 grabs the Republican-leaning communities that surround three different Raleigh country clubs—the North Ridge Country Club, the Wildwood Golf Club, and the Carolina Country Club.





154. To place these Republican areas in Senate District 18 while avoiding north Raleigh's Democratic areas, the General Assembly created a tentacle for Senate District 15 that grabs north Raleigh's Democratic voters. The General Assembly created this tentacle in Senate District 15 via a narrow passageway containing no more than a Costco.



Senate District 15
Costco Passageway



155.     Senate District 18, the "Country Club District," performed as the General

Assembly hoped in the 2018 election: Republicans held onto it by a few percentage points.

Republicans managed to win a Wake County seat in the Senate despite the fact that Democrats

won every county-wide election in Wake County in 2018 by overwhelming majorities.

Senate Districts 31 and 32

156.     Senate Districts 31 and 32 are within a county cluster of Davie and Forsythe

Counties.



157.    The General Assembly packed all of the most Democratic areas in and around

Winston-Salem into Senate District 32, so that Senate District 31 would favor Republicans.

<u>Senate Districts 37, 38, 39, 40, and 41</u>

158.    Senate Districts 37, 38, 39, 40, and 41 are all located within Mecklenburg County.



159.    The General Assembly packed as many Democrats as possible into Senate

Districts 37, 38, and 40, so as to create two Mecklenburg County districts—Senate Districts 39

and 41—that lean Republican based on the statewide elections the General Assembly considered.

160.    The General Assembly had to go to particularly great lengths to make Senate

District 41 competitive for Republicans.  The district begins north of Charlotte, then slices

through a thin stretch of land west of Charlotte, before curling back around to pick up

Republican-leaning areas south of Charlotte.  To stitch together these disparate areas, Senate

District 41 at one point connects through a nature preserve and at another point the district is

held together only by the Arrowood train station.





54



Senate District 41
Latta Plantation Nature Preserve

161.     The General Assembly manipulated Senate District 39 to be favorable to Republicans.  Despite the enormous Democratic wave in Mecklenburg County in 2018—with Democrats winning every county-wide election by huge margins and sweeping the Mecklenburg County Board of Commissioners races—Republicans managed to hold onto Senate District 39.

Senate Districts 48 and 49

162.     Senate Districts 48 and 49 are within a county cluster of Transylvania, Henderson, and Buncombe Counties.



163.    The General Assembly packed Democratic voters in and around Asheville into Senate District 49. This packing ensured that Senate District 48 would elect a Republican.

### 3.    The 2017 Plans Achieved Their Goal in the 2018 Election

164.    The 2017 Plans' cracking and packing of Democratic voters worked with remarkable success in the 2018 elections. While the Democratic wave did flip some seats, it could not overcome plans that were designed to guarantee Republicans majorities.

165.    In the 2018 House elections, Democratic candidates won 51.1% of the two-party statewide vote, but won only 54 of 120 seats (45%).[3]

166.    In the 2018 Senate elections, Democratic candidates won 50.4% of the two-party statewide vote, but won only 21 of 50 seats (42%).

---

[3] These statistics are based on the results posted on the North Carolina Board of Election's website as of November 12, 2018.

56

**I.     The Partisan Gerrymandering of the 2017 Plans Causes Plaintiffs and Other Democratic Voters To Be Entirely Shut Out of the Political Process**

167.     The effects of the gerrymander go beyond election results.  In today's state legislatures—and particularly in North Carolina—Republican representatives are simply not responsive to the views and interests of Democratic voters.  Regardless of whether gerrymandering has *caused* this increased partisanship, such extreme partisanship magnifies the *effects* of partisan gerrymandering.  When Democratic voters lose the ability to elect representatives of their party as a result of partisan gerrymandering, those voters lose not only electoral power, but also the ability to influence legislative outcomes—because Republican representatives pay no heed to these voters' views and interests once in office.

168.     There is substantial evidence documenting the increasing polarization of state legislatures, including ideological scores assigned to every state legislator in the country by political scientists Drs. Nolan McCarty and Boris Shor.  The chart below depicts the ideological distribution of state legislators nationwide in 1996 and in 2016.  Red reflects Republican legislators and blue reflects Democratic legislators, with negative scores on the left of the x-axis indicating a more liberal ideology and positive scores on the right on the x-axis indicating a more conservative ideology.[4]  The chart shows that today there are barely any state legislators across the country who overlap ideologically—*i.e.*, barely any Democratic and Republican legislators who overlap in ideological score—and far less than in 1996.  Instead, legislators from the parties have grown farther apart, and Republicans legislators in particular have become much more homogenous in ideology, coalescing around an ideological score of +1.

---

[4] *See* State Polarization, 1996-2016, https://americanlegislatures.com/2017/07/20/state-polarization-1996-2016/.



169. The North Carolina General Assembly is no exception to this trend. Political scientists McCarty and Shor have developed ideological scores for every state legislator in the country based on each legislator's roll call voting behavior. These ideological scores range from negative -3 to +3, with negative scores indicating more liberal ideological and positive scores a more conservative one. The below chart shows the gap between the average ideological scores of Republicans and Democrats in the North Carolina General Assembly. It shows that gap has grown dramatically—increasing by more than 50%—over the last 20 years.[5]

---

[5] *See* Boris Shor & Nolan McCarty, *Measuring American Legislatures*, https://americanlegislatures.com/category/polarization/.

58



170.     This increasing ideological gap reflects the fact that Republican legislators in the

North Carolina General Assembly have grown more and more conservative.  The below chart

shows the average ideological scores of Republicans in the General Assembly over the last 20

years.  It demonstrates how Republicans in the General Assembly vote in an increasingly more

conservative fashion, and thus are less likely to reflect the views of Democratic voters.



171.    The extreme polarization of Republicans in the General Assembly is further evidenced by their near-uniform bloc voting behavior.

172.    In the 2017-2018 Session, Republicans in the state Senate almost always voted with a majority of other Republicans and virtually never crossed over to vote with the minority. Every Republican Senator voted with a majority of Republicans over 95% of the time, and the median Republican Senator voted with the Republican majority a stunning 99.2% of the time.[6]

173.    Likewise in the House, in the 2017-2018 Session, nearly every Republican in the state House of Representatives voted with the Republican majority over 90% of the time, and the median Republican in the House voted with the Republican majority 96.70% of the time.[7]

174.    These statistics all illustrate that Republicans in the General Assembly do not represent the views and interests of their Democratic constituents and almost never engage in cross-over voting.  Thus, when gerrymandering denies Democratic voters the ability to elect representatives of their party, they also lose any chance of influencing legislative outcomes.

**COUNT I**
**Violation of the North Carolina Constitution's**
**Equal Protection Clause, Art. I, § 19**

175.    Plaintiffs hereby incorporate all other paragraphs as if fully set forth herein.

176.    Article I, Section 19 of the North Carolina Constitution provides in relevant part that "[n]o person shall be denied the equal protection of the laws."

---

[6] *See Senate Member Vote Statistics*, 2017-2018 Session, https://www.ncleg.net/gascripts/voteHistory/MemberVoteStatistics.pl?sSession=2017&sChamber=S.

[7] *See House Member Vote Statistics*, 2017-2018 Session, https://www.ncleg.net/gascripts/voteHistory/MemberVoteStatistics.pl?sSession=2017&sChamber=H.

177.    North Carolina's Equal Protection Clause affords broader protections to its

citizens in the voting rights context than the U.S. Constitution's equal protection provisions. *See*

*Stephenson v. Bartlett*, 562 S.E.2d 377, 393-95 & n.6 (N.C. 2002); *Blankenship v. Bartlett*, 681

S.E.2d 759, 763 (N.C. 2009).

178.    Irrespective of its federal counterpart, North Carolina's Equal Protection Clause

protects the right to "substantially equal voting power." *Stephenson*, 562 S.E.2d at 394. "It is

well settled in this State that the right to vote on equal terms is a fundamental right." *Id.* at 393

(internal quotation marks omitted).

179.    The 2017 Plans intentionally and impermissibly classify voters into districts on

the basis of their political affiliations and viewpoints. The intent and effect of these

classifications is to dilute the voting power of Democratic voters, to make it more difficult for

Democratic candidates to be elected across the state, and to render it virtually impossible for the

Democratic Party to achieve a majority of either chamber of the General Assembly. Defendants

can advance no compelling or even legitimate state interest to justify this discrimination.

180.    The 2017 Plans' intentional classification of, and discrimination against,

Democratic voters is plain. The Republican leaders of the House and Senate Redistricting

Committees explicitly used "political considerations and election results data" as a criterion in

creating the 2017 Plans, drew the maps in secret with a Republican mapmaker, and admitted that

they "did make partisan considerations when drawing particular districts." *Covington*, ECF No.

184-17 at 26. The partisan composition of the districts based on recent results demonstrates that

the map was designed to ensure overwhelming Republican majorities in both chambers. The

General Assembly's intent is also laid bare by the packing and cracking of individual Democratic

communities, as well as a host of statistical analyses and measures that will confirm the 2017 Plans necessarily reflect an intentional effort to disadvantage Democratic voters.

181.    These efforts have produced discriminatory effects for Plaintiffs other Democratic voters, including members of Common Cause and the NCDP. On a statewide basis, Democrats receive far fewer state House and Senate seats than they would absent the gerrymanders. The grossly disproportionate number of seats that Republicans have won and will continue to win in the General Assembly relative to their share of the statewide vote cannot be explained or justified by North Carolina's geography or any legitimate redistricting criteria. Moreover, because the gerrymanders guarantee that Republicans will hold a majority in the House and Senate, Plaintiffs and other Democratic voters are unable to elect a legislature that will pass legislation that reflects Democratic voters' positions or policies. The 2017 Plans burden the representational rights of Democratic voters individually and as a group and discriminate against Democratic candidates and organizations individually and as a group.

182.    Individual voters also experience discriminatory effects at the district level. For those Plaintiffs and other Democratic voters who live in cracked communities and districts, their voting power is diluted, and it is more difficult than it would be but-for the gerrymander for these voters to elect candidates of their choice. And given the extreme partisanship of Republican representatives in the General Assembly, these voters have no meaningful opportunity to influence legislative outcomes when Republican candidates win their districts, because the Republican representatives simply do not weigh their Democratic constituents' interests and policy preferences in deciding how to act. For those Plaintiffs and other Democratic voters, including members of Common Cause and the NCDP, who live in packed Democratic districts, the weight of their votes has been substantially diluted. Their votes have no marginal impact on

62

election outcomes, and representatives will be less responsive to their individual interests or policy preferences. Accordingly, for all Plaintiffs and others Democratic voters whose votes are diluted under the 2017 Plans, the 2017 Plans impermissibly deny these voters their fundamental right to "vote on equal terms" with "equal voting power." *Stephenson*, 562 S.E.2d at 393-94.

## COUNT II
## Violation of the North Constitution's
## Free Elections Clause, Art. I, § 5

183.    Plaintiffs hereby incorporate all other paragraphs as if fully set forth herein.

184.    Article I, Section 10 of the North Carolina Constitution, which has no counterpart in the U.S. Constitution, provides that "All elections shall be free" (the "Free Elections Clause").

185.    North Carolina's Free Elections Clause traces its roots to the 1689 English Bill of Rights, which declared that "Elections of members of Parliament ought to be free."

186.    Numerous other states have constitutional provisions that trace to the same provision of the 1689 English Bill of Rights, including Pennsylvania, which has a constitutional provision requiring that all "elections shall be free and equal." *See League of Women Voters v. Commonwealth*, 178 A.3d 737, 793 (Pa. 2018). On February 7, 2018, the Pennsylvania Supreme Court held that the partisan gerrymander of Pennsylvania's congressional districts violated this clause. The state high court held that Pennsylvania's Free and Equal Elections Clause requires that all voters "have an equal opportunity to translate their votes into representation," and that this requirement is violated where traditional districting criteria such as preserving political subdivisions and compactness are "subordinated, in whole or in part, to extraneous considerations such as gerrymandering for unfair partisan political advantage." *Id.* at 814, 817.

187.    North Carolina's Free Elections Clause protects the rights of voters to at least the same extent as Pennsylvania's analogous provision.

188.    The 2017 Plans violate the Free Elections Clause by denying Plaintiffs and other

Democratic voters, including members of Common Cause and the NCDP, an equal opportunity

to translate their votes into representation, and by providing an unfair partisan advantage to the

Republican Party and its candidates as a whole over the Democratic Party and its candidates as a

whole. The General Assembly's violation of the Free Election Clause is evidenced by, *inter alia*,

its subordination of traditional districting criteria to illicit partisan motivations.

189.    Elections under the 2017 Plans are anything but "free." They are rigged to

predetermine electoral outcomes and guarantee one party control of the legislature, in violation

of Article I, § 5 of the North Carolina Constitution.

## COUNT III
### Violation of the North Constitution's
### Freedom of Speech and Freedom of Assembly Clauses, Art. I, §§ 12 & 14

190.    Plaintiffs hereby incorporate all other paragraphs as if fully set forth herein.

191.    Article I, § 12 of the North Carolina Constitution provides in relevant part: "The

people have a right to assemble together to consult for their common good, to instruct their

representatives, and to apply to the General Assembly for redress of grievances."

192.    Article I, § 14 of the North Carolina Constitution provides in relevant part:

"Freedom of speech and of the press are two of the great bulwarks of liberty and therefore shall

never be restrained."

193.    North Carolina courts have recognized that Article I, Sections 12 and 14 may

afford broader protections than the federal First Amendment. *Evans v. Cowan*, 468 S.E.2d 575,

578, *aff'd*, 477 S.E.2d 926 (1996).

194.    Article I, Sections 12 and 14 protect the right of voters to participate in the

political process, to express political views, to affiliate with or support a political party, and to

64

cast a vote. Voting for a candidate of one's choice is core political speech and/or expressive conduct protected by the North Carolina Constitution. Contributing money to, or spending money in support of, a preferred candidate is core political speech and/or expressive conduct as well. And leading, promoting, or affiliating with a political party to pursue certain policy objectives is core political association protected by the North Carolina Constitution.

195. Irrespective of the U.S. Constitution, the 2017 Plans violate Article 1, Sections 12 and 14 of the North Carolina Constitution by intentionally burdening the protected speech and/or expressive conduct of Plaintiffs and other Democratic voters, including members of Common Cause and the NCDP, based on their identity, their viewpoints, and the content of their speech. The 2017 Plans burden the speech and/or expressive conduct of Plaintiffs and other Democratic voters by making their speech and/or expressive conduct—*i.e.*, their votes—less effective. For those Plaintiffs and other Democratic voters who live in cracked districts, the 2017 Plans artificially make it more difficult (if not impossible) for their speech and/or expressive conduct to succeed. And because of the polarization of Republicans in the General Assembly, these voters will be unable to influence the legislative process, resulting in the complete suppression of their political views. For those Plaintiffs and other Democratic voters who live in packed districts, the 2017 Plans artificially dilute the weight and impact of their speech and/or expressive conduct. The General Assembly intentionally created these burdens because of disfavor for Plaintiffs and other Democratic voters, their political views, and their party affiliations.

196. Irrespective of the U.S. Constitution, the 2017 Plans also violate Article 1, Sections 12 and 14 of the North Carolina Constitution by burdening the protected speech and/or expressive conduct of the NCDP. Because of the gerrymanders, the money the NCDP contributes to or spends on Democratic candidates—and the messages conveyed through the

65

contributions and expenditures—are less effective and less able to succeed. The General Assembly intentionally rendered the NCDP's contributions and expenditures less effective because of disagreement with the political viewpoints expressed through those contributions and expenditures and disfavor for the candidates that the NCDP supports.

197.     Irrespective of the U.S. Constitution, the 2017 Plans also violate Article 1, Sections 12 and 14 of the North Carolina Constitution by burdening the associational rights of Plaintiffs. The 2017 Plans burden the ability of Plaintiffs and other Democratic voters, including members of Common Cause and the NCDP, as well as the NCDP as an organization, to affiliate and join together in a political party, to carry out the party's activities, and to implement the party's policy preferences through legislative action. The 2017 Plans burden these associational rights by, *inter alia*, making it more difficult for Plaintiffs and other Democratic voters, as well as the NCDP, to register voters, attract volunteers, raise money in gerrymandered districts, campaign, and turn out the vote, by reducing the total representation of the Democratic Party in the General Assembly, and by making it virtually impossible for Democrats to constitute a majority of either chamber of the General Assembly.

198.     Irrespective of the U.S. Constitution, the 2017 Plans also violate Article 1, Sections 12 and 14 of the North Carolina Constitution by burdening the protected speech, expressive conduct, and associational rights of Common Cause. The 2017 Plans burden Common Cause's ability to convince voters in gerrymandered districts to vote in state legislative elections and to communicate with legislators. And because the 2017 Plans allow the General Assembly to disregard the will of the public, the 2017 Plans' burden Common Cause's ability to communicate effectively with legislators, to influence them to enact that promote voting, participatory democracy, public funding of elections, and other measures that encourage

accountable government. The 2017 Plans similarly burden the associational rights of Common Cause by frustrating its mission to promote participation in democracy and to ensure open, honest, and accountable government.

199. Irrespective of the U.S. Constitution, the 2017 Plans also violate the North Carolina Constitution's prohibition against retaliation against individuals who exercise their rights under Article I, Sections 12 and 14. *See Feltman v. City of Wilson*, 767 S.E.2d 615, 620 (N.C. App. 2014). The General Assembly expressly considered the prior protected conduct of Plaintiffs and other Democratic voters, including members of Common Cause and NCDP, by considering their voting histories and political party affiliations when placing these voters into districts. The General Assembly did this to disadvantage individual Plaintiffs and other Democratic voters because of their prior protected conduct, and this retaliation has diluted these individuals' votes in a way that would not have occurred but-for the retaliation. *Id.* Indeed, many Plaintiffs and other Democratic voters who currently live in Republican state House or Senate districts would live in districts that would be more likely to have, or would almost definitely have, a Democratic representative but for the gerrymander. Moreover, but-for the gerrymander, Plaintiffs and other Democratic voters would have an opportunity to elect a majority of the state House and Senate, which would afford an opportunity to influence legislation. The retaliation has also impermissibly burdened the associational rights of Plaintiffs and the NCDP by making it more difficult for Democrats to register voters, recruit candidates, attract volunteers, raise money, campaign, and turn out the vote, by reducing the total representation of the Democratic Party in the General Assembly, and by making it virtually impossible for Democrats to constitute a majority of either chamber of the General Assembly.

200. There is no legitimate state interest in discriminating and retaliating against Plaintiffs because of their political viewpoints, voting histories, and affiliations. Nor can the 2017 Plans be explained or justified by North Carolina's geography or any legitimate redistricting criteria.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendant, and:

a. Declare that each of the 2017 Plans is unconstitutional and invalid because each violates the rights of Plaintiffs and all Democratic voters in North Carolina under the North Carolina Constitution's Equal Protection Clause, Art. I, § 19; Free Elections Clause, Art. I, § 5; and Freedom of Speech and Freedom of Assembly Clauses, Art. I, §§ 12 & 14;

b. Enjoin Defendants, their agents, officers, and employees from administering, preparing for, or moving forward with the 2020 primary and general elections for the North Carolina General Assembly using the 2017 Plans;

c. Establish new state House and state Senate districting plans that comply with the North Carolina Constitution, if the North Carolina General Assembly fails to enact new state House and state Senate districting plans comporting with the North Carolina Constitution in a timely manner;

d. Grant Plaintiffs such other and further relief as the Court deems just and appropriate.

68

Dated: November 13, 2018                    Respectfully submitted,

POYNER SPRUILL LLP                          ARNOLD & PORTER
                                            KAYE SCHOLER LLP

By: _____              By: R. Stanton Jones /CPM with permission
    Edwin M. Speas, Jr.                         R. Stanton Jones*
      N.C. State Bar No. 4112                   David P. Gersch*
    Caroline P. Mackie                          Elisabeth S. Theodore*
      N.C. State Bar No. 41512                  Daniel F. Jacobson*
    P.O. Box 1801                               601 Massachusetts Ave. NW
    Raleigh, NC 27602-1801                      Washington, DC 20001-3743
    (919) 783-6400                              (202) 942-5000
    espeas@poynerspruill.com                    stanton.jones@arnoldporter.com

*Counsel for Common Cause, the*
*North Carolina Democratic Party,*          PERKINS COIE LLP
*and the Individual Plaintiffs*

                                            By: Marc E. Elias /CPM with permission
                                                Marc E. Elias*
                                                Aria C. Branch*
                                                700 13th Street NW
                                                Washington, DC 20005-3960
                                                (202) 654-6200
                                                melias@perkinscoie.com

                                                Abha Khanna*
                                                1201 Third Avenue
                                                Suite 4900
                                                Seattle, WA 98101-3099
                                                (206) 359-8000
                                                akhanna@perkinscoie.com

                                            *Counsel for Common Cause and the*
                                            *Individual Plaintiffs*

                                            *  Pro hac vice motions forthcoming*

# __Appendix__

Appendix A: North Carolina House of Representatives Districts



2018 House Election Districts

Legend
☐ Groupings
☐ Districts
☐ Counties

*As ordered by the U.S. Supreme Court on February 6, 2018 in North Carolina v. Covington.

0    25    50         100         150         200
                                              Miles

Printed by the NC General Assembly, February 14, 2018

Appendix B: North Carolina Senate Districts



2018 Senate Election Districts

Legend
Districts
Counties

As ordered by the U.S. Supreme Court on February 6, 2018 in North Carolina v. Covington.

0    25    50           100              150              200
                                                          Miles

Senate 19-CkSept3.                    Printed by the NC General Assembly, February 14, 2018.

STATE OF NORTH CAROLINA    FILED    IN THE GENERAL COURT OF JUSTICE

                        2018 DEC -7 PM 3: 13      SUPERIOR COURT DIVISION

COUNTY OF WAKE                            18-CVS-14001

                         WAKE COUNTY, C.S.C.

COMMON CAUSE, *et al.*,

       Plaintiffs,

v.

REPRESENTATIVE DAVID R. LEWIS,           **NOTICE OF APPEARANCE**
in his official capacity as Senior Chairman
of the Senate Select Committee on
Redistricting, *et al.*,

       Defendants.

---

      Michael D. McKnight of the law firm Ogletree, Deakins, Nash, Smoak & Stewart,

P.C. enters his Notice of Appearance as counsel on behalf of all Defendants. Mr. McKnight

is a member in good standing with the bar of the state of North Carolina.

      Respectfully submitted this 7th day of December, 2018.

                        OGLETREE, DEAKINS, NASH
                        SMOAK & STEWART, P.C.

                        /s/ JAT

                        Michael D. McKnight
                        N.C. State Bar No. 36932
                        4208 Six Forks Road, Suite 1100
                        Raleigh, North Carolina 27609
                        Telephone: (919) 787-9700
                        Facsimile: (919) 783-9412
                        *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

It is hereby certified that the foregoing **Notice of Appearance** by Michael McKnight was served via United States Mail, first-class, postage prepaid, upon the following:

Edwin M. Speas, Jr.
N.C. State Bar No. 4112
Caroline P. Mackie
N.C. State Bar No. 41512
POYNER SPRUILL LLP
P.O. Box 1801
Raleigh, NC 27602-1801
(919) 783-6400
espeas@poynerspruill.com
*Counsel for Common Cause,*
*the North Carolina Democratic*
*Party, and the Individual Plaintiffs*

R. Stanton Jones
David P. Gersch
Elisabeth S. Theodore
Daniel F. Jacobson
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Ave. NW
Washington, DC 2001-2743
(202) 942-5000
Stanton.jones@arnoldporter.com

Marc E. Elias
Aria C. Branch
PERKINS COIE LLP
700 13th Street NW
Washington, DC 20005-3960
(202) 654-6200
melias@perkinscoie.com

Abha Khanna
12012 Third Avenue
Suite 4900
Seattle, WA 98101-3099
(206) 359-9000
akhanna@perkinscoie.com

This, the 7th day of December, 2018

OGLETREE, DEAKINS, NASH
SMOAK & STEWART, P.C.

Michael D. McKnight
N.C. State Bar No. 36932
4208 Six Forks Road, Suite 1100
Raleigh, North Carolina 27609
Telephone: (919) 787-9700
Facsimile: (919) 783-9412
*Attorneys for Defendants*

36608989.1

# STATE OF NORTH CAROLINA

_____ Wake _____ County

File No. **18CV014001**

In The General Court Of Justice
☐ District ☑ Superior Court Division

| | |
|---|---|
| *Name Of Plaintiff*<br>Common Cause et al. | **CIVIL SUMMONS**<br>☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)** |
| *Address*<br>907 Glenwood Avenue | |
| *City, State, Zip*<br>Raleigh, NC 27605 | G.S. 1A-1, Rules 3 and 4 |
| **VERSUS** | |
| *Name Of Defendant(s)*<br>Representative David R. Lewis, in his official capacity as Senior Chairman of the House Select Committee on Redistricting, et al. | *Date Original Summons Issued*<br>11/13/2018<br><br>*Date(s) Subsequent Summons(es) Issued* |

## To Each Of The Defendant(s) Named Below:

| *Name And Address Of Defendant 1* | | *Name And Address Of Defendant 2* |
|---|---|---|
| Sen. Ralph E. Hise, in his official capacity<br><br>N.C. Senate<br>300 N Salisbury Street, Room 312<br>Raleigh, NC 27603 | Sen. Ralph E. Hise, in his official capacity<br>c/o Alexander Peters<br>Senior Deputy Attorney General<br>North Carolina Department of Justice<br>PO Box 629<br>Raleigh, NC 27602 | |

⚠️ **IMPORTANT! You have been sued!** These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!

**¡IMPORTANTE!** ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales. ¡NO TIRE estos papeles!
Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1.  Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2.  File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name And Address Of Plaintiff's Attorney (If none, Address Of Plaintiff)*<br>Edwin Speas<br>Poyner Spruill LLP<br>P.O. Box 1801<br>Raleigh, NC 27602-1801 | *Date Issued* 11-13-18 | *Time* 10 ☑ AM ☐ PM |
| | *Signature* Me | |
| | ☑ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

| ☐ **ENDORSEMENT (ASSESS FEE)**<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Date Of Endorsement* | *Time* ☐ AM ☐ PM |
| | *Signature* | |
| | ☐ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** Many counties have *MANDATORY ARBITRATION* programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.

(Over)

AOC-CV-100, Rev. 4/18
© 2018 Administrative Office of the Courts

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
| | | | Ralph E. Hise |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid | Signature Of Deputy Sheriff Making Return |
|---|---|
| $ | |
| Date Received | Name Of Sheriff (type or print) |
| | |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 4/18
© 2018 Administrative Office of the Courts

# STATE OF NORTH CAROLINA

_____Wake_____ County

File No. 18CV014001

In The General Court Of Justice
☐ District ☑ Superior Court Division

| | |
|---|---|
| *Name Of Plaintiff*<br>Common Cause et al. | **CIVIL SUMMONS** |
| *Address*<br>907 Glenwood Avenue | ☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)** |
| *City, State, Zip*<br>Raleigh, NC 27605 | |

**VERSUS**

G.S. 1A-1, Rules 3 and 4

| | |
|---|---|
| *Name Of Defendant(s)*<br>Representative David R. Lewis, in his official capacity as Senior Chairman of the House Select Committee on Redistricting, et al. | *Date Original Summons Issued*<br>11/13/2018 |
| | *Date(s) Subsequent Summons(es) Issued* |

**To Each Of The Defendant(s) Named Below:**

| *Name And Address Of Defendant 1*<br>Sen. Philip E. Berger, in his official capacity<br><br>N.C. Senate<br>16 W Jones Street, Room 2007<br>Raleigh, NC 27601 | Sen. Philip E. Berger, in his official capacity<br><br>c/o Alexander Peters<br>Senior Deputy Attorney General<br>North Carolina Department of Justice<br>PO Box 629<br>Raleigh, NC 27602 | *Name And Address Of Defendant 2* |
|---|---|---|

⚠ **IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales. ¡NO TIRE estos papeles!.**
**Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name And Address Of Plaintiff's Attorney (If none, Address Of Plaintiff)*<br>Edwin Speas<br>Poyner Spruill LLP<br>P.O. Box 1801<br>Raleigh, NC 27602-1801 | *Date Issued*<br>11-13-18 | *Time*<br>10 ☑ AM ☐ PM |
|---|---|---|
| | *Signature* | |
| | ☑ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

| ☐ **ENDORSEMENT (ASSESS FEE)**<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Date Of Endorsement* | *Time*<br>☐ AM ☐ PM |
|---|---|---|
| | *Signature* | |
| | ☐ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

(Over)

AOC-CV-100, Rev. 4/18
© 2018 Administrative Office of the Courts

I certify that this Summons and a copy of the complaint were received and served as follows:

## DEFENDANT 1

| Date Served | Time Served | | Name Of Defendant |
|---|---|---|---|
| | | ☐ AM ☐ PM | Philip E. Berger |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

## DEFENDANT 2

| Date Served | Time Served | | Name Of Defendant |
|---|---|---|---|
| | | ☐ AM ☐ PM | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid | Signature Of Deputy Sheriff Making Return |
|---|---|
| $ | |
| Date Received | Name Of Sheriff (type or print) |
| | |
| Date Of Return | County Of Sheriff |
| | |

AOC-CV-100, Side Two, Rev. 4/18
© 2018 Administrative Office of the Courts

# STATE OF NORTH CAROLINA

_____Wake_____ County

File No. **18CV014001**

| | |
|---|---|
| **Name Of Plaintiff**<br>Common Cause et al. | |
| **Address**<br>907 Glenwood Avenue | **CIVIL SUMMONS** |
| **City, State, Zip**<br>Raleigh, NC 27605 | ☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)** |
| **VERSUS** | G.S. 1A-1, Rules 3 and 4 |
| **Name Of Defendant(s)**<br>Representative David R. Lewis, in his official capacity as Senior Chairman of the House Select Committee on Redistricting, et al. | **Date Original Summons Issued**<br>11/13/2018 |
| | **Date(s) Subsequent Summons(es) Issued** |

**To Each Of The Defendant(s) Named Below:**

| **Name And Address Of Defendant 1**<br>Stacy Eggers IV, in his official capacity as member,<br>North Carolina State Board of Elections and Ethics Enforcement<br>c/o Josh Lawson, General Counsel<br>430 N. Salisbury St, Suite 3128<br>Raleigh, NC 276023 | **Name And Address Of Defendant 2** |
|---|---|

⚠️ **IMPORTANT! You have been sued! These papers are legal documents. DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales. ¡NO TIRE estos papeles!**
**Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| **Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)**<br>Edwin Speas<br>Poyner Spruill LLP<br>P.O. Box 1801<br>Raleigh, NC 27602-1801 | **Date Issued** 11-13-18 | **Time** 10 ☑ AM ☐ PM |
|---|---|---|
| | **Signature** _[signature]_ | |
| | ☑ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

| ☐ **ENDORSEMENT (ASSESS FEE)**<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | **Date Of Endorsement** | **Time** ☐ AM ☐ PM |
|---|---|---|
| | **Signature** | |
| | ☐ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** _Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed._

(Over)

AOC-CV-100, Rev. 4/18
© 2018 Administrative Office of the Courts

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
| | | | Stacy Eggers IV |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid $ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (type or print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 4/18
© 2018 Administrative Office of the Courts

# STATE OF NORTH CAROLINA

_____ Wake _____ County

| | |
|---|---|
| **Name Of Plaintiff** | |
| Common Cause et al. | |
| **Address** | |
| 907 Glenwood Avenue | |
| **City, State, Zip** | |
| Raleigh, NC 27605 | |

**File No.** 18CV014001

In The General Court Of Justice
☐ District ☑ Superior Court Division

**CIVIL SUMMONS**
☐ ALIAS AND PLURIES SUMMONS (ASSESS FEE)

G.S. 1A-1, Rules 3 and 4

**VERSUS**

**Name Of Defendant(s)**

Representative David R. Lewis, in his official capacity as Senior Chairman of the House Select Committee on Redistricting, et al.

**Date Original Summons Issued**
11/13/2018

**Date(s) Subsequent Summons(es) Issued**

**To Each Of The Defendant(s) Named Below:**

| **Name And Address Of Defendant 1** | **Name And Address Of Defendant 2** |
|---|---|
| Rep. Timothy Moore, in his official capacity | Rep. Timothy Moore, in his official capacity |
| N.C. House of Representatives | c/o Alexander Peters |
| 16 W Jones Street, Room 2304 | Senior Deputy Attorney General |
| Raleigh, NC 27601 | North Carolina Department of Justice |
| | PO Box 629 |
| | Raleigh, NC 27602 |

⚠ **IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales. ¡NO TIRE estos papeles!**
**Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| **Name And Address Of Plaintiff's Attorney (If none, Address Of Plaintiff)** | | |
|---|---|---|
| Edwin Speas | **Date Issued** 11-13-18 | **Time** 10 ☑AM ☐PM |
| Poyner Spruill LLP | **Signature** | |
| P.O. Box 1801 | | |
| Raleigh, NC 27602-1801 | ☑ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court | |

| ☐ ENDORSEMENT (ASSESS FEE) | **Date Of Endorsement** | **Time** ☐AM ☐PM |
|---|---|---|
| This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | **Signature** | |
| | ☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

(Over)

I certify that this Summons and a copy of the complaint were received and served as follows:

## DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
| --- | --- | --- | --- |
| | | | Timothy Moore |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

## DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
| --- | --- | --- | --- |
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid | Signature Of Deputy Sheriff Making Return |
| --- | --- |
| $ | |
| Date Received | Name Of Sheriff (type or print) |
| | |
| Date Of Return | County Of Sheriff |
| | |

AOC-CV-100, Side Two, Rev. 4/18
© 2018 Administrative Office of the Courts

CHAMBERS OF
CHIEF JUSTICE MARK D. MARTIN

BOX 1841
ZIP CODE 27602
TEL. (919) 831-5712

### Office of the
### Chief Justice of the Supreme Court
### of North Carolina

### ORDER

To the Honorables **Paul C. Ridgeway, Jr., Alma L. Hinton, and Joseph N. Crosswhite**, Judges of the Superior Court of North Carolina, Greetings:

As Chief Justice of the Supreme Court of North Carolina, by virtue of authority vested in me by the Constitution of North Carolina, and in accordance with the laws of North Carolina, the Rules of the Supreme Court, and specifically Chapter 1, Article 26A of the General Statutes of North Carolina, I hereby assign you to serve on a Three-Judge Panel for Redistricting Challenges, as defined in N.C.G.S. § 1-267.1, to hear and determine the following action challenging the validity of an act of the General Assembly that redistricts State legislative districts:

Common Cause, et al. v. David R. Lewis, in his official capacity as Senior Chairman of the North Carolina House of Representatives Select Committee on Redistricting, et al., 18-CVS-14001 (Wake County)

In Witness Whereof, I have hereunto signed my name as Chief Justice of the Supreme Court of North Carolina, on this day, November 27, 2018.

**Mark Martin, Chief Justice**
**Supreme Court of North Carolina**

STATE OF NORTH CAROLINA

COUNTY OF WAKE

COMMON CAUSE; NORTH CAROLINA
DEMOCRATIC PARTY; PAULA ANN
CHAPMAN; HOWARD DUBOSE; GEORGE
DAVID GAUCK; JAMES MACKIN NESBIT;
DWIGHT JORDAN; JOSEPH THOMAS
GATES; MARK S. PETERS; PAMELA
MORTON; VIRGINIA WALTERS BRIEN;
JOHN MARK TURNER; LEON CHARLES
SCHALLER; REBECCA HARPER; LESLEY
BROOK WISCHMANN; DAVID DWIGHT
BROWN; AMY CLARE OSEROFF; KRISTIN
PARKER JACKSON; JOHN BALLA;
REBECCA JOHNSON; AARON WOLFF;
MARY ANN PEDEN-COVIELLO; KAREN
SUE HOLBROOK; KATHLEEN BARNES,

Plaintiffs,

v.

REPRESENTATIVE DAVID LEWIS in his
official capacity as Senior Chairman of the House
Select Committee on Redistricting; SENATOR
RALPH E. HISE, JR., in his official capacity as
Chairman of the Senate Committee on
Redistricting; SPEAKER OF THE NORTH
CAROLINA HOUSE OF REPRESENTATIVES
TIMOTHY K. MOORE; PRESIDENT PRO
TEMPORE OF THE NORTH CAROLINA
SENATE PHILLIP E. BERGER; THE STATE
OF NORTH CAROLINA; THE NORTH
CAROLINA STATE BOARD OF ELECTIONS
AND ETHICS ENFORCEMENT; ANDY
PENRY, Chairman of The North Carolina State
Board of Elections and Ethics Enforcement;
JOSHUA MALCOLM, Vice-Chair of The North
Carolina State Board of Elections and Ethics
Enforcement; KEN RAYMOND, Secretary of the
North Carolina State Board of Elections and
Ethics Enforcement; STELLA ANDERSON,
Member of The North Carolina State Board of
Elections and Ethics Enforcement; DAMON

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 14001



NOTICE OF APPEARANCE

CIRCOSTA, Member of the North Carolina State
Board of Elections and Ethics Enforcement;
STACY "FOUR" EGGERS, IV, Member of the
North Carolina State Board of Elections and
Ethics Enforcement; JAY HEMPHILL, Member
of the North Carolina State Board of Elections
and Ethics Enforcement; VALERIE JOHNSON,
Member of the North Carolina State Board of
Elections and Ethics Enforcement; JOHN LEWIS
Member of the North Carolina State Board of
Elections and Ethics Enforcement;,

                    Defendants.

    PLEASE TAKE NOTICE that Stephanie A. Brennan, Special Deputy Attorney General,

enters her Notice of Appearance on behalf of Defendants, The State of North Carolina, The North

Carolina State Board of Elections, Andy Penry, Joshua Malcolm, Ken Raymond, Stella Anderson,

Damon Circosta, Stacy "Four" Eggers, IV, Jay Hemphill, Valerie Johnson, and John Lewis.  By

this Notice of Appearance, the undersigned requests that she receive all notices from the Court and

all papers served by the parties hereto.

    This the 28th day of November, 2018.

                              JOSHUA H. STEIN
                              Attorney General

                              _____ for

                              Stephanie A. Brennan
                              Special Deputy Attorney General
                              State Bar No. 35955
                              North Carolina Dept. of Justice
                              P.O. Box 629
                              Raleigh, NC  27602
                              Email:  sbrennan@ncdoj.gov
                              Tele No.: (919) 716-6920
                              Fax No.: (919) 716-6763

**CERTIFICATE OF SERVICE**

This is to certify that the undersigned has this day served the foregoing NOTICE

OF APPEARANCE in the above titled action upon all parties to this cause by depositing a

copy in the United States Mail, postage prepaid to:

Edwin M. Speas, Jr.
Caroline P. Mackie
Poyner Spruill LLP
P.O. Box 1801
Raleigh NC 27602-1801
espeas@poynerspruill.com
*Counsel for Common Cause,*
*the North Carolina Democratic Party,*
*and the Individual Plaintiffs*

R. Stanton Jones
David P. Gersch
Elisabeth S. Theodore
Daniel F. Jacobson
Arnold & Porter Kaye Scholer, LLP
601 Massachusetts Ave. NW
Washington DC 20001-3743
stanton.jones@arnoldporter.com
*Counsel for Common Cause*
*and the Individual Plaintiffs*

Marc E. Elias
Aria C. Branch
Perkins Coie, LLP
700 13th Street NW
Washington DC 20005-3960
melias@perkinscoie.com
*Counsel for Common Cause*
*and the Individual Plaintiffs*

Abha Khanna
Perkins Coie, LLP
1201 Third Ave.
Suite 4900
Seattle WA 89101-3099
akhanna@percinscoie.com
*Counsel for Common Cause*
*and the Individual Plaintiffs*

This the 28th day of November, 2018.

Stephanie A. Brennan
Special Deputy Attorney General

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 14001

COMMON CAUSE; NORTH CAROLINA
DEMOCRATIC PARTY; PAULA ANN
CHAPMAN; HOWARD DUBOSE; GEORGE
DAVID GAUCK; JAMES MACKIN NESBIT;
DWIGHT JORDAN; JOSEPH THOMAS
GATES; MARK S. PETERS; PAMELA
MORTON; VIRGINIA WALTERS BRIEN;
JOHN MARK TURNER; LEON CHARLES
SCHALLER; REBECCA HARPER; LESLEY
BROOK WISCHMANN; DAVID DWIGHT
BROWN; AMY CLARE OSEROFF; KRISTIN
PARKER JACKSON; JOHN BALLA;
REBECCA JOHNSON; AARON WOLFF;
MARY ANN PEDEN-COVIELLO; KAREN
SUE HOLBROOK; KATHLEEN BARNES,

Plaintiffs,

v.

REPRESENTATIVE DAVID LEWIS in his
official capacity as Senior Chairman of the House
Select Committee on Redistricting; SENATOR
RALPH E. HISE, JR., in his official capacity as
Chairman of the Senate Committee on
Redistricting; SPEAKER OF THE NORTH
CAROLINA HOUSE OF REPRESENTATIVES
TIMOTHY K. MOORE; PRESIDENT PRO
TEMPORE OF THE NORTH CAROLINA
SENATE PHILLIP E. BERGER; THE STATE
OF NORTH CAROLINA; THE NORTH
CAROLINA STATE BOARD OF ELECTIONS
AND ETHICS ENFORCEMENT; ANDY
PENRY, Chairman of The North Carolina State
Board of Elections and Ethics Enforcement;
JOSHUA MALCOLM, Vice-Chair of The North
Carolina State Board of Elections and Ethics
Enforcement; KEN RAYMOND, Secretary of the
North Carolina State Board of Elections and
Ethics Enforcement; STELLA ANDERSON,
Member of The North Carolina State Board of
Elections and Ethics Enforcement; DAMON



NOTICE OF APPEARANCE

CIRCOSTA, Member of the North Carolina State Board of Elections and Ethics Enforcement; STACY "FOUR" EGGERS, IV, Member of the North Carolina State Board of Elections and Ethics Enforcement; JAY HEMPHILL, Member of the North Carolina State Board of Elections and Ethics Enforcement; VALERIE JOHNSON, Member of the North Carolina State Board of Elections and Ethics Enforcement; JOHN LEWIS Member of the North Carolina State Board of Elections and Ethics Enforcement;,

Defendants.

PLEASE TAKE NOTICE that James Bernier, Jr., Special Deputy Attorney General, enters his Notice of Appearance on behalf of Defendants, The State of North Carolina, The North Carolina State Board of Elections, Andy Penry, Joshua Malcolm, Ken Raymond, Stella Anderson, Damon Circosta, Stacy "Four" Eggers, IV, Jay Hemphill, Valerie Johnson, and John Lewis. By this Notice of Appearance, the undersigned requests that he receive all notices from the Court and all papers served by the parties hereto.

This the 28th day of November, 2018.

JOSHUA H. STEIN
Attorney General

James Bernier, Jr.
Special Deputy Attorney General
State Bar No. 45869
North Carolina Dept. of Justice
Post Office Box 629
Raleigh, N.C. 27602
Email: jbernier@ncdoj.gov
Tele No.: (919)-716-6900
Fax No.: (919)-716-6763

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this day served the foregoing NOTICE

OF APPEARANCE in the above titled action upon all parties to this cause by depositing a

copy in the United States Mail, postage prepaid to:

Edwin M. Speas, Jr.
Caroline P. Mackie
Poyner Spruill LLP
P.O. Box 1801
Raleigh NC 27602-1801
espeas@poynerspruill.com
*Counsel for Common Cause,*
*the North Carolina Democratic Party,*
*and the Individual Plaintiffs*

R. Stanton Jones
David P. Gersch
Elisabeth S. Theodore
Daniel F. Jacobson
Arnold & Porter Kaye Scholer, LLP
601 Massachusetts Ave. NW
Washington DC 20001-3743
stanton.jones@arnoldporter.com
*Counsel for Common Cause*
*and the Individual Plaintiffs*

Marc E. Elias
Aria C. Branch
Perkins Coie, LLP
700 13th Street NW
Washington DC 20005-3960
melias@perkinscoie.com
*Counsel for Common Cause*
*and the Individual Plaintiffs*

Abha Khanna
Perkins Coie, LLP
1201 Third Ave.
Suite 4900
Seattle WA 89101-3099
akhanna@percinscoie.com
*Counsel for Common Cause*
*and the Individual Plaintiffs*

This the 28th day of November, 2018.

James Bernier, Jr.
Special Deputy Attorney General

STATE OF NORTH CAROLINA

COUNTY OF WAKE

COMMON CAUSE; NORTH CAROLINA
DEMOCRATIC PARTY; PAULA ANN
CHAPMAN; HOWARD DUBOSE; GEORGE
DAVID GAUCK; JAMES MACKIN NESBIT;
DWIGHT JORDAN; JOSEPH THOMAS
GATES; MARK S. PETERS; PAMELA
MORTON; VIRGINIA WALTERS BRIEN;
JOHN MARK TURNER; LEON CHARLES
SCHALLER; REBECCA HARPER; LESLEY
BROOK WISCHMANN; DAVID DWIGHT
BROWN; AMY CLARE OSEROFF; KRISTIN
PARKER JACKSON; JOHN BALLA;
REBECCA JOHNSON; AARON WOLFF;
MARY ANN PEDEN-COVIELLO; KAREN
SUE HOLBROOK; KATHLEEN BARNES,

Plaintiffs,

v.

REPRESENTATIVE DAVID LEWIS in his
official capacity as Senior Chairman of the House
Select Committee on Redistricting; SENATOR
RALPH E. HISE, JR., in his official capacity as
Chairman of the Senate Committee on
Redistricting; SPEAKER OF THE NORTH
CAROLINA HOUSE OF REPRESENTATIVES
TIMOTHY K. MOORE; PRESIDENT PRO
TEMPORE OF THE NORTH CAROLINA
SENATE PHILLIP E. BERGER; THE STATE
OF NORTH CAROLINA; THE NORTH
CAROLINA STATE BOARD OF ELECTIONS
AND ETHICS ENFORCEMENT; ANDY
PENRY, Chairman of The North Carolina State
Board of Elections and Ethics Enforcement;
JOSHUA MALCOLM, Vice-Chair of The North
Carolina State Board of Elections and Ethics
Enforcement; KEN RAYMOND, Secretary of the
North Carolina State Board of Elections and
Ethics Enforcement; STELLA ANDERSON,
Member of The North Carolina State Board of
Elections and Ethics Enforcement; DAMON

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 14001



NOTICE OF APPEARANCE

CIRCOSTA, Member of the North Carolina State
Board of Elections and Ethics Enforcement;
STACY "FOUR" EGGERS, IV, Member of the
North Carolina State Board of Elections and
Ethics Enforcement; JAY HEMPHILL, Member
of the North Carolina State Board of Elections
and Ethics Enforcement; VALERIE JOHNSON,
Member of the North Carolina State Board of
Elections and Ethics Enforcement; JOHN LEWIS
Member of the North Carolina State Board of
Elections and Ethics Enforcement;,

                    Defendants.

PLEASE TAKE NOTICE that Amar Majmundar, Senior Deputy Attorney General, enters

his Notice of Appearance on behalf of Defendants, The State of North Carolina, The North

Carolina State Board of Elections, Andy Penry, Joshua Malcolm, Ken Raymond, Stella Anderson,

Damon Circosta, Stacy "Four" Eggers, IV, Jay Hemphill, Valerie Johnson, and John Lewis. By

this Notice of Appearance, the undersigned requests that he receive all notices from the Court and

all papers served by the parties hereto.

This the 28th day of November, 2018.

                                        JOSHUA H. STEIN
                                        Attorney General


                                        Amar Majmundar
                                        Senior Deputy Attorney General
                                        State Bar No. 24668
                                        North Carolina Dept. of Justice
                                        Post Office Box 629
                                        Raleigh, N.C. 27602
                                        Email: amajmundar@ncdoj.gov
                                        Tele No.: (919)-716-6821
                                        Fax No.: (919)-716-6763

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this day served the foregoing NOTICE OF APPEARANCE in the above titled action upon all parties to this cause by depositing a copy in the United States Mail, postage prepaid to:

Edwin M. Speas, Jr.
Caroline P. Mackie
Poyner Spruill LLP
P.O. Box 1801
Raleigh NC 27602-1801
espeas@poynerspruill.com
*Counsel for Common Cause,*
*the North Carolina Democratic Party,*
*and the Individual Plaintiffs*

R. Stanton Jones
David P. Gersch
Elisabeth S. Theodore
Daniel F. Jacobson
Arnold & Porter Kaye Scholer, LLP
601 Massachusetts Ave. NW
Washington DC 20001-3743
stanton.jones@arnoldporter.com
*Counsel for Common Cause*
*and the Individual Plaintiffs*

Marc E. Elias
Aria C. Branch
Perkins Coie, LLP
700 13th Street NW
Washington DC 20005-3960
melias@perkinscoie.com
*Counsel for Common Cause*
*and the Individual Plaintiffs*

Abha Khanna
Perkins Coie, LLP
1201 Third Ave.
Suite 4900
Seattle WA 89101-3099
akhanna@percinscoie.com
*Counsel for Common Cause*
*and the Individual Plaintiffs*

This the 28th day of November, 2018.

Amar Majmundar
Senior Deputy Attorney General

STATE OF NORTH CAROLINA    FILED    IN THE GENERAL COURT OF JUSTICE
COUNTY OF WAKE    2018 DEC -7 PH 4:54    SUPERIOR COURT DIVISION
                                                18-CVS-014001
                          WAKE COUNTY, C.S.C.
                          BY

COMMON CAUSE et al.,

                        Plaintiffs,

        v.

REPRESENTATIVE DAVID R. LEWIS, IN HIS          **ACCEPTANCE OF SERVICE**
OFFICIAL CAPACITY AS SENIOR CHAIRMAN OF
THE HOUSE SELECT COMMITTEE ON
REDISTRICTING et al.,

                        Defendants.

---

Now comes Phillip J. Strach and says:

1.      That Defendants Phillip E. Berger, in his official capacity, Senator Ralph E. Hise,

in his official capacity, Representative David R. Lewis, in his official capacity, and

Timothy Moore, in his official capacity (the "Legislative Defendants") are parties to be served

with the Civil Summons issued and the Complaint filed in this civil action;

2.      That by execution hereof, the undersigned accepted service on November 20, 2018

of the Civil Summons and Complaint on behalf of the Legislative Defendants, and

acknowledges receipt of a copy of the Civil Summons issued, along with a copy of the

Complaint filed in this action; and

3.      That this acceptance of service does not waive any defenses that the Legislative

Defendants may have, except the defenses of insufficiency of process and insufficiency of

service of process, and the Legislative Defendants reserve the right to assert any other defenses

that may apply.

This the 2 7 th day of November, 2018.

By: _____

Phillip J. Strach
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
4208 Forks Road, Suite 1100,
Raleigh, NC, 27609

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day served a copy of the foregoing *by email and by U.S. mail*, addressed to the following persons at the following addresses which are the last addresses known to me:

> James Bernier
> Amar Majmundar
> Stephanie A. Brennan
> NC Department of Justice
> P.O. Box 629
> 114 W. Edenton St.
> Raleigh, NC 27602
> jbernier@ncdoj.gov
> *Counsel for the State of North Carolina and State Board of Elections and Ethics Enforcement and its members*

> Phillip J. Strach
> Michael McKnight
> Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
> 4208 Six Forks Road, Suite 1100
> Raleigh, NC 27609
> Phillip.strach@ogletree.com
> Michael.mcknight@ogletree.com
> *Counsel for the Legislative Defendants*

This the 7th day of December, 2018.

**POYNER SPRUILL LLP**

Caroline P. Mackie

STATE OF NORTH CAROLINA       F I L E D IN THE GENERAL COURT OF JUSTICE
                                        2018 DEC -7 PN 3: 13  SUPERIOR COURT DIVISION
COUNTY OF WAKE                                          18-CVS-14001
                              WAKE COUNTY, C.S.C.
COMMON CAUSE, *et al.*,

        Plaintiffs,                      )
                                         )
                                         )
v.                                       )
                                         )
REPRESENTATIVE DAVID R. LEWIS,           )        **NOTICE OF APPEARANCE**
in his official capacity as Senior Chairman )
of the Senate Select Committee on        )
Redistricting, *et al.*,                 )
                                         )
        Defendants.                      )
                                         )

        Phillip J. Strach of the law firm Ogletree, Deakins, Nash, Smoak & Stewart, P.C.

enters his Notice of Appearance as co-counsel on behalf of all Defendants. Mr. Strach is

a member in good standing with the bar of the state of North Carolina.

        Respectfully submitted this 7th day of December, 2018.

                                OGLETREE, DEAKINS, NASH
                                SMOAK & STEWART, P.C.

                                _____ / By SAT
                                Phillip J. Strach
                                N.C. State Bar No. 29456
                                phil.strach@ogletreedeakins.com
                                4208 Six Forks Road, Suite 1100
                                Raleigh, North Carolina 27609
                                Telephone: (919) 787-9700
                                Facsimile: (919) 783-9412
                                *Co-counsel for Defendants*

## CERTIFICATE OF SERVICE

It is hereby certified that the foregoing **Notice of Appearance** by Phillip Strach was served via United States Mail, first-class, postage prepaid, upon the following:

Edwin M. Speas, Jr.
N.C. State Bar No. 4112
Caroline P. Mackie
N.C. State Bar No. 41512
POYNER SPRUILL LLP
P.O. Box 1801
Raleigh, NC 27602-1801
(919) 783-6400
espeas@poynerspruill.com
*Counsel for Common Cause,*
*the North Carolina Democratic*
*Party, and the Individual Plaintiffs*

R. Stanton Jones
David P. Gersch
Elisabeth S. Theodore
Daniel F. Jacobson
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Ave. NW
Washington, DC 2001-2743
(202) 942-5000
Stanton.jones@arnoldporter.com

Marc E. Elias
Aria C. Branch
PERKINS COIE LLP
700 13th Street NW
Washington, DC 20005-3960
(202) 654-6200
melias@perkinscoie.com

Abha Khanna
12012 Third Avenue
Suite 4900
Seattle, WA 98101-3022
(206) 359-9000
akhanna@perkinscoie.com

This, the 7th day of December, 2018.

OGLETREE, DEAKINS, NASH
SMOAK & STEWART, P.C.

Phillip J. Strach
N.C. State Bar No. 29456
phil.strach@ogletreedeakins.com
4208 Six Forks Road, Suite 1100
Raleigh, North Carolina 27609
Telephone: (919) 787-9700
Facsimile: (919) 783-9412
*Co-counsel for Defendants*

36608944.1

STATE OF NORTH CAROLINA   FILED   IN THE GENERAL COURT OF JUSTICE
                    2018 DEC -7 PM 3: 13   SUPERIOR COURT DIVISION
COUNTY OF WAKE                     18-CVS-14001
                WAKE COUNTY, C.S.C.
COMMON CAUSE, *et al.*,   BY

        Plaintiffs,

v.

REPRESENTATIVE DAVID R. LEWIS,       **NOTICE OF APPEARANCE**
in his official capacity as Senior Chairman
of the Senate Select Committee on
Redistricting, *et al.*,

        Defendants.

          Michael D. McKnight of the law firm Ogletree, Deakins, Nash, Smoak & Stewart,

P.C. enters his Notice of Appearance as counsel on behalf of all Defendants. Mr. McKnight

is a member in good standing with the bar of the state of North Carolina.

          Respectfully submitted this 7th day of December, 2018.

                        OGLETREE, DEAKINS, NASH
                        SMOAK & STEWART, P.C.

                        Michael D. McKnight
                        N.C. State Bar No. 36932
                        4208 Six Forks Road, Suite 1100
                        Raleigh, North Carolina 27609
                        Telephone: (919) 787-9700
                        Facsimile: (919) 783-9412
                        *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

It is hereby certified that the foregoing **Notice of Appearance** by Michael McKnight was served via United States Mail, first-class, postage prepaid, upon the following:

Edwin M. Speas, Jr.
N.C. State Bar No. 4112
Caroline P. Mackie
N.C. State Bar No. 41512
POYNER SPRUILL LLP
P.O. Box 1801
Raleigh, NC 27602-1801
(919) 783-6400
espeas@poynerspruill.com
*Counsel for Common Cause,*
*the North Carolina Democratic*
*Party, and the Individual Plaintiffs*

R. Stanton Jones
David P. Gersch
Elisabeth S. Theodore
Daniel F. Jacobson
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Ave. NW
Washington, DC 2001-2743
(202) 942-5000
Stanton.jones@arnoldporter.com

Marc E. Elias
Aria C. Branch
PERKINS COIE LLP
700 13th Street NW
Washington, DC 20005-3960
(202) 654-6200
melias@perkinscoie.com

Abha Khanna
12012 Third Avenue
Suite 4900
Seattle, WA 98101-3099
(206) 359-9000
akhanna@perkinscoie.com

This, the 7th day of December, 2018

OGLETREE, DEAKINS, NASH
SMOAK & STEWART, P.C.

Michael D. McKnight
N.C. State Bar No. 36932
4208 Six Forks Road, Suite 1100
Raleigh, North Carolina 27609
Telephone: (919) 787-9700
Facsimile: (919) 783-9412
*Attorneys for Defendants*

36608989.1

STATE OF NORTH CAROLINA ~~FILED~~ IN THE GENERAL COURT OF JUSTICE

COUNTY OF WAKE SUPERIOR COURT DIVISION

2018 DEC -7 P 4: 46

WAKE CO., C.S.C.

Docket No. 18 CVS 014001

COMMON CAUSE; NORTH CAROLINA
DEMOCRATIC PARTY; PAULA ANN CHAPMAN;
HOWARD DU BOSE JR.; GEORGE DAVID GAUCK;
JAMES MACKIN NESBIT; DWIGHT JORDAN; JOSEPH
THOMAS GATES; MARK S. PETERS; PAMELA
MORTON; VIRGINIA WALTERS BRIEN; JOHN MARK
TURNER; LEON CHARLES SCHALLER; REBECCA
HARPER; LESLEY BROOK WISCHMANN; DAVID
DWIGHT BROWN; AMY CLARE OSEROFF; KRISTIN
PARKER JACKSON; JOHN BALLA; REBECCA
JOHNSON; AARON WOLFF; MARY ANN PEDEN-
COVIELLO; KAREN SUE HOLBROOK; KATHLEEN
BARNES; ANN MCCRACKEN; JACKSON THOMAS
DUNN, JR.; ALYCE MACHAK; WILLIAM SERVICE;
DONALD RUMPH; STEPHEN DOUGLAS MCGRIGOR;
NANCY BRADLEY; VINOD THOMAS; DERRICK
MILLER; ELECTA E. PERSON; DEBORAH ANDERSON
SMITH; ROSALYN SLOAN; JULIE ANN FREY; LILY
NICOLE QUICK; JOSHUA BROWN; CARLTON E.
CAMPBELL SR.,

          Plaintiffs,

    v.

REPRESENTATIVE DAVID R. LEWIS, IN HIS
OFFICIAL CAPACITY AS SENIOR CHAIRMAN OF
THE HOUSE SELECT COMMITTEE ON
REDISTRICTING; SENATOR RALPH E. HISE, JR., IN
HIS OFFICIAL CAPACITY AS CHAIRMAN OF THE
SENATE COMMITTEE ON REDISTRICTING;
SPEAKER OF THE NORTH CAROLINA HOUSE OF
REPRESENTATIVES TIMOTHY K. MOORE;
PRESIDENT PRO TEMPORE OF THE NORTH
CAROLINA SENATE PHILIP E. BERGER; THE STATE
OF NORTH CAROLINA; THE NORTH CAROLINA
STATE BOARD OF ELECTIONS AND ETHICS
ENFORCEMENT; JOSHUA MALCOLM, CHAIRMAN
OF THE NORTH CAROLINA STATE BOARD OF
ELECTIONS & ETHICS ENFORCEMENT; KEN
RAYMOND, SECRETARY OF THE NORTH CAROLINA

**AMENDED COMPLAINT**

(Three-Judge Court Pursuant to
N.C. Gen. Stat § 1-267.1)

STATE BOARD OF ELECTIONS & ETHICS
ENFORCEMENT; STELLA ANDERSON, MEMBER OF
THE NORTH CAROLINA STATE BOARD OF
ELECTIONS & ETHICS ENFORCEMENT; DAMON
CIRCOSTA, MEMBER OF THE NORTH CAROLINA
STATE BOARD OF ELECTIONS & ETHICS
ENFORCEMENT; STACY "FOUR" EGGERS IV,
MEMBER OF THE NORTH CAROLINA STATE BOARD
OF ELECTIONS & ETHICS ENFORCEMENT; JAY
HEMPHILL, MEMBER OF THE NORTH CAROLINA
STATE BOARD OF ELECTIONS & ETHICS
ENFORCEMENT; VALERIE JOHNSON, MEMBER OF
THE NORTH CAROLINA STATE BOARD OF
ELECTIONS & ETHICS ENFORCEMENT; JOHN
LEWIS, MEMBER OF THE NORTH CAROLINA STATE
BOARD OF ELECTIONS & ETHICS ENFORCEMENT;
ROBERT CORDLE, MEMBER OF THE NORTH
CAROLINA STATE BOARD OF ELECTIONS & ETHICS
ENFORCEMENT,

     Defendants.

Plaintiffs, complaining of Defendants, say and allege:

## INTRODUCTION

1.     Partisan gerrymandering is an existential threat to our democracy, and nowhere more so than in North Carolina. Republicans in the North Carolina General Assembly have egregiously rigged the state legislative district lines to guarantee that their party will control both chambers of the General Assembly regardless of how the people of North Carolina vote. This attack on representative democracy and North Carolinians' voting rights is wrong. It violates the North Carolina Constitution. And it needs to stop.

2.     In 2011, as part of a national movement by the Republican Party to entrench itself in power through redistricting, North Carolina Republicans' mapmaker manipulated district boundaries with surgical precision to maximize the political advantage of Republican voters and minimize the representational rights of Democratic voters. And it worked. In the 2012, 2014, and 2016 elections, Republicans won veto-proof super-majorities in both chambers of the General Assembly despite winning only narrow majorities of the overall statewide vote.

3.     In 2017, after federal courts struck down some of the 2011 districts as illegal racial gerrymanders, Republicans redoubled their efforts to gerrymander the district lines on partisan grounds. They instructed the same Republican mapmaker to use partisan data and prior election results in drawing new districts. The results should outrage anyone who believes in democracy. In both the state House and state Senate elections in 2018, Democratic candidates won a majority of the statewide vote, but Republicans still won a substantial majority of seats in each chamber. The maps are impervious to the will of the voters.

4.     It gets worse. Because North Carolina is one of the few states in the country where the Governor lacks power to veto redistricting legislation, the General Assembly alone

1

will control the next round of redistricting after the 2020 census. Accordingly, as things currently stand, the Republican majorities in the General Assembly elected under the current maps will have free reign to redraw both state legislative and congressional district lines for the next decade. This perpetuates a vicious cycle in which representatives elected under one gerrymander enact new gerrymanders both to maintain their control of the state legislature and to rig congressional elections for ten more years. Only the intervention of the judiciary can break this cycle and protect the constitutional rights of millions of North Carolinians.

5.     The North Carolina Constitution prohibits partisan gerrymandering. This State's equal protection guarantees provide more robust protections for voting rights than the federal constitution. Specifically, "[i]t is well settled in this State that the right to vote *on equal terms* is a fundamental right." *Stephenson v. Bartlett*, 562 S.E.2d 377, 394 (N.C. 2002). There is nothing "equal" about the "terms" on which North Carolinians vote for candidates for the General Assembly. North Carolina's Constitution also commands that "all elections shall be free"—a provision that has no counterpart in the federal constitution. Elections to the North Carolina General Assembly are not "free" when the outcomes are predetermined by partisan actors sitting behind a computer. And the North Carolina Constitution's free speech and association guarantees prohibit the General Assembly from burdening the speech and associational rights of voters and organizations because the General Assembly disfavors their political views.

6.     No matter how the U.S. Supreme Court resolves longstanding questions about partisan gerrymandering under the federal constitution, North Carolina's Constitution independently secures the rights of North Carolina citizens. This State's courts should not hesitate to enforce North Carolina's unique protections here. This Court should invalidate the 2017 Plans and order that new, fair maps be used for the 2020 elections.

2

## PARTIES

**A.    Plaintiffs**

7.    Common Cause brings this action on its own behalf and on behalf of its members who are registered voters in North Carolina whose votes have been diluted or nullified under the districting plans enacted by the General Assembly in 2017 for the North Carolina House of Representatives and North Carolina Senate (the "2017 Plans"). Common Cause is a non-profit corporation organized and existing under the laws of the District of Columbia. It is a nonpartisan democracy organization with over 1.2 million members and local organizations in 35 states, including North Carolina. Common Cause has members in every North Carolina House and Senate district, and has members who have suffered injury in every district that is gerrymandered under 2017 Plans. Since its founding by John Gardner in 1970, Common Cause has been dedicated to fair elections and making government at all levels more representative, open, and responsive to the interests of ordinary people. "For the past twenty-five years, Common Cause has been one of the leading proponents of redistricting reform." Jonathan Winburn, The Realities of Redistricting p. 205 (2008). The 2017 Plans frustrate Common Cause's mission to promote participation in democracy and to ensure open, honest, and accountable government. The 2017 Plans burden Common Cause's ability to convince voters in gerrymandered districts to vote in state legislative elections and communicate with legislators. The 2017 Plans also burden Common Cause's ability to communicate effectively with legislators and to influence them to enact laws that promote voting, participatory democracy, public funding of elections, and other measures that encourage accountable government.

8.    The North Carolina Democratic Party ("NCDP") brings this action on its own behalf and on behalf of its members who are registered voters in North Carolina whose votes have been diluted or nullified as a result of the gerrymandering of the 2017 Plans. The NCDP is

3

a political party as defined in N.C. Gen. Stat. § 163-96. Its purposes are (i) to bring people together to develop public policies and positions favorable to NCDP members and the public generally, (ii) to identify candidates who will support and defend those policies and positions, and (iii) to persuade voters to cast their ballots for those candidates. The NCDP has members in every North Carolina House and Senate district, and has members who have suffered injury in every district that is gerrymandered under 2017 Plans. The partisan gerrymanders under the 2017 Plans discriminate against the NCDP's members because of their past votes, their political views, and their party affiliations. The gerrymanders also discriminate against the NCDP itself on the basis of its viewpoints and affiliations, and the plans frustrate and burden NCDP's ability to achieve its essential purposes and to carry out its core functions, including registering voters, attracting volunteers, raising money in gerrymandered districts, campaigning, turning out the vote, and ultimately electing candidates who will pursue policies favorable to NCDP members and the public generally in the North Carolina General Assembly. The NCDP must expend additional funds and other resources than it would otherwise to combat the effects of the partisan gerrymanders under the 2017 Plans, and even then, the 2017 Plans make it impossible for Democrats to win a majority in either chamber of the legislature.

9.     Plaintiff Paula Ann Chapman is a retired small business owner residing in Charlotte, North Carolina, within House District 100 and Senate District 40. Ms. Chapman is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly. House District 100 and Senate District 40 are both packed Democratic districts. In 2018, the Democratic candidate won these districts with over 70% and 75% of the vote.

10.     Plaintiff Howard Du Bose Jr. is a retired school teacher and Army veteran residing in Hurdle Mills, North Carolina, within House District 2. Mr. Du Bose is a registered

4

Democrat who has consistently voted for Democratic candidates for the General Assembly. The General Assembly packed House District 32, which adjoins House District 2, to ensure that House District 2 would elect a Republican. In 2018, the Republican candidate won House District 2 with roughly 55% of the vote.

11.     Plaintiff George David Gauck is a retired software engineer residing in Southport, North Carolina, within House District 17 and Senate District 8. Mr. Gauck is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly. House District 17 is adjacent to the packed Democratic House District 18. In 2018, the Republican candidate won House District 17 with over 63% of the vote. With respect to Senate District 8, a heavily Democratic area in Wilmington is extracted from Senate District 9 and placed in Senate District 8 to make Senate District 9 as competitive as possible for Republicans. As a result, in 2018, Senate District 9 was a near tie, while Republicans won Senate District 8 by a comfortable margin.

12.     Plaintiff James Mackin Nesbit is a retired kindergarten teacher residing in Wilmington, North Carolina, within House District 19 and Senate District 9. Mr. Nesbit is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly. House District 19 borders the packed Democratic House District 18. The Republican candidate has won every election in House District 19 since the 2011 redistricting, running unopposed in 2014 and 2016. With respect to Senate District 9, a heavily Democratic area in Wilmington is extracted from Senate District 9 and placed in Senate District 8 to make Senate District 9 as competitive as possible for Republicans. As a result, in 2018, the election in Senate District 9 was a near tie.

5

13.     Plaintiff Dwight Jordan is a customer support professional residing in Nashville, North Carolina, within House District 25 and Senate District 11. Mr. Jordan is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly. House District 25 is a packed Democratic district that was constructed to ensure that neighboring House District 7 would elect a Republican, which occurred in 2018. The county cluster encompassing Senate District 11 cracks Democratic voters across its three districts (10, 11, and 12). In 2018, the Republican candidate won Senate District 11 with roughly 56% of the vote.

14.     Plaintiff Joseph Thomas Gates is a former Colonel in the Air Force and a retired information technology project manager residing in Weaverville, North Carolina, within House District 115 and Senate District 49. Mr. Gates is a registered unaffiliated voter who has consistently voted for Democratic candidates for the General Assembly. The General Assembly made House District 115 as competitive as possible for Republicans by packing the adjoining House District 114 with Democratic voters. Senate District 49 is a packed Democratic district that the Democratic candidate won in 2018 with Senate District 49 with over 63% of the vote.

15.     Plaintiff Mark S. Peters is a retired physician assistant residing in Fletcher, North Carolina, within House District 116 and Senate District 48. Mr. Peters is a registered unaffiliated voter who has consistently voted for Democratic candidates for the General Assembly. The General Assembly made House District 116 as competitive as possible for Republicans by packing the adjoining House District 114 with Democratic voters. Senate District 48 was drawn to avoid the Democratic areas in and around Asheville to ensure that the district would lean Republican. In 2018, the Republican candidate won Senate District 48 by roughly 13 points.

16.     Plaintiff Pamela Morton is a retired professional in the financial industry residing in Charlotte, North Carolina, within House District 100 and Senate District 37. Ms. Morton is a

6

registered Democrat who has consistently voted for Democratic candidates for the General Assembly. House District 100 and Senate District 37 are both packed Democratic districts. In 2018, the Democratic candidates won these districts with over 70% and 78% of the vote.

17.    Plaintiff Virginia Walters Brien is a sales manager residing in Charlotte, North Carolina, within House District 102 and Senate District 37. Ms. Brien is a registered unaffiliated who has consistently voted for Democratic candidates for the General Assembly. House District 102 and Senate District 37 are both packed Democratic districts. In 2018, the Democratic candidates won these districts with over 83% and 78% of the vote.

18.    Plaintiff John Mark Turner is a Navy veteran and a system administrator residing in Raleigh, North Carolina, within House District 38 and Senate District 15. Mr. Turner is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly. House District 38 and Senate District 15 are both packed Democratic districts. In 2018, the Democratic candidates won these districts with over 81% and 73% of the vote.

19.    Plaintiff Leon Charles Schaller is a retired safety and fire protection engineer residing in Burlington, North Carolina, within House District 64. Mr. Schaller is a registered unaffiliated voter who has consistently voted for Democratic candidates for the General Assembly. The county cluster that contains House Districts 63 and 64 was not changed in the 2017 Plans and retains the same district lines enacted in 2011. In constructing the cluster, the General Assembly cracked Democratic voters in Burlington across the two districts. Republican candidates have won every election in House District 64 since the 2011 redistricting—with over 58% of the vote in 2012 and 2018, and running unopposed in 2014 and 2016.

20.    Plaintiff Rebecca Harper is a real estate agent residing in Cary, North Carolina, within House District 36 and Senate District 17. Ms. Harper is a registered Democrat who has

consistently voted for Democratic candidates for the General Assembly. The General Assembly packed several districts surrounding House District 36 with Democratic voters to make House District 36 as Republican as possible. In 2018, the Democratic candidate won House District 36 with barely over 50% of the two-party vote. The General Assembly similarly packed several districts surrounding Senate District 17 to make Senate District 17 as competitive for Republicans as possible. In 2018, the Democratic candidate narrowly won Senate District 17.

21.     Plaintiff Lesley Brook Wischmann is a semi-retired writer and historian residing in Holly Ridge, North Carolina, within House District 15. Ms. Wischmann is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly. The General Assembly cracked Democratic voters across House Districts 14 and 15. In 2018, the Republican candidate won House District 15 with roughly 66% of the vote.

22.     Plaintiff David Dwight Brown is a retired computer systems analyst residing in Greensboro, North Carolina, within House District 58. Mr. Brown is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly. House District 58 is a packed Democratic district. In 2018, the Democratic candidate won House District 58 with over 76% of the vote.

23.     Plaintiff Amy Clare Oseroff is a teacher residing in Greenville, North Carolina, within House District 8. Ms. Oseroff is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly. The General Assembly packed Greenville's most heavily Democratic areas into House District 8 to create a strongly Democratic district, ensuring that nearby House Districts 9 and 12 would favor Republicans. In 2018, the Democratic candidate won House District 8 with over 64% of the vote.

8

24.     Plaintiff Kristin Parker Jackson is a paralegal residing in Matthews, North Carolina, within House District 103 and Senate District 39. Ms. Jackson is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly. The General Assembly packed Democrats into the districts surrounding House District 103 to make House District 103 as Republican-leaning as possible. In 2018, House District 103 was a virtual tie. The General Assembly made Senate District 39 a Republican-leaning district by packing its neighboring districts with Democratic voters. In 2018, the Republican candidate won Senate District 39 with roughly 53% of the vote.

25.     Plaintiff John Balla is a digital marketing strategist residing in Raleigh, North Carolina, within House District 34 and Senate District 16. Mr. Balla is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly in every election since he moved to North Carolina. House District 34 and Senate District 16 are both packed Democratic districts. In 2018, the Democratic candidates won both districts with over 65% of the vote.

26.     Plaintiff Rebecca Johnson is a retired educator residing in Winston-Salem, North Carolina, within House District 74 and Senate District 31. Ms. Johnson is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly. House District 74 adjoins two packed Democratic districts, allowing House District 74 to favor Republicans. In 2018, the Republican candidate won House District 74 with more than 54% of the vote. Senate District 31—which cradles Senate District 32, a packed Democratic district—leans Republican. In 2018, the Republican candidate won Senate District 31 with over 61% of the vote.

27.     Plaintiff Aaron Wolff is a veterinarian residing in Holly Springs, North Carolina, within House District 37 and Senate District 17. Mr. Wolff is a registered Democrat who has

consistently voted for Democratic candidates for the General Assembly. The General Assembly packed as many Democrats as possible into the districts surrounding House District 37 and Senate District 17 to make these districts as favorable to Republicans as possible. In 2018, Democratic candidates won both districts with bare majorities.

28.     Plaintiff Mary Ann Peden-Coviello is a writer and editor residing in Winston-Salem, North Carolina, within House District 72 and Senate District 32. Ms. Peden-Coviello is a registered Democrat who has consistently voted for Democratic candidates for the General Assembly. House District 72 is a packed Democratic district. In 2018, the Democratic candidate won House District 72 with 79% of the vote. Senate District 32 is a packed Democratic district that was drawn to ensure that neighboring Senate District 31 would elect a Republican. In 2018, the Democratic candidate won Senate District 32 with 72% of the vote.

29.     Plaintiff Kathleen Barnes is the owner of a small publishing company residing in Brevard, North Carolina, within House District 113 and Senate District 48. Ms. Barnes is a registered Democrat who has consistently voted for Democratic candidates for the North Carolina General Assembly. The Democrats who reside in House District 113, like Ms. Barnes, were strategically placed in a different district from the Democratic voters around Hendersonville to ensure that Republicans were favored in both districts. In the 2018 elections, the Republican candidate won House District 113 with over 57% of the vote. Senate District 48 was similarly cracked, splitting the Democratic voters in Brevard from the strong base of Democratic voters in nearby Asheville so that Senate District 48 would be Republican-leaning. In 2018, the Republican candidate won Senate District 48 with over 56% of the vote.

30.     Plaintiff Karen Sue Holbrook is a retired psychology professor residing in Southport, North Carolina, within House District 17 and Senate District 8. Dr. Holbrook is a

10

registered Democrat who has consistently voted for Democratic candidates for the General Assembly. In the county cluster containing House District 17, the General Assembly packed Democratic voters into House District 18 to make House District 17 and the other districts in the cluster lean Republican. In 2018, the Republican candidate won House District 17 with over 63% of the vote. With respect to Senate District 8, a heavily Democratic area in Wilmington is extracted from Senate District 9 and placed in Senate District 8 to make Senate District 9 as competitive as possible for Republicans. As a result, in 2018, Senate District 9 was a near tie, while Republicans won Senate District 8 with a comfortable margin.

31.    Plaintiff Ann McCracken is a retired English instructor residing in Sanford, North Carolina, within House District 51 and Senate District 12. Ms. McCracken is a registered Democrat who has consistently voted for Democratic candidates for the North Carolina General Assembly. House District 51 and Senate District 12 are both cracked districts favoring Republicans, with the Republican candidates having won 53% and 60% of the vote in 2018.

32.    Plaintiff Jackson Thomas Dunn, Jr. is a retired attorney and law professor residing in Charlotte, North Carolina, within House District 104 and Senate District 39. Mr. Dunn is a registered Democrat who has consistently voted for Democratic candidates for the North Carolina General Assembly. The General Assembly manipulated House District 104 to be as competitive as possible for Republicans, with the Democratic candidate winning by just a few points in 2018. The General Assembly made Senate District 39 a Republican-leaning district by packing its neighboring districts with Democratic voters. In 2018, the Republican candidate won Senate District 39 with roughly 53% of the vote.

33.    Plaintiff Alyce Machak is an app programmer residing in Gastonia, North Carolina, within House District 109. Ms. Machak is a registered Democrat who has consistently

voted for Democratic candidates for the North Carolina General Assembly. The county cluster containing House District 109 cracks the Democratic stronghold of Gastonia across House Districts 108, 109, and 110, ensuring that Democrats do not win any of those districts. In 2018, the Republican candidate won House District 109 with 59% of the vote.

34. Plaintiff William Service is a semi-retired environmental consultant residing in Raleigh, North Carolina, within House District 34 and Senate District 18. Mr. Service is a registered Democrat who has consistently voted for Democratic candidates for the North Carolina General Assembly. House District 34 is a packed Democratic district, with the Democratic candidate having won over 65% of the vote in 2018. Senate District 18 adjoins several packed Democratic districts, and the General Assembly manipulated the district lines of Senate District 18 to squeeze in as many Republican voters as possible. The Republican candidate won Senate District 18 by less than three percentage points in 2018.

35. Plaintiff Donald Rumph is an Army and Air Force combat veteran and retired registered nurse residing in Greenville, North Carolina, within House District 9. Mr. Rumph is a registered Democrat who has consistently voted for Democratic candidates for the North Carolina General Assembly. House District 9 is a Republican district because the General Assembly packed Democratic voters into the adjoining House District 8. In 2018, the Republican candidate won House District 9 with nearly 60% of the vote.

36. Plaintiff Stephen Douglas McGrigor is employed in the emergency power supply system industry and resides in Youngsville, North Carolina, within House District 7 and Senate District 18. Mr. McGrigor is a registered unaffiliated voter who has consistently voted for Democratic candidates for the North Carolina General Assembly. House District 7 was carefully constructed to be a Republican district. In 2018, the Republican candidate won House District 7

12

with 58% of the vote. Senate District 18 adjoins several packed Democratic districts, and the General Assembly manipulated the district lines of Senate District 18 to squeeze in as many Republican voters as possible. The Republican candidate won Senate District 18 by less than three percentage points in 2018.

37. Plaintiff Nancy Bradley is a state government benefits eligibility official residing in Raleigh, North Carolina, within House District 35 and Senate District 14. Ms. Bradley is a registered Democrat who has consistently voted for Democratic candidates for the North Carolina General Assembly. House District 35 was constructed to be as competitive for Republicans as possible, with the Democratic candidate having won a narrow victory in 2018. Senate District 14 is a packed Democratic district that the Democratic candidate won with over 71% of the vote in 2018.

38. Plaintiff Vinod Thomas is a teacher at the Davidson Center for Learning and Academic Planning residing in Cornelius, North Carolina, within House District 98 and Senate District 41. Mr. Thomas is a registered Democrat who has consistently voted for Democratic candidates for the North Carolina General Assembly. The General Assembly made both House District 98 and Senate District 41 as competitive for Republicans as possible by packing their adjoining districts with Democratic voters.

39. Plaintiff Derrick Miller is a professor residing in Wilmington, North Carolina, within House District 18 and Senate District 8. Dr. Miller is a registered Democrat who has consistently voted for Democratic candidates for the North Carolina General Assembly. House District 18 is a packed Democratic district that the Democratic candidate won in 2018 with over 62% of the vote. With respect to Senate District 8, a heavily Democratic area in Wilmington— where Dr. Miller resides—is extracted from Senate District 9 and placed in Senate District 8 to

13

waste the votes of these Democratic votes in Senate District 8 and make Senate District 9 as competitive as possible for Republicans. In 2018, the Republican candidate won Senate District 8 with over 58% of the vote.

40.  Plaintiff Electa E. Person is a retired NASA management analyst and Air Force veteran residing in Fayetteville, North Carolina, within House District 43. Ms. Person is a registered Democrat who has consistently voted for Democratic candidates for the North Carolina General Assembly. House District 43 is a packed Democratic district that the Democratic candidate won with over 74% of the vote in 2018.

41.  Plaintiff Deborah Anderson Smith is an Army veteran and retired educator residing in Kannapolis, North Carolina, within House District 83. Ms. Smith is a registered unaffiliated voter who has consistently voted for Democratic candidates for the North Carolina General Assembly. Kannapolis and its Democratic voters are cracked across House Districts 77, 82, and 83, ensuring that Republicans win each seat. In 2018, the Republican candidate won House District 83 by just five percentage points.

42.  Plaintiff Rosalyn Sloan is a registered nurse residing in New London, North Carolina, within House District 67. Ms. Sloan is a registered unaffiliated voter who has consistently voted for Democratic candidates for the North Carolina General Assembly. The General Assembly constructed House Districts 66 and 67 to make House District 66 as competitive for Republicans as possible while keeping House 67 a safe Republican seat. In 2018, the Republican candidate won House District 67 with over 72% of the vote.

43.  Plaintiff Julie Ann Frey is a retired bank employee residing in Monroe, North Carolina, within House District 69. Ms. Frey is a registered unaffiliated voter who has consistently voted for Democratic candidates for the North Carolina General Assembly. Monroe

14

and its Democratic voters are cracked between House Districts 68 and 69, ensuring that Republicans win both districts. In 2018, the Republican candidate won House District 69 with roughly 60% of the vote.

44. Plaintiff Lily Nicole Quick is a homemaker residing in Greensboro, North Carolina, within House District 59. Ms. Quick is a registered Democrat who has consistently voted for Democratic candidates for the North Carolina General Assembly. The General Assembly packed House Districts 58 and 60 to ensure that Republicans win House District 59. In 2018, the Republican candidate won House District 59 with over 56% of the vote.

45. Plaintiff Joshua Brown is a water quality technician residing in High Point, North Carolina, within House District 60 and Senate District 26. Mr. Brown is a registered Democrat who has consistently voted for Democratic candidates for the North Carolina General Assembly. House District 60 is a packed Democratic district that the Democratic candidate won with over 69% of the vote in 2018. Senate District 26 grabs the heavily Democratic areas in and around High Point, wasting the votes of these Democratic voters (such as Mr. Brown) in an overwhelmingly Republican district. In 2018, the Republican candidate won Senate District 26 with nearly 65% of the vote.

46. Plaintiff Carlton E. Campbell Sr. is a retired teacher residing in Whiteville, North Carolina, within House District 46. Mr. Campbell is a registered Democrat who has consistently voted for Democratic candidates for the North Carolina General Assembly. The General Assembly cracked Democratic voters across House Districts 46 and 16, and packed Democratic voters in the neighboring House District 47, ensuring that House District 46 would elect a Republican. In 2018, the Republican candidate won House District 46 with over 63% of the vote.

15

**B.    Defendants**

47.    Defendant David R. Lewis is a member of the North Carolina House of Representatives, representing House District 53, and the Senior Chairman of the House Select Committee on Redistricting. Defendant Lewis is sued in his official capacity only.

48.    Defendant Ralph E. Hise, Jr. is a member of the North Carolina Senate, representing Senate District 39, and the Chairman of the Senate Standing Committee on Redistricting. Defendant Hise is sued in his official capacity only.

49.    Defendant Timothy K. Moore is the Speaker of the North Carolina House of Representatives. Defendant Moore is sued in his official capacity only.

50.    Defendant Philip E. Berger is the President Pro Tempore of the North Carolina Senate. Defendant Berger is sued in his official capacity only.

51.    Defendant the State of North Carolina has its capital in Raleigh, North Carolina.

52.    Defendant North Carolina State Board of Elections and Ethics Enforcement is an agency responsible for the regulation and administration of elections in North Carolina.

53.    Defendant Joshua Malcolm is the Chairman of the North Carolina State Board of Elections and Ethics Enforcement. Mr. Malcolm is sued in his official capacity only.

54.    Defendant Ken Raymond is the Secretary of the North Carolina State Board of Elections and Ethics Enforcement. Mr. Raymond is sued in his official capacity only.

55.    Defendant Stella Anderson is a member of the North Carolina State Board of Elections and Ethics Enforcement. Ms. Anderson is sued in her official capacity only.

56.    Defendant Damon Circosta is a member of the North Carolina State Board of Elections and Ethics Enforcement. Mr. Circosta is sued in his official capacity only.

16

57.     Defendant Stacy "Four" Eggers IV is a member of the North Carolina State Board of Elections and Ethics Enforcement. Mr. Eggers is sued in his official capacity only.

58.     Defendant Jay Hemphill is a member of the North Carolina State Board of Elections and Ethics Enforcement. Mr. Hemphill is sued in his official capacity only.

59.     Defendant Valerie Johnson is a member of the North Carolina State Board of Elections and Ethics Enforcement. Ms. Johnson is sued in her official capacity only.

60.     Defendant John Lewis is a member of the North Carolina State Board of Elections and Ethics Enforcement. Mr. Lewis is sued in his official capacity only.

61.     Defendant Robert Cordle is a member of the North Carolina State Board of Elections and Ethics Enforcement. Mr. Cordle is sued in his official capacity only.

### JURISDICTION AND VENUE

62.     This Court has jurisdiction of this action pursuant to Articles 26 and 26A of Chapter 1 of the General Statutes.

63.     Under N.C. Gen. Stat. § 1-81.1, the exclusive venue for this action is the Wake County Superior Court.

64.     Under N.C. Gen. Stat. § 1-267.1, a three-judge court must be convened because this action challenges the validity of redistricting plans enacted by the General Assembly.

### FACTUAL ALLEGATIONS

**A.      National Republican Party Officials Target North Carolina For Partisan Gerrymandering Prior to the 2010 Elections**

65.     In the years leading up to the 2010 decennial census, national Republican leaders undertook a sophisticated and concerted effort to gain control of state governments in critical swing states such as North Carolina. The Republican State Leadership Committee (RSLC) codenamed the plan "the REDistricting Majority Project" or "REDMAP." REDMAP's goal was

17

to "control[] the redistricting process in . . . states [that] would have the greatest impact on determining how both state legislative and congressional district boundaries would be drawn" after the 2010 census. The RSLC's REDMAP website explained that fixing these district lines in favor of Republicans would "solidify conservative policymaking at the state level and maintain a Republican stronghold in the U.S. House of Representatives for the next decade."

66.    North Carolina was a key REDMAP "target state." REDMAP aimed to flip both chambers of the North Carolina General Assembly from Democratic to Republican control.

67.    To spearhead its efforts in North Carolina, the RSLC enlisted the most influential conservative donor in North Carolina, Art Pope. The RSLC and Pope targeted 22 races in the North Carolina House and Senate. Pope helped create a new non-profit organization called "Real Jobs NC" to finance spending on the races, and the RSLC donated $1.25 million to this new group. Pope himself made significant contributions; in total, Pope, his family, and groups backed by him spent $2.2 million on the 22 targeted races. This represented three-quarters of the total spending by all independent groups in North Carolina on the 2010 state legislative races.

68.    The money was well spent. Republicans won 18 of the 22 races the RSLC targeted, giving Republicans control of both the House and Senate for the first time since 1870.

**B.    Republican Mapmakers Create the 2011 Plans from Party Headquarters**

69.    After taking control of both chambers of the General Assembly, Republicans set out to redraw district lines to entrench Republicans in power. The RSLC's President and CEO, Chris Jankowski, sent a letter to officials in Republican-controlled states (including North Carolina) offering the RSLC's assistance with the upcoming redistricting. Jankowski explained that the RSLC had "taken the initiative to retain a team of seasoned redistricting experts," and the RSLC would happily make this team "available to" the Republican state officials.

18

Jankowski noted that RSLC's expert "redistricting team" was "led by Tom Hofeller," who had been the principal redistricting strategist for the Republican Party for decades.

70.     Republicans leaders in the North Carolina General Assembly took Jankowski up on his offer. The drawing of the new North Carolina House and Senate plans (the "2011 Plans") was not done by any committee or subcommittee of the General Assembly. Instead, it was primarily done by four Republican Party operatives: (1) Hofeller; (2) John Morgan, another national Republican mapmaker and longtime associate of Hofeller, (3) Dale Oldham, an attorney who served as counsel to the Republican National Committee; and (4) Joel Raupe, a former aide to several Republican representatives in the North Carolina Senate. A newly created shadow organization known as "Fair and Legal Redistricting North Carolina" paid for Morgan's and Raupe's work, while Hofeller was paid with a combination of state funds and money from the RSLC's non-profit arm the State Government Leadership Foundation.

71.     Hofeller and his team worked out of the basement of the state Republican Party headquarters on Hillsborough Street in Raleigh. They did not use a government computer to create the new plans. Rather, they created the new plans using computers owned by the Republican National Committee and software licensed by the state Republican Party.

72.     The map-making process was shielded from public view. Only a small group of individuals that included Hofeller's team and Republican leaders in the General Assembly saw the first drafts of the maps before they were publicly released in June 2011.

73.     One person who was allowed to directly participate in the map-drawing process was mega-donor Art Pope. Despite not being a practicing lawyer, Pope served as "pro bono" counsel to the state legislature and met several times with Hofeller and his team at Republican

Party headquarters while they were working on the new plans. Pope even proposed specific changes to certain districts.

74. Although Republicans drew their maps in secret, their intentions were clear as day. Their goal was to maximize the number of seats Republicans would win in the General Assembly through whatever means necessary.

75. Hofeller later admitted that, in creating the 2011 Plans, his team used past election results in North Carolina to predict the "partisan voting behavior" of the new districts. Republican leaders in the General Assembly likewise later admitted in court filings that "[p]olitical considerations played a significant role in the enacted [2011] plans," and that the plans were "designed to ensure Republican majorities in the House and Senate." *Dickson v. Rucho*, No. 201PA12-3, 2015 WL 4456364, at *16, 55 (N.C. July 13, 2015). The Republican leaders asserted that they were "perfectly free" to engage in partisan gerrymandering, and that they had done just that in constructing the 2011 Plans. *Dickson v. Rucho*, No. 201PA12-2, 2013 WL 6710857, at *60 (N.C. Dec. 9, 2013).

**C.      Republicans Enact the 2011 Plans To Entrench Their Party's Political Power**

76. The General Assembly adopted the Hofeller-drawn plans in July 2011, designated HB 937 and SB 45 respectively. Not a single Democrat in the General Assembly voted for either plan, and only one Republican representative voted against them.

77. Shortly thereafter, legislators learned that certain census blocks were not assigned to any district in the enacted plans. In November 2011, the General Assembly passed curative House and Senate plans, designated HB 776 and SB 282 respectively, to add the previously omitted blocks. No Democrat voted for either curative plan.

**D. The 2011 Plans Gave Republicans Super-Majorities That Were Grossly Disproportionate to Republicans' Share of the Statewide Vote**

78. The 2011 Plans achieved exactly the effect that Republicans in the General Assembly intended. In the 2012 election, the parties' vote shares for the North Carolina House of Representatives were nearly evenly split across the state, with Democrats receiving 48.4% of the two-party statewide vote. But Democrats won only 43 of 120 seats (36%). In other words, Republicans won a veto-proof majority in the state House—64% of the seats (77 of 120)—despite winning just a bare majority of the statewide vote. Further, because of the rigging of district lines, 53 of the 120 House races were uncontested.

79. In the 2012 Senate elections, Democrats won nearly half of the statewide vote (48.8%), but won only 18 of 50 seats (36%). Republicans thus won a veto-proof majority in the Senate while winning only a tiny majority of the total statewide vote.

80. In 2014, Republican candidates for the House won 54.4% of the statewide vote, and again won a super-majority of seats (74 of 120, or 61.6%). Over half of the House seats, 62 of 120, went uncontested in 2014.

81. In the 2014 Senate elections, Republicans won 54.3% of statewide vote and 68% of the seats (34 of 50). There were 21 uncontested elections in the Senate in 2014, with Republicans winning 12 uncontested districts and Democrats winning 9.

82. In 2016, Republicans again won 74 of 120 House seats, or 62%, this time with 52.6% of the statewide vote. Nearly half of all of the House seats were uncontested (59 of 120).

83. In the 2016 Senate elections, Republicans won 55.9% of the statewide vote and 70% of the seats (35 of 50). Republicans held 12 uncontested seats compared to 6 for Democrats, for a total of 18 uncontested races.

84. The below charts summarizes the election results under the 2011 Plans:

| Year | House | | Senate | |
|------|-------|---|--------|---|
| | Republican Percentage of Statewide Vote | Republican Percentage of Seats Won | Republican Percentage of Statewide Vote | Republican Percentage of Seats Won |
| 2012 | 51.6% | 64.2% (77 of 120) | 51.2% | 64.0% (32 of 50) |
| 2014 | 54.4% | 61.6% (74 of 120) | 54.3% | 68.0% (34 of 50) |
| 2016 | 52.6% | 61.6% (74 of 120) | 55.9% | 70.0% (35 of 50) |

E.      **A Federal Court Strikes Down Many Districts as Racially Gerrymandered**

85.      The 2011 Plans led to substantial litigation, including the federal lawsuit styled

*Covington v. North Carolina*, No. 1:15-CV-00399 (M.D.N.C.).  In *Covington*, the plaintiffs

challenged 19 districts in the North Carolina House (5, 7, 12, 21, 24, 29, 31, 32, 33, 38, 42, 43,

48, 57, 58, 60, 99, 102, and 107) and 9 districts in the North Carolina Senate (4, 5, 14, 20, 21, 28,

32, 38, and 40).  They alleged that race predominated in the drawing of these districts, in

violation of the federal Equal Protection Clause.  In August 2016, the federal district court found

for the plaintiffs as to all of the challenged districts, but permitted the General Assembly to wait

until after the November 2016 elections to enact remedial plans.  *Covington v. North Carolina*,

316 F.R.D. 176, 176-78 (M.D.N.C. 2016).  The U.S. Supreme Court summarily affirmed this

decision.  137 S. Ct. 2211 (2017).

86.      In a subsequent order, the district court gave the General Assembly a deadline of

September 1, 2017 to enact new House and Senate plans remedying the racial gerrymanders the

court had found.  *Covington v. North Carolina*, 267 F. Supp. 3d 664 (M.D.N.C.  2017).

F.      **The General Assembly Enacts the 2017 Plans To Dilute the Voting Power of
       Democratic Voters and Maximize the Political Advantage of Republicans**

87.      The General Assembly began developing new House and Senate plans in June

2017.  On June 30, 2017, Senator Berger appointed 15 senators—10 Republicans and

5 Democrats—to the Senate Committee on Redistricting.  Senator Hise was appointed Chair.

22

88.     Also on June 30, 2017, Representative Moore appointed 41 House members—28 Republicans and 13 Democrats—to the House Select Committee on Redistricting. Representative Lewis was appointed Senior Chair.

89.     At a July 26, 2017 joint meeting of the House and Senate Redistricting Committees, Representative Lewis and Senator Hise disclosed that Republican leadership would again employ Dr. Hofeller to draw the new House and Senate plans. When Democratic Senator Terry Van Duyn asked whether Hofeller would "be available to Democrats and maybe even the Black Caucus to consult," Representative Lewis answered "no." Joint Comm. Hr'g, July 26, 2017, at 22-23. Representative Lewis explained that, "with the approval of the Speaker and the President Pro Tem of the Senate," "Dr. Hofeller is working as a consultant to the Chairs," *i.e.*, as a consultant only to Representative Lewis and Senator Hise. *Id.* at 23.

90.     In overseeing the 2016 redrawing of North Carolina's congressional districts, Representative Lewis had previously explained that Hofeller is "very fluent in being able to help legislators translate their desires" into the district lines, and that Representative Lewis' "desires" are to elect as many Republicans as possible. Representative Lewis said about the newly created congressional districts: "I think electing Republicans is better than electing Democrats. So I drew this map in a way to help foster what I think is better for the country."

91.     On August 4, 2017, at another joint meeting of the House and Senate Redistricting Committees, Representative Lewis and Senator Hise advised Committee members that the *Covington* decision invalidating 28 districts on federal constitutional grounds had rendered a large number of additional districts invalid under the Whole County Provision of the North Carolina Constitution, and those districts would also have to be redrawn.

92.     At this meeting, the Committees allowed 31 citizens to speak for two minutes each about the manner in which the House and Senate maps should be redrawn. All speakers urged the members to adopt fair maps free of partisan bias. The Committees ignored them.

93.     At another joint meeting on August 10, 2017, the House and Senate Redistricting Committees voted on criteria to purportedly govern the new plans.

94.     Representative Lewis proposed as one criterion: "election data[:] political consideration and election results data may be used in drawing up legislative districts in the 2017 House and Senate plans." Joint Comm. Hr'g, Aug. 10, 2017, at 132. Representative Lewis provided no further explanation or justification for this criterion in introducing it, stating only: "I believe this is pretty self-explanatory, and I would urge members to adopt the criteria." *Id.*

95.     Democratic members repeatedly pressed Representative Lewis for details on how Hofeller would use the elections data and for what purpose. Senator Clark asked, for instance: "You're going to collect the political data. What specifically would the Committee do with it?" *Id.* at 135. Representative Lewis answered that "the Committee could look at the political data as evidence to how, perhaps, votes have been cast in the past." *Id.* When Senator Clark inquired why the Committees would consider election results if not to predict *future* voting behavior, Representative Lewis offered no substantive answer, stating only that "the consideration of political data in terms of election results is an established districting criteria, and it's one that I propose that this committee use in drawing the map." *Id.* at 141.

96.     The House and Senate Committees adopted the "election data" criterion on a party-line vote. *Id.* at 141-48. No Democrat on the Committees voted for the criterion, but all 32 Republican members of the Committees did. *Id.*

24

97.    Representative Lewis disclosed that the specific election results that Hofeller would use were the U.S. Senate election in 2010, the elections for President, Governor, and Lieutenant Governor in 2012, the U.S. Senate election in 2014, and the elections for President, U.S. Senate, Governor, Lieutenant Governor, and Attorney General in 2016. *Id.* at 137-38.

98.    Senator Clark proposed an amendment that would prohibit the General Assembly from seeking to maintain or establish a partisan advantage for any party in redrawing the plans. *Id.* at 166-67.  Representative Lewis opposed the amendment without explanation, stating only that he "would not advocate for [its] passage." *Id.* at 167.  The Committees rejected Senator Clark's proposal on a straight party-line vote. *Id.* at 168-74.

99.    As a further criterion, Representative Lewis proposed incumbency protection. Specifically, he proposed that "reasonable efforts and political considerations may be used to avoid pairing incumbent members of the House or Senate with another incumbent in legislative districts drawn in [the] 2017 House and Senate plans." *Id.* at 119.

100.    Representative Darren Jackson objected to protecting incumbents who were elected under the unconstitutional prior maps. *Id.* at 120.  Senator Van Duyn likewise stated that new districts "should represent the voters and not elected officials," and therefore she "fundamentally believe[d] that incumbency should not be a criteria." *Id.* at 123.

101.    The House and Senate Committees adopted the incumbency-protection criterion on a straight-party line vote. *Id.* at 125-32.  All 32 Republican members of the Committees voted in favor, and all 18 Democratic members voted against. *Id.*

102.    The Committees also adopted as criteria, along straight party-line votes, that the Committees would make "reasonable efforts" to split fewer precincts than under the 2011 Plans,

and that the Committees "may consider municipal boundaries" in drawing the new districts. *Covington, id.* at 66, 79, 98-104, 112-19.

103.    As a final criterion, Representative Lewis proposed that the Committees be prohibited from considering racial data in drawing the new House and Senate plans. *Covington,* ECF 184-9 at 148. Representative Lewis and other Republican leaders thus explicitly asserted that no districts would be drawn with the goal of complying with Section 2 of the Voting Rights Act. *See id.* at 157. Republican leaders added in a later court filing that, "[t]o the extent that any district in the 2017 House and Senate redistricting plans exceed 50% BVAP, such a result was naturally occurring and the General Assembly did not conclude that the Voting Rights Act obligated it to draw any such district." *Covington,* ECF No. 184 at 10.

104.    The full criteria adopted by the Committees for the 2017 Plans read as follows:

Equal Population. The Committees shall use the 2010 federal decennial census data as the sole basis of population for drawing legislative districts in the 2017 House and Senate plans. The number of persons in each legislative district shall comply with the +/- 5 percent population deviation standard established by *Stephenson v. Bartlett,* 355 N.C. 354, 562 S.E. 2d 377 (2002).

Contiguity. Legislative districts shall be comprised of contiguous territory. Contiguity by water is sufficient.

County Groupings and Traversals. The Committees shall draw legislative districts within county groupings as required by *Stephenson v. Bartlett,* 355 N.C. 354, 562 S.E. 2d 377 (2002) (*Stephenson I*), *Stephenson v. Bartlett,* 357 N.C. 301, 582 S.E.2d 247 (2003) (*Stephenson II*), *Dickson v. Rucho,* 367 N.C. 542, 766 S.E.2d 238 (2014) (*Dickson I*) and *Dickson v. Rucho,* 368 N.C. 481, 781 S.E.2d 460 (2015) (*Dickson II*). Within county groupings, county lines shall not be traversed except as authorized by *Stephenson I, Stephenson II, Dickson I,* and *Dickson II.*

Compactness. The Committees shall make reasonable efforts to draw legislative districts in the 2017 House and Senate plans that improve the compactness of the current districts. In doing so, the Committees may use as a guide the minimum Reock ("dispersion") and Polsby-Popper ("perimeter") scores identified by Richard H. Pildes and Richard G. Neimi in *Expressive Harms, "Bizarre Districts," and Voting Rights: Evaluating Election-District Appearances After Shaw v. Reno,* 92 Mich. L. Rev. 483 (1993).

26

Fewer Split Precincts. The Committees shall make reasonable efforts to draw legislative districts in the 2017 House and Senate plans that split fewer precincts than the current legislative redistricting plans.

Municipal Boundaries. The Committees may consider municipal boundaries when drawing legislative districts in the 2017 House and Senate plans.

Incumbency Protection. Reasonable efforts and political considerations may be used to avoid pairing incumbent members of the House or Senate with another incumbent in legislative districts drawn in the 2017 House and Senate plans. The Committees may make reasonable efforts to ensure voters have a reasonable opportunity to elect non-paired incumbents of either party to a district in the 2017 House and Senate plans.

Election Data. Political considerations and election results data may be used in the drawing of legislative districts in the 2017 House and Senate plans.

No Consideration of Racial Data. Data identifying the race of individuals or voters shall not be used in the drawing of legislative districts in the 2017 House and Senate plans.

*Covington*, ECF No. 184-37.

105.    Republican leaders in the General Assembly "did not introduce any evidence regarding what additional instructions, if any, Representative Lewis or Senator Hise provided to Dr. Hofeller about the proper use and weighting of the various criteria." *Covington v. North Carolina*, 283 F. Supp. 3d 410, 418 (M.D.N.C. 2018). "Nor did they offer any evidence as to how Dr. Hofeller weighted or ordered the criteria in drawing the proposed remedial maps, either in general or as to any particular district." *Id.*

106.    As in 2011, no committee or subcommittee of the General Assembly participated in drawing the new maps. Instead, Hofeller again drew the maps in secret, under the direction of Representative Lewis and Senator Hise. Representative Lewis would admit that he "primarily . . . directed how the [House] map was produced," and that he, Hofeller, and Representative Nelson

27

Dollar were the only "three people" who had even "seen it prior to its public publication." N.C. House Floor Session Hr'g, Aug. 28, 2017, at 40.

107.     And as in 2011, Hofeller did not use a government computer in creating the new districts. On information and belief, he used a personal computer instead.

108.     Representative Lewis and Senator Hise released the proposed House and Senate plans on August 21, 2017.

109.     At a Senate Redistricting Committee hearing three days later, Senate Van Duyn asked Senator Hise how the prior elections data had been used in drawing the proposed maps. Senator Hise admitted that they "did make partisan considerations when drawing particular districts." Senate Comm. Hr'g, Aug. 24, 2017, at 26.

110.     Outside expert analyses confirmed that the proposed maps were gerrymandered to favor Republicans. The Campaign Legal Center calculated the "efficiency gap" of the proposed plans. The efficiency gap measures how efficiently a party's voters are distributed across districts. For each party, the efficiency gap calculates that party's number of "wasted" votes, defined as the number of votes cast for losing candidates of that party (as a measure of cracked votes) plus the number of votes cast for winning candidates in excess of 50% (as a measure of packed votes). The lower each of these numbers, the fewer wasted votes and the more likely a party is to win additional seats. The efficiency gap equals the difference in the total wasted votes between the two parties, divided by the total number of votes cast in the election. Using the same elections data that the Committees used to develop the proposed maps, the Campaign Legal Center calculated that the proposed House plan had an efficiency gap of 11.98% in Republicans' favor, and the proposed Senate plan had an efficiency gap of 11.87% in Republicans' favor.

28

*Covington*, ECF No. 187-3 at 2. The Campaign Legal Center explained that, "[b]y historical standards, these are extraordinarily large figures, revealing an enormous Republican edge." *Id.*

111.    Other statistical analyses found the same. Dr. Gregory Herschlag, a professor of mathematics at Duke University, created tens of thousands of alternative, non-partisan Senate districting configurations within Wake, Mecklenburg, Cumberland, and Guilford Counties. Dr. Herschlag created these simulated districting plans using the traditional districting criteria of equal population, compactness, avoiding splitting precincts, and contiguity. *Covington*, ECF No. 187-3 at 10 ¶ 6. Dr. Herschlag then compared the expected outcomes under these simulated districts with those under the Republican leaders' proposed districts in the same counties. Dr. Herschlag found that, using the votes cast in the 2012 and 2016 Presidential elections, the 2014 and 2016 U.S. Senate elections, the 2012 and 2014 U.S. House of Representatives elections, and the 2016 Governor election to predict partisan outcomes, the Republicans leaders' proposed districts were more favorable to Republicans than 99.9% of the non-partisan simulations. *Id.* ¶ 12. Plaintiffs in this case will show that similar results hold across the state.

112.    The extreme partisan bias of the proposed plans was also apparent from the elections data that the House and Senate Redistricting Committees themselves released with the proposals. The Committees provided data on the partisan breakdown of each proposed district using the state and federal elections that the Committees considered in drawing the districts.

113.    The chart below shows the number of House districts Republicans would be expected to win under the Committees' House plan when overlaying the results of each election the General Assembly considered. These expected seats approximate the number of seats Republicans actually won under the 2011 House plan (77 in 2012, 74 in 2014, and 74 in 2016).

| Election | Expected Republican Seats Under Committees' House Plan |
|---|---|
| 2010 U.S. Senate | 82 |
| 2012 Lieutenant Governor | 74 |
| 2012 Governor | 72 |
| 2012 President | 78 |
| 2014 U.S. Senate | 76 |
| 2016 Attorney General | 77 |
| 2016 Lieutenant Governor | 79 |
| 2016 Governor | 72 |
| 2016 U.S. Senate | 79 |
| 2016 President | 76 |

114.    The following chart shows the number of Senate districts Republicans would be expected to win under the Committees' Senate plan when overlaying the results of each of the elections that the General Assembly considered. These expected Republican seats approximate the number of seats Republicans actually won under the 2011 Senate plan (which were 32, 34, and 35 seats in 2012, 2014, and 2016 respectively).

| Election | Expected Republican Seats Under Committees' Senate Plan |
|---|---|
| 2010 U.S. Senate | 35 |
| 2012 Lieutenant Governor | 31 |
| 2012 Governor | 33 |
| 2012 President | 33 |
| 2014 U.S. Senate | 33 |
| 2016 Attorney General | 31 |
| 2016 Lieutenant Governor | 34 |
| 2016 Governor | 32 |
| 2016 U.S. Senate | 34 |
| 2016 President | 33 |

115.    Thus, for example, overlaying the results of the 2014 U.S. Senate election over the Committees' proposed districts, Republicans would win 76 of the 120 proposed House districts and 33 of the 50 proposed Senate districts. Republicans would win these massive landslides in both chambers even though the 2014 U.S. Senate election was nearly a tie statewide—the Republican candidate won by only 1.5 percentage points.

116. Of the roughly 4,300 public comments received by the General Assembly about the 2017 redistricting process, more than 99% reflected opposition to gerrymandering. For example, the author of the first written comment submitted to the Committees said: "I strongly encourage the North Carolina General Assembly to adopt new maps that are fair and open, that avoid racial or partisan gerrymandering, and that allow voters to pick their political representatives, not the other way around." Other comments made the same plea.

117. But the Committees ignored the will of the people and forged ahead. On August 24, 2017, on a straight party-line vote, the Senate Redistricting Committee adopted the Senate map crafted by Hofeller without modification. The next day, the House Redistricting Committee adopted Hofeller's proposed House plan without modification, also on a straight party-line vote.

118. On August 28, 2017, during a House floor debate on the proposed House map, an amendment modifying some districts in Wake County was approved by a largely party-line vote.

119. On August 31, 2017, the General Assembly passed the House plan (designated HB 927) and the Senate plan (designated SB 691), with a few minor modifications from the versions passed by the Committees. No Democratic Senator voted in favor of either plan. The sole Democratic member of the House who voted for the plans was Representative William Brisson, who switched to become a Republican several months later.

120. The 2017 Plans passed by the General Assembly altered at least 106 of the 170 total House and Senate districts from the 2011 Plans. *Covington*, 283 F. Supp. 3d at 418.

### G. The *Covington* Court Appoints a Special Master To Redraw Several Districts in the 2017 Plans That Remained Racially Gerrymandered

121. The *Covington* plaintiffs objected to the new plans, arguing that the plans did not cure the racial gerrymanders in two House districts (21 and 57) and two Senate districts (21 and 28). *Covington*, 283 F. Supp. 3d at 429. The court agreed. *Id.* at 429-42. The court further held

31

that the General Assembly's changes to five House districts (36, 37, 40, 41, and 105) violated the North Carolina Constitution's prohibition on mid-decade redistricting. *Id.* at 443-45.

122.    The *Covington* plaintiffs also stated that the new plans were blatant partisan gerrymanders. But given the remedial stage of the case, the plaintiffs did not "raise any partisan gerrymandering objections," and the court "[did] not address whether the 2017 Plans are unconstitutional partisan gerrymanders." *Covington*, 283 F. Supp. 3d at 429 n.2.

123.    The court appointed Dr. Nathaniel Persily as a Special Master to assist in redrawing the districts for which the court had sustained the plaintiffs' objections. To cure the racially gerrymandered districts, the Special Master needed to adjust not only those districts, but also certain districts adjoining them. In his recommended remedial plans submitted to the court on December 1, 2017, the Special Master made material adjustments to House Districts 22, 59, 61, and 62 in redrawing House Districts 21 and 57, and made material adjustments to Senate Districts 19, 24, and 27 in redrawing Senate Districts 21 and 28. *Covington*, ECF No. 220 at 30-55. The court adopted the Special Master's recommended changes to all of these districts.

124.    The Special Master also restored the districts that the court had found were redrawn in violation of the ban on mid-decade redistricting to the 2011 versions of those districts. *Covington*, ECF No. 220 at 56-66. The court adopted these changes as well.

125.    On June 28, 2018, the U.S. Supreme Court affirmed the lower court's adoption of the Special Master's remedial plans for House Districts 21 and 57 (and the relevant adjoining districts) and Senate Districts 21 and 28 (and the relevant adjoining districts). *North Carolina v. Covington*, 138 S. Ct. 2548, 2553-54 (2018). But the U.S. Supreme Court reversed the district court's adoption of the Special Master's plans for the districts allegedly enacted in violation of the mid-decade redistricting prohibition, finding that the district court had exceeded its remedial

32

authority in rejecting newly enacted districts on this basis. *Id.* at 2554-55. Plaintiffs do not challenge in this case any district materially redrawn by the Special Master that remains in effect.

**H.      The 2017 Plans Pack and Crack Plaintiffs and Other Democratic Voters To Dilute Their Votes and Maximize the Political Advantage of Republicans**

126.    To maximize the number of Republican seats in the General Assembly, the 2017 Plans meticulously "pack" and "crack" Democratic voters. Packing and cracking are the two primary means by which mapmakers carry out a partisan gerrymander. "Packing" involves concentrating one party's backers in a few districts that they will win by overwhelming margins to minimize the party's votes elsewhere. "Cracking" involves dividing a party's supporters among multiple districts so that they fall comfortably short of a majority in each district.

127.    The sections below set forth some of the examples of packing and cracking of Democratic voters in each of the 2017 Plans.

**1.      The 2017 House Plan Packs and Cracks Democratic Voters**

House Districts 2 and 32

128.    House Districts 2 and 32 are within a county cluster of Person, Granville, Vance, and Warren Counties.

33



129.    As shown in the image above,[1] in drawing the two districts within this cluster, the General Assembly packed the Democratic voters in and around Oxford with the Democratic voters in Henderson and in municipalities east of Henderson such as Warrenton and Norlina. This packing made House District 32 an overwhelmingly Democratic district in order to ensure that House District 2 would be a Republican-leaning district.

<u>House Districts 4, 14, and 15</u>

130.    House Districts 4, 14, and 15 are within a county cluster containing Duplin and Onslow Counties.

---

[1] All precinct-level partisanship data in the images that follow are based on the precinct-level election results from the 2014 U.S. Senate election in North Carolina.

34



131.     The General Assembly split Jacksonville across House District 14 and 15, cracking its Democratic voters across the two districts and placing its most Democratic precincts in House District 15 with otherwise heavily Republican areas. The General Assembly also made sure to keep Jacksonville's Democratic voters in separate districts from the Democratic-leaning cities of Warsaw and Kenansville. This cracking allowed all three districts to lean Republican.

House Districts 7 and 25

132.     House Districts 7 and 25 are within a county cluster of Franklin and Nash Counties.



133.    The General Assembly constructed this cluster to make sure that one of the two

districts, House District 7, would favor Republicans, rather than risk that both districts could

elect Democrats.  To accomplish this, the General Assembly caused House District 7 to wrap

around the southwestern edge of House District 25, allowing House District 7 to pick up deep

red communities in southern Nash County.

<u>House Districts 8, 9 and 12</u>

134.    House Districts 8, 9, and 12 are within a county cluster consisting of Pitt and

Lenoir Counties.

36



135.    The General Assembly split Greenville nearly in half across separate districts in this cluster, even though Greenville is the county seat of Pitt County and has a population that is just slightly more than the target population for a single district. But the General Assembly carefully placed Greenville's most Democratic areas in House District 8, packing these Democratic voters with others in the surrounding areas to create an overwhelmingly Democratic district. The General Assembly placed the more moderate and Republican-leaning areas of Greenville in House District 9 with other Republican areas, ensuring that this district would elect a Republican. The General Assembly similarly constructed House District 12 to favor Republicans by avoiding the Democratic precincts in and around Greenville.

<u>House Districts 10, 26, 28, 51, and 53</u>

136. House Districts 10, 26, 28, 51, and 53 are part of a seven-county cluster spanning Greene, Wayne, Sampson, Bladen, Johnston, Harnett, and Lee Counties. This cluster also includes House Districts 21 and 22, which were redrawn by the special master in *Covington* and are not challenged in this case.



137. The General Assembly cracked the Democratic pockets of Johnston, Harnett, and Lee Counties into four separate districts (House Districts 26, 28, 53, and 51), so that none of these four districts would lean toward Democrats.

<u>House Districts 11, 33, 34, 35, 36, 37, 38, 39, 40, 41, and 49</u>

138. House Districts 11, 33, 34, 35, 36, 37, 38, 39, 40, 41, and 49 are all located within Wake County.

38



139.     The General Assembly packed Democrats into House Districts 11, 33, 34, 38, 39,

and 49 in order to maximize the number of districts within Wake County that would be

competitive for Republicans.  Based on the 2014 U.S. Senate results, for example, House

Districts 35, 36, 37, and 40 all favor Republicans.  Under a non-partisan map, these districts

would be more Democratic-leaning.  Indeed, although all four districts elected Democratic

candidates by narrow margins in 2018, the NCDP had to spend far more money and other

resources to win these districts than it would have under a non-partisan map.

140.     On February 17, 2018, the North Carolina State Conference of NAACP Branches

and other plaintiffs filed an action alleging that four of the House Districts in Wake County (36,

37, 40, and 41) were redrawn in 2017 violation of the North Carolina Constitution's prohibition

on mid-decade redistricting.  *N.C. State. Conf. of NAACP Branches v. Lewis*, 18 CVS 2322 (N.C.

Super.).  On November 2, 2018, the Superior Court granted summary judgment to the plaintiffs

and ordered the General Assembly to "remedy the identified defects and enact a new Wake

County House District map for use in the 2020 general election."  House Districts 36, 37, 40,

39

and 41 therefore will revert to the 2011 versions of those districts or to districts closely

resembling the 2011 versions.  The 2011 versions of House Districts 36, 37, 40, and 41 were all

gerrymandered to favor Republicans.

<u>House Districts 16, 46, and 47</u>

141.    House Districts 16, 46, and 47 are within a county cluster of Pender, Columbus,

and Robeson Counties.



142.    The General Assembly split Lumberton across two separate districts in this

cluster.  It placed the Democratic areas of Lumberton in House District 47 with other heavily

Democratic areas, while placing the more Republican parts of Lumberton into House District 46.

The General Assembly then cracked the Democratic voters of Whiteville (in House District 16)

from those in and around Chadbourn (just to the west of Whiteville in House District 46).

Through these choices, the General Assembly created two districts that moderately favor

Republicans using the statewide election results that the General Assembly considered (House

District 16 and 46) and one overwhelmingly Democratic district (House District 47).

40

House Districts 17, 18, 19, and 20

143.    House Districts 17, 18, 19, and 20 are within a county cluster of New Hanover

and Brunswick Counties.



144.    The General Assembly manipulated this county cluster to create one packed

Democratic district (House District 18) and three Republican-leaning districts (House Districts

17, 19, 20). The General Assembly split Wilmington across three different districts to

accomplish this feat. It placed Wilmington's most Democratic areas in House District 18, where

these Democratic voters were joined with the Democratic voters in and around Leland, while

Wilmington's more Republican-leaning and swing precincts were placed in House Districts 19

and 20. In 2018, Republican candidates won House Districts 17, 19, and 20 with 63%, 51%, and

53% of the two-party vote respectively.

House Districts 42, 43, 44, and 45

145.    House Districts 42, 43, 44, and 45 are all within Cumberland County.

41



146.    The General Assembly placed almost all of the most Democratic areas of Cumberland County into three of the four districts in this cluster, House District 42, 43, and 44. The General Assembly packed these Democratic voters to create a Republican-leaning district in Cumberland County, House District 45.  Under a non-partisan map, this district would be more Democratic-leaning.

    House Districts 55, 68, and 69

147.    House Districts 55, 68, and 69 are within a county cluster of Anson and Union Counties.

42



148.    The General Assembly cracked the Democratic voters throughout this cluster to ensure that all three districts would favor Republicans.  As part of this cracking, the General Assembly split Monroe across the three districts, and split Monroe's most Democratic areas between House Districts 68 and 69.

House Districts 58, 59, and 60

149.    House Districts 58, 59 and 60 are three of the six House districts within Guilford County.  The other three districts—House Districts 57, 61, and 62—were redrawn by the special master in the federal Covington lawsuit and are not challenged in this case.[2]

---

[2] The special master made minor changes to House District 59, but Plaintiffs challenge this district in this case.

43



150.    The General Assembly packed House Districts 58 and 60 with heavily

Democratic areas.  This packing, *inter alia*, enabled House District 59 to favor Republicans.

House Districts 63 and 64

151.    House Districts 63 and 64 are both located within Alamance County.



44

152.     The General Assembly caused both House Districts 63 and 64 to favor

Republicans by cracking Burlington and its Democratic voters in half across the two districts.

House Districts 66, 67, 76, 77, 82, and 83

153.     House Districts 66, 67, 76, 77, 82, and 83 are part of a county cluster that covers

Richmond, Montgomery, Stanly, Cabarrus, Rowan, and Davie Counties.



154.     The General Assembly meticulously distributed the Democratic voters in these

counties across all five districts in the cluster, such that Republicans have majorities in all five

districts based on the statewide elections the General Assembly considered.  For instance, the

General Assembly put Albemarle into House District 67, wasting the votes of Albemarle's

Democratic voters in House District 67 to make House District 66 more competitive for Republicans. Although the Democratic candidate won House District 66 in 2018, the NCDP had to spend far more money and other resources to win this district than it would have under a non-partisan map. The General Assembly also wasted Salisbury's Democratic votes in House District 76 by grouping the city with deep red areas. And the General Assembly cracked Concord in half between House Districts 82 and 83, and it splintered Kannapolis and its Democratic voters into three different districts (House Districts 77, 82, and 83).

House Districts 71, 72, 73, 74, and 75

155. House Districts 71, 72, 73, 74, and 75 are within a county cluster of Forsyth and Yadkin Counties.



156. The General Assembly packed Democrats into House Districts 71 and 72 so that the other three districts—House Districts 73, 74, and 75—would all favor Republicans. The General Assembly split the City of Winston-Salem across all five districts in the cluster as part of this scheme, even though Winston-Salem's population could fit within just three districts.

<u>House Districts 88, 92, 98, 99, 100, 101, 102, 103, 104, 105, 106, and 107</u>

157.    House Districts 88, 92, 98, 99, 100, 101, 102, 103, 104, 105, 106, and 107 are all

within Mecklenburg County.



158.    Mecklenburg County is the pinnacle of packing.  The General Assembly packed

as many Democratic voters as possible into seven Mecklenburg County districts (House Districts

88, 92, 99, 100, 101, 106, and 107), in order to create four districts in the county that are

competitive for Republicans (House Districts 98, 103, 104, and 105).  Under a non-partisan map,

these latter four districts would all be more Democratic-leaning.  Indeed, although all four

districts elected Democratic candidates by narrow margins in 2018, the NCDP had to spend far

more money and other resources to win these districts than it would have under a non-partisan

map.

47

House Districts 108, 109, 110, and 111

159.  House Districts 108, 109, 110, and 111 make up a county cluster of Gaston and Cleveland Counties.



160.  The General Assembly split the Democratic stronghold of Gastonia across three different districts (House Districts 108, 109, and 110), and cut the Democratic city of Shelby in half (in House Districts 110 and 111).  The General Assembly similarly distributed the Democratic voters north of Shelby across House District 110 and 111.  The result of all of this cracking is that all four districts in the cluster have comfortable Republican majorities:  the Republican vote share in all four districts is around 60% using the 2014 U.S. Senate results.

House Districts 113 and 117

161.  House Districts 113 and 117 are within a county cluster of Transylvania, Henderson, and Polk Counties.

48



162.　　The General Assembly cracked the Democratic voters in and around Hendersonville from the Democratic voters in and around Brevard, ensuring that both districts in this cluster would elect Republicans.

<u>House District 114, 115, and 116</u>

163.　　House Districts 114, 115, and 116 are all within Buncombe County.

49



164. The General Assembly packed Democratic voters into House District 114 to make House Districts 115 and 116 as favorable to Republicans as possible. Republicans are favored to win House Districts 115 and 116 using the statewide election results from 2010-2016. And although Democrats have won both districts in some both not all election cycles since the districts were enacted in 2011, the NCDP has had to spend more money and other resources to win these districts than it would have under a non-partisan map.

        2.     **The 2017 Senate Plan Packs and Cracks Democratic Voters**

<u>Senate Districts 8 and 9</u>

165. Senate Districts 8 and 9 are within a county cluster of Bladen, Pender, Brunswick, and New Hanover Counties.

50



Piece of Wilmington transferred to Senate District 8

166. Because the population of New Hanover County is slightly too large to fit into one Senate district, the General Assembly had to include a small portion of New Hanover County in Senate District 8 rather than Senate District 9. The General Assembly chose the most heavily Democratic piece of New Hanover County to move to Senate District 8 in order to make Senate District 9 as favorable to Republicans as possible. Specifically, the General Assembly split off a small portion of Wilmington—the "Wilmington Notch"—transferring thousands of Democratic voters from Senate District 9 to 8. The loss of these Democratic voters causes Senate District 9 to lean Republican rather than Democratic using the 2014 U.S. Senate election results. And although Senate District 9 elected a Democrat by less than a percentage point in 2018, the NCDP had to spend far more money and other resources to win this district than it would have under a non-partisan map.

51



The Wilmington Notch

## Senate Districts 10, 11, and 12

167. Senate Districts 10, 11, and 12 span a six-county cluster of Sampson, Duplin, Johnston, Nash, Lee, and Harnett Counties.



168.    The General Assembly cracked the Democratic areas of the six counties in this

cluster across the three districts that the cluster contains.  For instance, the General Assembly

dispersed the Democratic voters in and around Rocky Mount, Clinton, and Sanford across Senate

Districts 10, 11, and 12, respectively.  As a result, all three districts favor Republicans.

Senate Districts 14, 15, 16, 17, and 18

169.    Senate Districts 14, 15, 16, 17, and 18 are within a county cluster of Wake and

Franklin Counties.



170.    The General Assembly packed as many Wake County Democrats as possible into

three districts within this cluster (Senate District 14, 15, and 16).  This packing was done to make

Senate Districts 17 and 18 as Republican-leaning as possible.

171.    To carry out this scheme, the General Assembly split Raleigh across four districts

(Senate District 14, 15, 16, and 18), even though Raleigh's population could fit almost entirely

within two Senate districts.  The General Assembly dissected Raleigh to put its only Republican-

Case 5:18-cv-00589-FL   Document 1-1   Filed 12/14/18   Page 157 of 189

leaning areas, in north and northwest Raleigh, in Senate District 18. Specifically, Senate District 18 grabs the Republican-leaning communities that surround three different Raleigh country clubs—the North Ridge Country Club, the Wildwood Golf Club, and the Carolina Country Club.





172.    To place these Republican areas in Senate District 18 while avoiding north Raleigh's Democratic areas, the General Assembly created a tentacle for Senate District 15 that grabs north Raleigh's Democratic voters. The General Assembly created this tentacle in Senate District 15 via a narrow passageway containing no more than a Costco.

55



Senate District 15
Costco Passageway



173.     Senate District 18, the "Country Club District," performed as the General

Assembly hoped in the 2018 election: Republicans held onto it by a few percentage points.

Republicans managed to win a Wake County seat in the Senate despite the fact that Democrats

won every county-wide election in Wake County in 2018 by overwhelming majorities.  And

although the Democratic won Senate District 17 by a narrow margin, the NCDP had to spend far

more money and other resources to win this district than it would have under a non-partisan map.

    Senate Districts 24, 26, 27, and 28

Case 5:18-cv-00589-FL   Document 1-1   Filed 12/14/18   Page 161 of 189

174.    Senate Districts 24, 26, 27, and 28 are in a county cluster containing Randolph, Guilford, and Alamance Counties.



175.    Senate District 28 is one of the districts that the *Covington* court found to be racially gerrymandered and that the special master redrew. The special master also made certain changes to Senate Districts 24 and 27 in redrawing Senate District 28. But the special master did not alter Senate District 26 from the version enacted by the General Assembly in 2017.

176.    In creating Senate District 26, the General Assembly appended to Randolph County the most heavily Democratic area of Guilford County that could be appended, in and around High Point. The General Assembly moved these Democratic voters into Senate District 26 in order to waste their votes in an otherwise extremely Republican district.

Senate Districts 31 and 32

58

177.     Senate Districts 31 and 32 are within a county cluster of Davie and Forsythe

Counties.



178.     The General Assembly packed all of the most Democratic areas in and around

Winston-Salem into Senate District 32, so that Senate District 31 would favor Republicans.

Senate Districts 37, 38, 39, 40, and 41

179.     Senate Districts 37, 38, 39, 40, and 41 are all located within Mecklenburg County.



180.     The General Assembly packed as many Democrats as possible into Senate

Districts 37, 38, and 40, so as to create two Mecklenburg County districts—Senate Districts 39

and 41—that lean Republican based on the statewide elections the General Assembly considered.

181.     The General Assembly had to go to particularly great lengths to make Senate

District 41 competitive for Republicans.  The district begins north of Charlotte, then slices

through a thin stretch of land west of Charlotte, before curling back around to pick up

Republican-leaning areas south of Charlotte.  To stitch together these disparate areas, Senate

District 41 at one point connects through a nature preserve and at another point the district is

held together only by the Arrowood train station.







Senate District 41
Latta Plantation Nature Preserve

182.    The General Assembly manipulated Senate District 39 to be favorable to Republicans. Despite the enormous Democratic wave in Mecklenburg County in 2018—with Democrats winning every county-wide election by huge margins and sweeping the Mecklenburg County Board of Commissioners races—Republicans managed to hold onto Senate District 39. And although the Democratic candidate won Senate District 41 in 2018, the NCDP had to spend far more money and other resources to win this district than it would have under a non-partisan map.

Senate Districts 48 and 49

183.    Senate Districts 48 and 49 are within a county cluster of Transylvania, Henderson, and Buncombe Counties.

62



184.　The General Assembly packed Democratic voters in and around Asheville into Senate District 49. This packing ensured that Senate District 48 would elect a Republican.

### 3.　The 2017 Plans Achieved Their Goal in the 2018 Election

185.　The 2017 Plans' cracking and packing of Democratic voters worked with remarkable success in the 2018 elections. While the Democratic wave did flip some seats, it could not overcome plans that were designed to guarantee Republicans majorities.

186.　In the 2018 House elections, Democratic candidates won 51.2% of the two-party statewide vote, but won only 55 of 120 seats (46%).

187.　In the 2018 Senate elections, Democratic candidates won 50.5% of the two-party statewide vote, but won only 21 of 50 seats (42%).

188.　Democrats would have won more seats in the House and Senate in 2018—and potentially a majority in either or both chambers—under non-partisan maps.

63

I.    **The Partisan Gerrymandering of the 2017 Plans Causes Plaintiffs and Other Democratic Voters To Be Entirely Shut Out of the Political Process**

189.    The effects of the gerrymander go beyond election results. In today's state legislatures—and particularly in North Carolina—Republican representatives are simply not responsive to the views and interests of Democratic voters. Regardless of whether gerrymandering has *caused* this increased partisanship, such extreme partisanship magnifies the *effects* of partisan gerrymandering. When Democratic voters lose the ability to elect representatives of their party as a result of partisan gerrymandering, those voters lose not only electoral power, but also the ability to influence legislative outcomes—because Republican representatives pay no heed to these voters' views and interests once in office.

190.    There is substantial evidence documenting the increasing polarization of state legislatures, including ideological scores assigned to every state legislator in the country by political scientists Drs. Nolan McCarty and Boris Shor. The chart below depicts the ideological distribution of state legislators nationwide in 1996 and in 2016. Red reflects Republican legislators and blue reflects Democratic legislators, with negative scores on the left of the x-axis indicating a more liberal ideology and positive scores on the right on the x-axis indicating a more conservative ideology.[3] The chart shows that today there are barely any state legislators across the country who overlap ideologically—*i.e.*, barely any Democratic and Republican legislators who overlap in ideological score—and far less than in 1996. Instead, legislators from the parties have grown farther apart, and Republicans legislators in particular have become much more homogenous in ideology, coalescing around an ideological score of +1.

---

[3] *See* State Polarization, 1996-2016, https://americanlegislatures.com/2017/07/20/state-polarization-1996-2016/.



191.    The North Carolina General Assembly is no exception to this trend.  Political

scientists McCarty and Shor have developed ideological scores for every state legislator in the

country based on each legislator's roll call voting behavior.  These ideological scores range from

negative -3 to +3, with negative scores indicating more liberal ideological and positive scores a

more conservative one.  The below chart shows the gap between the average ideological scores

of Republicans and Democrats in the North Carolina General Assembly.  It shows that gap has

grown dramatically—increasing by more than 50%—over the last 20 years.[4]

---

[4] *See* Boris Shor & Nolan McCarty, *Measuring American Legislatures*,
https://americanlegislatures.com/category/polarization/.



192.    This increasing ideological gap reflects the fact that Republican legislators in the North Carolina General Assembly have grown more and more conservative.  The below chart shows the average ideological scores of Republicans in the General Assembly over the last 20 years.  It demonstrates how Republicans in the General Assembly vote in an increasingly more conservative fashion, and thus are less likely to reflect the views of Democratic voters.



66

193.   The extreme polarization of Republicans in the General Assembly is further evidenced by their near-uniform bloc voting behavior.

194.   In the 2017-2018 Session, Republicans in the state Senate almost always voted with a majority of other Republicans and virtually never crossed over to vote with the minority. Every Republican Senator voted with a majority of Republicans over 95% of the time, and the median Republican Senator voted with the Republican majority a stunning 99.2% of the time.[5]

195.   Likewise in the House, in the 2017-2018 Session, nearly every Republican in the state House of Representatives voted with the Republican majority over 90% of the time, and the median Republican in the House voted with the Republican majority 96.70% of the time.[6]

196.   These statistics all illustrate that Republicans in the General Assembly do not represent the views and interests of their Democratic constituents and almost never engage in cross-over voting. Thus, when gerrymandering denies Democratic voters the ability to elect representatives of their party, they also lose any chance of influencing legislative outcomes.

## COUNT I
### Violation of the North Carolina Constitution's
### Equal Protection Clause, Art. I, § 19

197.   Plaintiffs hereby incorporate all other paragraphs as if fully set forth herein.

198.   Article I, Section 19 of the North Carolina Constitution provides in relevant part that "[n]o person shall be denied the equal protection of the laws."

---

[5] *See Senate Member Vote Statistics*, 2017-2018 Session, https://www.ncleg.net/gascripts/voteHistory/MemberVoteStatistics.pl?sSession=2017&sChamber=S.

[6] *See House Member Vote Statistics*, 2017-2018 Session, https://www.ncleg.net/gascripts/voteHistory/MemberVoteStatistics.pl?sSession=2017&sChamber=H.

199.    North Carolina's Equal Protection Clause affords broader protections to its

citizens in the voting rights context than the U.S. Constitution's equal protection provisions.  *See*

*Stephenson v. Bartlett*, 562 S.E.2d 377, 393-95 & n.6 (N.C. 2002); *Blankenship v. Bartlett*, 681

S.E.2d 759, 763 (N.C. 2009).

200.    Irrespective of its federal counterpart, North Carolina's Equal Protection Clause

protects the right to "substantially equal voting power." *Stephenson*, 562 S.E.2d at 394.  "It is

well settled in this State that the right to vote on equal terms is a fundamental right." *Id.* at 393

(internal quotation marks omitted).

201.    The 2017 Plans intentionally and impermissibly classify voters into districts on

the basis of their political affiliations and viewpoints.  The intent and effect of these

classifications is to dilute the voting power of Democratic voters, to make it more difficult for

Democratic candidates to be elected across the state, and to render it virtually impossible for the

Democratic Party to achieve a majority of either chamber of the General Assembly.  Defendants

can advance no compelling or even legitimate state interest to justify this discrimination.

202.    The 2017 Plans' intentional classification of, and discrimination against,

Democratic voters is plain.  The Republican leaders of the House and Senate Redistricting

Committees explicitly used "political considerations and election results data" as a criterion in

creating the 2017 Plans, drew the maps in secret with a Republican mapmaker, and admitted that

they "did make partisan considerations when drawing particular districts." *Covington*, ECF No.

184-17 at 26.  The partisan composition of the districts based on recent results demonstrates that

the map was designed to ensure overwhelming Republican majorities in both chambers.  The

General Assembly's intent is also laid bare by the packing and cracking of individual Democratic

68

communities, as well as a host of statistical analyses and measures that will confirm the 2017 Plans necessarily reflect an intentional effort to disadvantage Democratic voters.

203. These efforts have produced discriminatory effects for Plaintiffs other Democratic voters, including members of Common Cause and the NCDP. On a statewide basis, Democrats receive far fewer state House and Senate seats than they would absent the gerrymanders. The grossly disproportionate number of seats that Republicans have won and will continue to win in the General Assembly relative to their share of the statewide vote cannot be explained or justified by North Carolina's geography or any legitimate redistricting criteria. Moreover, because the gerrymanders guarantee that Republicans will hold a majority in the House and Senate, Plaintiffs and other Democratic voters are unable to elect a legislature that will pass legislation that reflects Democratic voters' positions or policies. The 2017 Plans burden the representational rights of Democratic voters individually and as a group and discriminate against Democratic candidates and organizations individually and as a group.

204. Individual voters also experience discriminatory effects at the district level. For those Plaintiffs and other Democratic voters who live in cracked communities and districts, their voting power is diluted, and it is more difficult than it would be but-for the gerrymander for these voters to elect candidates of their choice. And given the extreme partisanship of Republican representatives in the General Assembly, these voters have no meaningful opportunity to influence legislative outcomes when Republican candidates win their districts, because the Republican representatives simply do not weigh their Democratic constituents' interests and policy preferences in deciding how to act. For those Plaintiffs and other Democratic voters, including members of Common Cause and the NCDP, who live in packed Democratic districts, the weight of their votes has been substantially diluted. Their votes have no marginal impact on

69

election outcomes, and representatives will be less responsive to their individual interests or policy preferences. Accordingly, for all Plaintiffs and others Democratic voters whose votes are diluted under the 2017 Plans, the 2017 Plans impermissibly deny these voters their fundamental right to "vote on equal terms" with "equal voting power." *Stephenson*, 562 S.E.2d at 393-94.

### COUNT II
### Violation of the North Constitution's
### Free Elections Clause, Art. I, § 5

205. Plaintiffs hereby incorporate all other paragraphs as if fully set forth herein.

206. Article I, Section 10 of the North Carolina Constitution, which has no counterpart in the U.S. Constitution, provides that "All elections shall be free" (the "Free Elections Clause").

207. North Carolina's Free Elections Clause traces its roots to the 1689 English Bill of Rights, which declared that "Elections of members of Parliament ought to be free."

208. Numerous other states have constitutional provisions that trace to the same provision of the 1689 English Bill of Rights, including Pennsylvania, which has a constitutional provision requiring that all "elections shall be free and equal." *See League of Women Voters v. Commonwealth*, 178 A.3d 737, 793 (Pa. 2018). On February 7, 2018, the Pennsylvania Supreme Court held that the partisan gerrymander of Pennsylvania's congressional districts violated this clause. The state high court held that Pennsylvania's Free and Equal Elections Clause requires that all voters "have an equal opportunity to translate their votes into representation," and that this requirement is violated where traditional districting criteria such as preserving political subdivisions and compactness are "subordinated, in whole or in part, to extraneous considerations such as gerrymandering for unfair partisan political advantage." *Id.* at 814, 817.

209. North Carolina's Free Elections Clause protects the rights of voters to at least the same extent as Pennsylvania's analogous provision.

70

210.    The 2017 Plans violate the Free Elections Clause by denying Plaintiffs and other

Democratic voters, including members of Common Cause and the NCDP, an equal opportunity

to translate their votes into representation, and by providing an unfair partisan advantage to the

Republican Party and its candidates as a whole over the Democratic Party and its candidates as a

whole. The General Assembly's violation of the Free Election Clause is evidenced by, *inter alia*,

its subordination of traditional districting criteria to illicit partisan motivations.

211.    Elections under the 2017 Plans are anything but "free." They are rigged to

predetermine electoral outcomes and guarantee one party control of the legislature, in violation

of Article I, § 5 of the North Carolina Constitution.

### COUNT III
### Violation of the North Constitution's
### Freedom of Speech and Freedom of Assembly Clauses, Art. I, §§ 12 & 14

212.    Plaintiffs hereby incorporate all other paragraphs as if fully set forth herein.

213.    Article I, § 12 of the North Carolina Constitution provides in relevant part: "The

people have a right to assemble together to consult for their common good, to instruct their

representatives, and to apply to the General Assembly for redress of grievances."

214.    Article I, § 14 of the North Carolina Constitution provides in relevant part:

"Freedom of speech and of the press are two of the great bulwarks of liberty and therefore shall

never be restrained."

215.    North Carolina courts have recognized that Article I, Sections 12 and 14 may

afford broader protections than the federal First Amendment. *Evans v. Cowan*, 468 S.E.2d 575,

578, *aff'd*, 477 S.E.2d 926 (1996).

216.    Article I, Sections 12 and 14 protect the right of voters to participate in the

political process, to express political views, to affiliate with or support a political party, and to

cast a vote. Voting for a candidate of one's choice is core political speech and/or expressive conduct protected by the North Carolina Constitution. Contributing money to, or spending money in support of, a preferred candidate is core political speech and/or expressive conduct as well. And leading, promoting, or affiliating with a political party to pursue certain policy objectives is core political association protected by the North Carolina Constitution.

217. Irrespective of the U.S. Constitution, the 2017 Plans violate Article 1, Sections 12 and 14 of the North Carolina Constitution by intentionally burdening the protected speech and/or expressive conduct of Plaintiffs and other Democratic voters, including members of Common Cause and the NCDP, based on their identity, their viewpoints, and the content of their speech. The 2017 Plans burden the speech and/or expressive conduct of Plaintiffs and other Democratic voters by making their speech and/or expressive conduct—*i.e.*, their votes—less effective. For those Plaintiffs and other Democratic voters who live in cracked districts, the 2017 Plans artificially make it more difficult (if not impossible) for their speech and/or expressive conduct to succeed. And because of the polarization of Republicans in the General Assembly, these voters will be unable to influence the legislative process, resulting in the complete suppression of their political views. For those Plaintiffs and other Democratic voters who live in packed districts, the 2017 Plans artificially dilute the weight and impact of their speech and/or expressive conduct. The General Assembly intentionally created these burdens because of disfavor for Plaintiffs and other Democratic voters, their political views, and their party affiliations.

218. Irrespective of the U.S. Constitution, the 2017 Plans also violate Article 1, Sections 12 and 14 of the North Carolina Constitution by burdening the protected speech and/or expressive conduct of the NCDP. Because of the gerrymanders, the money the NCDP contributes to or spends on Democratic candidates—and the messages conveyed through the

72

contributions and expenditures—are less effective and less able to succeed. The General Assembly intentionally rendered the NCDP's contributions and expenditures less effective because of disagreement with the political viewpoints expressed through those contributions and expenditures and disfavor for the candidates that the NCDP supports.

219.     Irrespective of the U.S. Constitution, the 2017 Plans also violate Article 1, Sections 12 and 14 of the North Carolina Constitution by burdening the associational rights of Plaintiffs. The 2017 Plans burden the ability of Plaintiffs and other Democratic voters, including members of Common Cause and the NCDP, as well as the NCDP as an organization, to affiliate and join together in a political party, to carry out the party's activities, and to implement the party's policy preferences through legislative action. The 2017 Plans burden these associational rights by, *inter alia*, making it more difficult for Plaintiffs and other Democratic voters, as well as the NCDP, to register voters, attract volunteers, raise money in gerrymandered districts, campaign, and turn out the vote, by reducing the total representation of the Democratic Party in the General Assembly, and by making it virtually impossible for Democrats to constitute a majority of either chamber of the General Assembly.

220.     Irrespective of the U.S. Constitution, the 2017 Plans also violate Article 1, Sections 12 and 14 of the North Carolina Constitution by burdening the protected speech, expressive conduct, and associational rights of Common Cause. The 2017 Plans burden Common Cause's ability to convince voters in gerrymandered districts to vote in state legislative elections and to communicate with legislators. And because the 2017 Plans allow the General Assembly to disregard the will of the public, the 2017 Plans' burden Common Cause's ability to communicate effectively with legislators, to influence them to enact legislation that promote voting, participatory democracy, public funding of elections, and other measures that encourage

73

accountable government. The 2017 Plans similarly burden the associational rights of Common Cause by frustrating its mission to promote participation in democracy and to ensure open, honest, and accountable government.

221.     Irrespective of the U.S. Constitution, the 2017 Plans also violate the North Carolina Constitution's prohibition against retaliation against individuals who exercise their rights under Article I, Sections 12 and 14. *See Feltman v. City of Wilson*, 767 S.E.2d 615, 620 (N.C. App. 2014). The General Assembly expressly considered the prior protected conduct of Plaintiffs and other Democratic voters, including members of Common Cause and NCDP, by considering their voting histories and political party affiliations when placing these voters into districts. The General Assembly did this to disadvantage individual Plaintiffs and other Democratic voters because of their prior protected conduct, and this retaliation has diluted these individuals' votes in a way that would not have occurred but-for the retaliation. *Id.* Indeed, many Plaintiffs and other Democratic voters who currently live in Republican state House or Senate districts would live in districts that would be more likely to have, or would almost definitely have, a Democratic representative but for the gerrymander. Moreover, but-for the gerrymander, Plaintiffs and other Democratic voters would have an opportunity to elect a majority of the state House and Senate, which would afford an opportunity to influence legislation. The retaliation has also impermissibly burdened the associational rights of Plaintiffs and the NCDP by making it more difficult for Democrats to register voters, recruit candidates, attract volunteers, raise money, campaign, and turn out the vote, by reducing the total representation of the Democratic Party in the General Assembly, and by making it virtually impossible for Democrats to constitute a majority of either chamber of the General Assembly.

222.    There is no legitimate state interest in discriminating and retaliating against Plaintiffs because of their political viewpoints, voting histories, and affiliations.  Nor can the 2017 Plans be explained or justified by North Carolina's geography or any legitimate redistricting criteria.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendant, and:

   a.  Declare that each of the 2017 Plans is unconstitutional and invalid because each violates the rights of Plaintiffs and all Democratic voters in North Carolina under the North Carolina Constitution's Equal Protection Clause, Art. I, § 19; Free Elections Clause, Art. I, § 5; and Freedom of Speech and Freedom of Assembly Clauses, Art. I, §§ 12 & 14;

   b.  Enjoin Defendants, their agents, officers, and employees from administering, preparing for, or moving forward with the 2020 primary and general elections for the North Carolina General Assembly using the 2017 Plans;

   c.  Establish new state House and state Senate districting plans that comply with the North Carolina Constitution, if the North Carolina General Assembly fails to enact new state House and state Senate districting plans comporting with the North Carolina Constitution in a timely manner;

   d.  Grant Plaintiffs such other and further relief as the Court deems just and appropriate.

75

Dated: December 7, 2018                    Respectfully submitted,

**POYNER SPRUILL LLP**                     **ARNOLD & PORTER**
                                           **KAYE SCHOLER LLP**

By: _Edwin M. Speas, Jr. /CPM_   By: _R. Stanton Jones /CPM_
Edwin M. Speas, Jr.                        R. Stanton Jones*
  N.C. State Bar No. 4112                  David P. Gersch*
Caroline P. Mackie                         Elisabeth S. Theodore*
  N.C. State Bar No. 41512                 Daniel F. Jacobson*
P.O. Box 1801                              601 Massachusetts Ave. NW
Raleigh, NC 27602-1801                     Washington, DC 20001-3743
(919) 783-6400                             (202) 942-5000
espeas@poynerspruill.com                   stanton.jones@arnoldporter.com

*Counsel for Common Cause, the*
*North Carolina Democratic Party,*         **PERKINS COIE LLP**
*and the Individual Plaintiffs*

                                     By: _Marc D. Elias /CPM_
                                           Marc D. Elias*
                                           Aria C. Branch*
                                           700 13th Street NW
                                           Washington, DC 20005-3960
                                           (202) 654-6200
                                           melias@perkinscoie.com

                                           Abha Khanna*
                                           1201 Third Avenue
                                           Suite 4900
                                           Seattle, WA 98101-3099
                                           (206) 359-8000
                                           akhanna@perkinscoie.com

                                           *Counsel for Common Cause and the*
                                           *Individual Plaintiffs*

                                           *  Pro hac vice motions forthcoming*

# **Appendix**

Appendix A:  North Carolina House of Representatives Districts



2018 House Election Districts

Legend
Groupings
Districts
Counties

*As ordered by the U.S. Supreme Court on February 6, 2018 in North Carolina v. Covington.

0    25    50         100              150            200
                                                       Miles

Appendix B: North Carolina Senate Districts



2018 Senate Election Districts

Legend
Districts
Counties

As ordered by the U.S. Supreme Court on February 6, 2018 in North Carolina v. Covington.

Printed by the NC General Assembly, February 14, 2018.

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing *by email and by U.S. mail*, addressed to the following persons at the following addresses which are the last addresses known to me:

James Bernier
Amar Majmundar
Stephanie A. Brennan
NC Department of Justice
P.O. Box 629
114 W. Edenton St.
Raleigh, NC 27602
jbernier@ncdoj.gov
*Counsel for the State of North Carolina and State Board of Elections and Ethics Enforcement and its members*

Phillip J. Strach
Michael McKnight
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
4208 Six Forks Road, Suite 1100
Raleigh, NC 27609
Phillip.strach@ogletree.com
Michael.mcknight@ogletree.com
*Counsel for the Legislative Defendants*

This the 7th day of December, 2018.

POYNER SPRUILL LLP

*Caroline P. Mackie*

Caroline P. Mackie

STATE OF NORTH CAROLINA ~~FILED~~

COUNTY OF WAKE

2018 DEC 12 P 3: 41

WAKE CO., C.S.C.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 014001

COMMON CAUSE, et al.,

        Plaintiffs,

   v.

DAVID LEWIS, IN HIS OFFICIAL CAPACITY AS SENIOR
CHAIRMAN OF THE HOUSE SELECT COMMITTEE ON
REDISTRICTING, et al.,

        Defendants.

**SUPPLEMENTAL BRIEF IN
SUPPORT OF MOTION FOR
EXPEDITED
DISCOVERY AND TRIAL
AND
FOR CASE MANAGEMENT
ORDER**

**(OTHR)**

Plaintiffs Common Cause, the North Carolina Democratic Party, and 38 North Carolina

registered voters respectfully file this supplemental brief in support of their Motion for Expedited

Discovery and Trial and for Case Management Order. A new development in the General

Assembly underscores the critical need to resolve this matter as expeditiously as possible.

      1.     Plaintiffs filed their initial complaint in this action on November 13, 2018. On

November 20, 2018, Plaintiff filed a motion for leave to conduct expedited discovery, and for

entry of a Discovery Scheduling Order and Case Management Order establishing a schedule for

expedited discovery, motions practice, and trial. Through this motion, Plaintitffs seek to ensure

that, if the challenged districting plans for the state House of Representatives and state Senate

(the "2017 Plans") are found unconstitutional in this case, there will be sufficient time to

establish new, lawful districts for the 2020 primary and general elections. On December 7, 2018,

Plaintiffs filed an amended complaint as contemplated by the schedule that Plaintiffs requested

in the Motion to Expedite.

      2.     Last night, on December 11, 2018, leaders in the General Assembly unveiled a

bill that, among other things, would attempt to significantly extend the time that the General

Assembly must be afforded to develop remedial districtings plans should the current plans be found unconstitutional. The bill would amend N.C. Gen. Stat. § 120-2.4(a)—which currently affords the General Assembly at least two weeks to establish remedial plans—to read as follows, with the underlined language reflecting the proposed changes:

> If the General Assembly enacts a plan apportioning or redistricting State legislative or congressional districts, in no event may a court impose its own substitute plan unless the court first gives the General Assembly a period of time to remedy any defects identified by the court in its findings of fact and conclusions of law. That period of time shall not be less than two ~~weeks~~ weeks, provided, however, that if the General Assembly is scheduled to convene legislative session within 45 days of the date of the court order that period of time shall not be less than two weeks from the convening of that legislative session.

HB 1029, § 4.7.

     3.     The House voted to approve this revision today, December 12, 2018, just a day after the proposal was first unveiled. The Senate is set to vote on the bill in the days ahead.

     4.     If enacted, the revised provision could purport to require that the General Assembly be given up to *59 days* to enact remedial districting plans, depending on when the General Assembly schedules its next legislative session. The provision would revise N.C. Stat. § 120-2.4 even though the current requirement of two weeks to enact remedial plans has never been an impediment to the General Assembly carrying out this task, and no compelling reason has been advanced for changing the statute.

     5.     The proposed revisions are a transparent attempt to interfere with this already filed litigation by making it more difficult to complete a remedial process in time for the 2020 elections. Before they have even begun defending the challenged plans in this case, leaders in the General Assembly already are trying to create unnecessary delay in hopes of running out the clock.

2

6.      While Plaintiffs do not believe that the proposed new requirement could be lawfully applied to this pending lawsuit (or at all, if a shorter remedial timeline were necessary to cure a constitutional violation), the prospect that the General Assembly will enact the proposed language provides all the more reason to grant Plaintiffs' Motion to Expedite. Resolving this matter as expeditiously as possible will reduce the chances that the courts will have to rule on the constitutionality of the new provision, and it will ensure that the 2017 Plans, if found unconstitutional, will be remedied in time for the next election. Above all else, it is essential that North Carolonians not be forced yet again to vote in unconstitutional districts should Plantiffs prevail in this case. To that end, Plaintiffs respectfully request that the Court adopt their proposed expedited schedule.

3

Respectfully submitted this the 12th day of December, 2018.

POYNER SPRUILL LLP

By: _Caroline P. Mackie_
Edwin M. Speas, Jr.
  N.C. State Bar No. 4112
Caroline P. Mackie
  N.C. State Bar No. 41512
P.O. Box 1801
Raleigh, NC 27602-1801
(919) 783-6400
espeas@poynerspruill.com

*Counsel for Common Cause, the*
*North Carolina Democratic Party,*
*and the Individual Plaintiffs*

ARNOLD & PORTER
KAYE SCHOLER LLP

By: _R. Stanton Jones/CPM_
R. Stanton Jones*
David P. Gersch*
Elisabeth S. Theodore*
Daniel F. Jacobson*
601 Massachusetts Ave. NW
Washington, DC 20001-3743
(202) 942-5000
stanton.jones@arnoldporter.com

PERKINS COIE LLP

By: _Marc E. Elias/CPM_
Marc E. Elias*
Aria C. Branch*
700 13th Street NW
Washington, DC 20005-3960
(202) 654-6200
melias@perkinscoie.com

Abha Khanna*
1201 Third Avenue
Suite 4900
Seattle, WA 98101-3099
(206) 359-8000
akhanna@perkinscoie.com

*Counsel for Common Cause and the*
*Individual Plaintiffs*

* *Pro hac vice motions forthcoming*

4

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing *by email and by U.S. mail*, addressed to the following persons at the following addresses which are the last addresses known to me:

James Bernier
Amar Majmundar
Stephanie A. Brennan
NC Department of Justice
P.O. Box 629
114 W. Edenton St.
Raleigh, NC 27602
jbernier@ncdoj.gov
*Counsel for the State of North Carolina and State Board of Elections and Ethics Enforcement and its members*

Phillip J. Strach
Michael McKnight
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
4208 Six Forks Road, Suite 1100
Raleigh, NC 27609
Phillip.strach@ogletree.com
Michael.mcknight@ogletree.com
*Counsel for the Legislative Defendants*

This the 12th day of December, 2018.

POYNER SPRUILL LLP

*Caroline P. Mackie*
Caroline P. Mackie

5