IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

COMMON CAUSE, et al.

     Plaintiffs

     v.

REPRESENTATIVE DAVID R. LEWIS, et al.,

     Defendants.

Civil Action No. 18-CV-589

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
## EMERGENCY MOTION TO REMAND

E. Mark Braden (DC Bar 419915)
Trevor M. Stanley (DC Bar 77351)
Richard B. Raile (VA Bar 84340)
Baker & Hostetler
1050 Connecticut Ave Suite 1100
Washington DC, 20036
Phone 202-861-1500
Fax 202-861-1783

Phillip J. Strach
N.C. State Bar No. 29456
Michael McKnight
N.C. State Bar No. 36932
Ogletree, Deakins, Nash, Smoak, & Stewart, P.C.
phil.strach@ogletreedeakins.com
michael.mcknight@ogletreedeakins.com
4208 Six Forks Road, Suite 1100
Raleigh, North Carolina 27609
Telephone: (919) 787-9700
Facsimile: (919) 783-9412

*Counsel for the Legislative Defendants and State of North Carolina*

## Table of Contents

Introduction ................................................................................................................. 1

Factual Background ...................................................................................................... 2

The Legal Standard ...................................................................................................... 6

Argument ..................................................................................................................... 7

    I.      Removal Is Proper Under The "Refusal" Clause of Section
          1443(2) ....................................................................................................... 7

         A.      The State Defendants' Choice Not To Implement
               Plaintiffs' Interpretation of State Law Amounts to a
               "Refusal" Under Section 1443(2) ................................................ 8

         B.      There Is a Direct Conflict Between Plaintiffs'
               Interpretation of State Law and Federal Law Providing
               for Equal Rights ....................................................................... 12

              1.      Intentional Vote Dilution ................................................... 14

              2.      The Federal-Court Order Enforcing the Equal
                    Protection Clause ............................................................... 17

              3.      The Voting Rights Act ....................................................... 19

    II.     Removal Is Proper Under Section 1441(a) ....................................... 22

    III.    Judicial Estoppel Does Not Apply ................................................... 25

    IV.    This Case Is Not Barred by Sovereign Immunity ............................ 27

    V.    Plaintiffs' Demand for Attorneys' Fees Is Itself Frivolous ............. 29

Conclusion ................................................................................................................. 30

# INTRODUCTION

Plaintiffs' motion to remand is remarkable in how far it goes to run from the state-law theory Plaintiffs posit in the underlying case. There, they contend that the North Carolina General Assembly's 2017 legislative redistricting plans "crack" and "pack" Democratic Party voters by placing too many Democratic voters in some districts and too few in others. They read several state constitutional provisions to prohibit this and mandate districting maps that afford them "an equal opportunity to translate their votes into representation." Amended Compl. ¶ 186 (quotations omitted). In practical terms, this theory means the 2017 plans' "packed" districts must have fewer Democratic Party voters (but not *too* few, lest they become "cracked"), and the "cracked" districts must have more Democratic Party voters (but not *too* many, lest they become "packed"). That type of partisan fine-tuning is no easy feat.

The State Defendants—House and Senate leaders who represent the General Assembly and, per statute, the State itself—refuse to implement Plaintiffs' proposed redistricting regime. There are many grounds for this, but the relevant one here is that the regime conflicts with the State's obligation to its minority voters under federal law. Because of the strong correlation between race and party affiliation in North Carolina, to take Democratic Party voters out of "packed" districts is to remove African American voters from functioning minority crossover districts. Dismantling these districts on purpose would likely violate the Civil War Amendments; dismantling them even unintentionally would likely violate the Voting Rights Act (VRA).

Removal is therefore appropriate under two separate federal statutes. First, 28 U.S.C. § 1443(2) allows state officials to remove state cases seeking to enforce state-law theories "inconsistent" with federal law "providing for equal rights." The statute's elements are met here. The State Defendants are refusing to dismantle crossover districts on the ground that doing so would create a colorable conflict with the Fourteenth and Fifteenth Amendments and the VRA.

1

Second, 28 U.S.C. § 1441(a) allows removal where a state-law claim necessarily turns on resolution of a federal question, which is the scenario here because, as a requirement of *state* law, Plaintiffs must prove that their proposed redistricting scheme is consistent with federal law. Moreover, federal-court adjudication of this case does no violence to federalism because federal courts have been adjudicating challenges to North Carolina redistricting plans for the better part of 40 years. Nor does removal violate sovereign immunity where the State Defendants are statutorily defined as the State and are authorized to waive immunity.

Plaintiffs' arguments on all these points ignore their own theory of what state law requires, their arguments on estoppel grossly misconstrue the history of litigation over North Carolina's legislative plans, and their demand for attorneys' fees is itself frivolous. The Court should deny Plaintiffs' motion in full and set this case for discovery and trial.

## FACTUAL BACKGROUND

Understanding this case requires understanding this decade's labyrinthian litigation over North Carolina redistricting plans. Here is a *Reader's Digest* overview:

In 2011, new census data required the General Assembly to redraw its House and Senate districts to comply with the Equal Protection Clause's one-person, one-vote principle. In that redistricting, the General Assembly interpreted the Supreme Court's decision in *Bartlett v. Strickland*, 556 U.S. 1 (2009), which held that VRA § 2 imposes a "majority-minority" rule, *id.* at 17, to require the creation of majority-minority districts with a black voting-age population, or "BVAP," of at least 50%. Accordingly, the General Assembly included 28 majority-minority House and Senate districts in the 2011 plans. The Department of Justice Voting Rights Section precleared the 2011 plans under VRA § 5.

In May 2015, residents of the respective majority-minority districts filed suit in the Middle District of North Carolina, *see Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C.

2016), alleging that the General Assembly's majority-minority goal rendered race the "predominant" redistricting criterion and thereby triggered strict scrutiny. *See Miller v. Johnson*, 515 U.S. 900, 911–17 (1995) (discussing the predominance test). They also contended that drawing 28 majority-minority districts was insufficiently tailored under the VRA to satisfy strict scrutiny because (they claimed) a 50% BVAP target was not necessary to afford the African American communities in these regions an equal opportunity to elect their preferred candidates. The *Covington* plaintiffs, represented by a law firm that represents Plaintiffs in this case, presented an expert report by political-science professor Dr. Allen Lichtman opining that African American voters in North Carolina are able to elect "candidates of their choice in districts that are 40 percent or more African American…in their voting age population." *See* Ex. 1 (*Covington v. North Carolina* Sur-Rebuttal Report of Dr. Lichtman) at 2.

The *Covington* case was nearly identical to a North Carolina state-court challenge filed in November 2011, which also alleged a theory of racial predominance. The plaintiffs in that case, as in *Covington*, introduced reports by Dr. Lichtman opining that 40% BVAP districts enabled minority communities to elect their preferred candidates. *See* Ex. 2 (First Affidavit of Allan J. Lichtman, *Dickson v. Rucho*); Ex. 3 (Second Affidavit of Allan J. Lichtman, *Dickson v. Rucho*). The State prevailed in North Carolina court in that case. *Dickson v. Rucho*, 368 N.C. 481, 781 S.E.2d 404, 410–11 (2015).

The federal case, however, proceeded parallel to the state case at the demand of the *Covington* plaintiffs whose counsel—at the time—believed federal courts have "primary responsibility" for "deciding matters involving the federal Constitution." Ex. 4 (Pls.' Opp'n to Defs.' Mot. to Stay, Defer, or Abstain) at 7. The Middle District of North Carolina agreed and

denied the State's motion to stay or abstain pending the state-court proceeding. Ex. 5 (Order

Denying Abstention and Preliminary Injunction, *Covington v. North Carolina*) at 2–7.

On the merits, the Middle District of North Carolina ultimately sided with the *Covington*

plaintiffs. It held both that race predominated and that a 50% BVAP target was not justified on

the record before the General Assembly in 2011, which did not contain sufficient evidence of

legally significant polarized voting. The court found from expert reports that, although voting in

North Carolina *is* racially polarized, it is not "legally significant" because of "crossover" voting

that empowers the minority community in districts below 50% BVAP to elect its preferred

candidates with the aid of some white voters. 316 F.R.D. at 167–69. The Middle District of

North Carolina, however, made "no finding that the General Assembly acted in bad faith or with

discriminatory intent," and it did not "reach the issue of whether majority-minority districts

could be drawn in any of the areas covered by the current districts under a proper application of

the law"—i.e., with proof of legally significant polarized voting. *Id.* at 124 n.1. The Supreme

Court affirmed. *North Carolina v. Covington*, 137 S. Ct. 2211 (2017).

The injunction against 28 House and Senate districts necessitated new maps.[1] The Middle

District of North Carolina afforded the General Assembly an opportunity to enact remedial maps,

and the General Assembly did so. Because "[n]o information regarding legally sufficient racially

polarized voting was provided to the redistricting committees to justify the use of race in

drawing districts," the General Assembly did not consider race in the process. Mem. in Supp. of

Pls.' Emergency Mot. to Remand ("Pls.' Mem.") Ex. D, ECF No. 6-4, at 10. But, as a result of

---

[1] The case made an intermediate pit stop in the Supreme Court after the Middle District of North
Carolina issued an order scheduling special elections and changing term lengths of North
Carolina legislators, which the Supreme Court summarily vacated. *North Carolina v. Covington*,
137 S. Ct. 1624, 1625 (2017).

the General Assembly's race-neutral goals, approximately two dozen House and Senate districts in regions with high concentrations of African American residents were drawn at BVAP levels near or above 40%, the range Dr. Lichtman identified as sufficient to afford African Americans an equal opportunity to elect their preferred candidates. *See* Notice of Removal, ECF No. 1 ¶ 22 (identifying these districts).[2] The General Assembly was aware of Dr. Lichtman's findings and introduced his reports into the legislative record in support of the 2017 plans.[3]

In addition to redrawing the 28 invalidated districts and many adjacent districts, the 2017 plans also adjusted districts in Wake and Mecklenburg Counties.

The General Assembly presented the 2017 plans to the Middle District of North Carolina, which partially accepted and partially rejected them. *See Covington v. North Carolina*, 283 F. Supp. 3d 410 (M.D.N.C. 2018). The court rejected four remedial districts to which the *Covington* plaintiffs objected because it found them insufficiently altered from their 2011 forms to serve as effective remedial districts. *Id.* at 429–42. The court also rejected the changes in Wake and Mecklenburg Counties, even though no objection was lodged against those changes on the ground of their not sufficiently addressing equal-protection violations; instead, the Middle District of North Carolina found that these changes violated the North Carolina Constitution. *Id.* at 442–47. The Middle District of North Carolina adopted districts drawn by a special master insofar as it was dissatisfied with the General Assembly's remedial maps, but it adopted the remaining remedial legislatively drawn districts and issued a final order requiring North Carolina to use "the 2017 Plans for use in future elections in the State." *Id.* at 458.

---

[2] In addition to districts identified in the removal notice, HD12 and HD21 also qualify as minority crossover districts.

[3] *See* North Carolina General Assembly, Senate Bill 691, 2017 Senate Floor Redistricting Plan, https://www.ncleg.net/Sessions/2017/s691maps/s691maps.html

5

The Supreme Court affirmed in part and reversed in part. *North Carolina v. Covington*, 138 S. Ct. 2548 (2018). It held that the Middle District of North Carolina properly exercised authority to review the remedial legislative plans (rather than require the *Covington* plaintiffs to plead and prove a new claim) and that its rejection of four remedial districts as insufficiently altered from their 2011 configurations was not clearly erroneous. *Id.* at 2554. But the Supreme Court held that the Middle District of North Carolina committed clear error in rejecting the changes in Wake and Mecklenburg Counties because this rejection had "nothing to do with" the plaintiffs' claim that "they had been placed in their legislative districts on the basis of race." *Id.* at 2554. The Supreme Court therefore reversed the order as to Wake and Mecklenburg Counties and affirmed as to all other regions.

On November 19, 2018, Plaintiffs filed this case in the North Carolina Superior Court. They challenge the 2017 plans under North Carolina's Equal Protection, Free Elections, and Free Speech and Assembly Clauses. They contend the 2017 plans "crack" and "pack" Democratic Party voters and thereby concentrate their votes in some districts and minimize their voting strength in others. They assert a state constitutional right to "an equal opportunity to translate their votes into representation." Amended Compl. ¶ 186 (quotations omitted).

Plaintiffs filed an Amended Complaint on December 7. One week later, the State Defendants removed the case to this Court. On December 21, the State Defendants filed an Answer to the Amended Complaint. ECF No. 35. Plaintiffs now seek a remand.

## THE LEGAL STANDARD

Removal is proper under the "refusal" clause of 28 U.S.C. § 1443(2) if a state official is shown to be subject to a civil action "for refusing to do any act on the ground that it would be inconsistent with" a federal "law providing for equal rights." Removal is proper under 28 U.S.C. § 1441(a) where, *inter alia*, a "state-law claim necessarily raise[s] a stated federal issue, actually

disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (quotations omitted).

## ARGUMENT

### I. Removal Is Proper Under the "Refusal" Clause of Section 1443(2)

A state official may invoke the "removal clause" of Section 1443(2) by identifying a "colorable conflict between state and federal law leading to the removing defendant's refusal to follow plaintiff's interpretation of state law because of a good faith belief that to do so would violate federal law." *White v. Wellington*, 627 F.2d 582, 587 (2d Cir. 1980) (quotations omitted). That is precisely the situation here. Plaintiffs interpret the North Carolina Constitution to require the State Defendants to remove Democratic Party voters from "packed" Democratic districts. The State Defendants refuse both to implement Plaintiffs' interpretation of those provisions and to redraw any part of the 2017 plans. One basis for refusal is that, given the "inextricable link between race and politics in North Carolina," *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016); *id*. at 225.[4] "Unpacking" the Democratic-leaning districts would require the State Defendants to dismantle minority crossover districts. Intentionally dismantling these districts would likely violate the Fourteenth and Fifteenth Amendments; even unintentionally dismantling them would likely violate the VRA. Moreover, the districts Plaintiffs contend should be "unpacked" were created under federal-court supervision and are in current use at its express command. A state-court order that they be dismantled would contradict a federal-court order that, in turn, enforces the Equal Protection Clause. These conflicts support removal.

---

[4] *Cert. denied sub nom. North Carolina v. N.C. State Conference of NAACP*, 137 S. Ct. 1399 (2017).

7

### A. The State Defendants' Choice Not To Implement Plaintiffs' Interpretation of State Law Amounts to a "Refusal" Under Section 1443(2)

The State Defendants refuse to implement Plaintiffs' interpretation of state law in a new redistricting plan that Plaintiffs sued the State Defendants to obtain. Plaintiffs contend that the North Carolina Constitution requires the State Defendants to remove Democratic Party voters from "packed" districts. The State Defendants refuse to do this, and they refuse to replace the 2017 plans with any new legislation. They are, then, "refusing to do an[] act" within the meaning of the "refusal" clause of Section 1443(2).

Plaintiffs are flat wrong (at 9) that the State Defendants "simply ignore the refusal clause's 'refusal' requirement." The type of refusal at issue here qualifies, as precedent makes clear. In *Alonzo v. City of Corpus Christi*, 68 F.3d 944, 946 (5th Cir. 1995), plaintiffs brought a state-law challenge to a city's 5-3-1 school-board districting plan; the city refused to adopt "some other system" compliant with the plaintiffs' state-law theory. *Id.* The city's basis for refusal was that a federal-court consent decree in VRA litigation ratified the 5-3-1 system and departing from it would violate the consent decree. The Fifth Circuit concluded that this rejection of plaintiffs' state-law arguments was a "refusal" and affirmed Section 1443(2) removal. The refusal here to implement Plaintiffs' view of state law into a redistricting plan is no different.

This Court reached an identical holding in *Cavanaugh v. Brock*, 577 F. Supp. 176 (E.D.N.C. 1983). The state-court plaintiffs there asserted that numerous districts in North Carolina's 1980-cycle redistricting plans violated the state Constitution's whole county provision (WCP). The State defended on the ground that implementing the WCP would require the State to violate the VRA. This was a "refusal," so this Court denied the motion to remand. Similarly, one of Plaintiffs' lead cases, *Stephenson v. Bartlett*, 180 F. Supp. 2d 779 (E.D.N.C. 2001), though it

granted remand, treated the choice not to implement the plaintiffs' view of state law into a redistricting plan as a refusal—which is why it called the case "a close call." *Id.* at 785.

Plaintiffs appear to believe that, because they challenge the affirmative *act* of passing the 2017 plans, this case involves no *omission*, no "refusal" to act. But they concede (at 9 n.2) that *Cavanaugh* is at odds with their position. So are *Alonzo* and *Stephenson*. In fact, if Plaintiffs were right, then a state-law challenge to a school-desegregation plan would also be unremovable as a challenge to an *act*, the adoption of the desegregation plan, not an omission. Yet such challenges are paradigmatic removable cases under the refusal clause. *See, e.g.*, *Burns v. Bd. of Sch. Comm'rs of City of Indianapolis, Ind.*, 437 F.2d 1143, 1144 (7th Cir. 1971); *Linker v. Unified Sch. Dist. No. 259, Wichita, Kan.*, 344 F. Supp. 1187, 1195 (D. Kan. 1972); *Mills v. Birmingham Bd. of Ed.*, 449 F.2d 902, 905 (5th Cir. 1971); *Buffalo Teachers Fed'n v. Bd. of Ed. of City of Buffalo*, 477 F. Supp. 691, 694 (W.D.N.Y. 1979).

The desegregation cases illustrate Plaintiffs' error. They fail to appreciate that plaintiffs in these cases want a *new* regime, not merely invalidation of the status quo. Refusal to implement that regime is an omission, not an affirmative act. Thus, just as state officials who "refuse to undo their actual and contemplated transfer of teachers" satisfy the refusal element, *Burns v. Bd. of Sch. Comm'rs of City of Indianapolis, Ind.*, 302 F. Supp. 309, 312 (S.D. Ind. 1969), the State Defendants also engage in an omission by refusing to adopt new plans, which Plaintiffs' prayer for relief expressly demands, and undo the minority crossover districts that Plaintiffs' Amended Complaint identifies as unlawfully "packed." *See also Bridgeport Ed. Ass'n v. Zinner*, 415 F. Supp. 715, 722 (D. Conn. 1976) (reading "the phrase 'any act'…literally, without limitation" to reach a refusal to undo an appointment of officials and make new appointments).

Though long on citations, Plaintiffs' contrary argument lacks substance. Their cases involve, respectively, a challenge to a city's implementation of a promotional eligibility list, *Detroit Police Lieutenants & Sergeants Ass'n v. City of Detroit*, 597 F.2d 566, 567 (6th Cir. 1979), a defamation case involving statements made before the EEOC, *Thornton v. Holloway*, 70 F.3d 522, 523 (8th Cir. 1995), a state civil-service commission's order requiring reinstatement of a public official, *City and County of San Francisco v. Civil Service Comm'n of City and County of San Francisco*, 2002 WL 1677711 (N.D. Cal. July 24, 2002), an executive order granting racial preferences, *Massachusetts Council of Const. Emp., Inc. v. White*, 495 F. Supp. 220, 221 (D. Mass. 1980), termination of public employees, *McQueary v. Jefferson Cty.*, Ky., 819 F.2d 1142 (6th Cir. 1987), prosecutions for trespass and resisting arrest, *People v. State of N.Y.*, 424 F.2d 697, 699 (2d Cir. 1970), and a case where private individuals tried to remove a case under Section 1443(2) that did not reach the issue of what constitutes a "refusal," *Baines v. City of Danville, Va.*, 357 F.2d 756, 772 (4th Cir. 1966). These factual scenarios have nothing to do with this case. By contrast, *Alonzo*, *Cavanaugh*, *Linker*, *Burns*, and *Stephenson* are directly on point.

Plaintiffs' only other argument is that the State Defendants "have no authority to 'refuse' to enforce state laws at all—they are legislators." Pls.' Mem. at 14. But Plaintiffs chose to name the State Defendants, and—unless this was for harassment—they did so expecting relief.[5] Presumably, that contemplated relief is a new redistricting plan compliant with Plaintiffs' rendition of the North Carolina Constitution, which is what their Amended Complaint demands. The State Defendants, as a matter of simple logic, can and do "refuse" to comply.

---

[5] If Plaintiffs sued the State Defendants knowing that they could not properly be named, that would be sanctionable. *See, e.g.*, *Collins v. Daniels*, 2018 WL 1671599, at *6 (D.N.M. Jan. 4, 2018) (sanctioning lawyers under Rule 11 for naming parties they subjectively knew were immune from suit).

Indeed, Plaintiffs forget that the "state laws" the State Defendants refuse to enforce are the state constitutional provisions (actually, Plaintiffs' rendition of them) that govern redistricting. Legislators most certainly can "refuse" to implement them in redistricting. Not only is this refusal something the legislature can logically accomplish, but it is in fact the *primary* state actor to accomplish it—since the executive branch does not enact a redistricting plan. Amended Compl. ¶ 4 (complaining about the absence of the executive's role in redistricting). That is why state legislative actors, such as school boards and city councils, are allowed to remove cases (or at least to try) challenging their refusal to implement state law in their legislation. *See, e.g.*, *Buffalo Teachers Fed'n*, 477 F. Supp. at 694; *Bridgeport Ed. Ass'n*, 415 F. Supp. at 720; *Burns*, 302 F. Supp. at 311–12.

Moreover, to the extent Plaintiffs believe the State Defendants are not "state officers" under Section 1443(2), they ignore that North Carolina is "able to designate agents to represent it in federal court." *Hollingsworth v. Perry*, 570 U.S. 693, 710 (2013). It has expressly identified the State Defendants as such, both by defining the "Speaker of the House of Representatives and the President Pro Tempore of the Senate, *as agents of the State*" and by providing that, "when the State of North Carolina is named as a defendant…, both the General Assembly and the Governor constitute the State of North Carolina." N.C. Gen. Stat. § 1-72.2(b) (emphasis added). That statutorily defined role defeats Plaintiffs' notion that the State Defendants are not capable of refusing to enforce state law. *See, e.g.*, *Bridgeport Ed. Ass'n*, 415 F. Supp. at 721 (finding school-board members qualified for Section 1443(2) removal because they "are properly considered state officials under state law"). They can and have refused. The first element is met.

### B.    There Is a Direct Conflict Between Plaintiffs' Interpretation of State Law and Federal Law Providing for Equal Rights

This case also presents a "colorable conflict between state and federal law leading to the removing defendant's refusal to follow plaintiff's interpretation of state law…." *White*, 627 F.2d at 587. Plaintiffs' Amended Complaint accuses the General Assembly of creating two types of districts: those "packed" with Democratic constituents at high percentages and those that "crack" Democratic constituents across several districts at low percentages. *See, e.g.*, Am. Compl. ¶¶ 9, 14, 16, 17, 18, 20, 22 (identifying various districts as "packed"), *see also id.* ¶¶ 10, 11, 12, 13, 15, 19, 21 (identifying various districts as "cracked"); *see also id.* at 28 ("The 2017 Plan Packs and Cracks Democratic Voters"). The "packed" districts, in Plaintiffs' view, have too many Democratic voters; the "cracked" districts have too few. Their assertion is that the North Carolina Constitution requires a more balanced share of Democratic voters so that the two major political parties have "substantially equal voting power," *id.* ¶ 178 (quotations omitted), or, in other words, so that "all voters have an equal opportunity to translate their votes into representation," *id.* ¶ 186 (quotations omitted).

But, remarkably, this assertion of what state law requires, so prominent in Plaintiffs' Amended Complaint, goes unmentioned in their motion to remand. That apparently is because it refutes Plaintiffs' assertion that "there are trillions of possible maps that" would comply with both their asserted state-law rights and federal law. Pls.' Mem. at 10. That is nonsense. Under their view, a plan that placed as many as, or more, Democratic Party voters in the districts they consider "packed" would not comply with state law. Nor would a plan that removed too many Democratic voters from those districts, such that they became "cracked." In Plaintiffs' view, both state law and the remedial plan they demand from the State Defendants must drop the Democratic vote share in the "packed" districts just enough to spread Democratic voting strength

12

in neighboring districts but not too much so as to dilute Democratic voting strength in the source districts. Few, if any, maps meet that standard of partisan fine-tuning.

More importantly, the range of possible maps that meets that standard *and* complies with federal law amounts to a null set. In North Carolina, racial identity and partisan affiliation correspond to a high degree, and the Democratic Party consists largely of racial and ethnic minorities. *N.C. Carolina State Conference of NAACP*, 831 F.3d at 225. As a result, "unpacking" the "packed" Democratic districts means removing African Americans from these districts. But because (1) BVAP in these districts is near or above 40% and (2) voting patterns reflected in Dr. Lichtman's reports enable African American-preferred candidates to win in districts near or above 40% BVAP, they qualify as performing minority "crossover" districts. Plaintiffs do not explain how Democratic constituents can be removed without drawing down BVAP. Nor would any such explanation make sense when tampering with Democratic vote share necessarily means tampering with the minority community's electoral prospects. Plaintiffs' theory means BVAP can only go down in these districts.

That raises profound federal-law problems, which are detailed below.[6] At the outset, it bears emphasizing that, if harmonizing Plaintiffs' state-law theory and federal law were easy, Plaintiffs would have no problem demonstrating this with an alternative map showing just one of the "trillions" of ways it can be done. That is what the plaintiffs did in *Stephenson v. Bartlett*, 180 F. Supp. 2d 799 (E.D.N.C. 2001)—a case Plaintiffs say (at 11) is "strikingly similar to this one." In opposing Section 1443(2) removal under the VRA, the *Stephenson* plaintiffs presented

---

[6] The State Defendants are not required to admit that the proffered state-law theory would conflict with federal law; it is sufficient that there is a colorable conflict. *Greenberg v. Veteran*, 889 F.2d 418, 421 (2d Cir. 1989). Thus, the State Defendants need not and do not concede at this time that any such action actually would violate federal law. The existence of a colorable conflict suffices for removal.

"proposed redistricting plans that adopt the proposed minority districts enacted by the General Assembly in the 2001 House Plan and the 2001 Senate Plan" and that changed only surrounding districts. *See* Ex. 6 (Pls.' Mem. ISO Remand, *Stephenson v. Bartlett*) at 15. This, the *Stephenson* plaintiffs argued, proved consistency between their state-law theory and federal law. Plaintiffs' failure to do this exposes their arguments as empty rhetoric.

### 1. Intentional Vote Dilution

A crossover district is one in which "the minority population, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009). As discussed below (§ I.B.3), these districts need not be created on purpose; like any type of district, they can occur naturally by operation of non-racial criteria. However they are formed, the Supreme Court has warned that "a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts…, would raise serious questions under both the Fourteenth and Fifteenth Amendments." *Id.* at 24. That is because an intentional state decision to dilute minority voting strength falls among the core prohibitions of the Civil War Amendments. *See Reno v. Bossier Parish School Bd.*, 520 U.S. 471, 481–482 (1997). *Bartlett* warns that this prohibition applies to the deliberate choice to dismantle a performing crossover district just as it does to the deliberate choice to dismantle a performing majority-minority district. Hence, in demanding that the State Defendants dismantle crossover districts, Plaintiffs demand a violation of Fourteenth and Fifteenth Amendments.

Plaintiffs' principal response, that enacting a remedial plan under state-court supervision would not be "intentional" discrimination, is remarkable. Pls.' Mem., at 16. Most of the districts Plaintiffs challenge here were drawn under federal-court supervision, and Plaintiffs allege in this very case that they were drawn with improper intent. Obviously, the premise of their case is that

14

court involvement does not immunize a plan from such a claim. In fact, Plaintiffs' sole authority expressly states that a redistricting plan drawn under court supervision can occur with discriminatory intent. *Abbot v. Perez*, 138 S. Ct. 2305, 2327 (2018) ("[W]e do not suggest either that the intent of the 2011 Legislature is irrelevant or that the plans enacted in 2013 are unassailable because they were previously adopted on an interim basis by the Texas court."). Unless Plaintiffs are willing to concede that any act a legislature undertakes at a court's direction is devoid of intentional discrimination, this argument must fail.

Plaintiffs also suggest (at 16) that it is possible to redistrict North Carolina under their state-law theory without intentionally engaging in vote dilution. But that is hardly plausible when they demand a one-way ratchet dropping Democratic vote share (and BVAP) in the crossover districts. Removing African American voters simply must be done on purpose, and this would likely constitute legally actionable discriminatory intent under Fourth Circuit law, which holds that a racial vote-dilution plaintiff need not show "any evidence of race-based hatred." *N.C. State Conference of NAACP*, 831 F.3d at 222. A motivation to impact one party's political power, where race and politics correlate, qualifies under Circuit precedent.[7] *Id.*

On all points, Plaintiffs' authorities are distinguishable because the asserted conflict they address was amorphous. *Stephenson* involved the alleged conflict between North Carolina's WCP and the VRA. Although it was a "close call," 180 F. Supp. 2d at 785, the court found no conflict because the WCP did not directly correlate with racial percentages, leaving the possibility of conflict "uncertain"—especially where (as noted) the *Stephenson* plaintiffs

---

[7] To be sure, the State Defendants disagree with the Fourth Circuit's interpretation of the intent element, but the decision stands as written. Although the Supreme Court may someday clarify the intent standard, the conflict is more than colorable under current law.

presented an alternative map harmonizing state and federal law. *Id.* Whereas that was a borderline case, this case involves a direct correlation between racial and partisan percentages.

Plaintiffs' reliance on *Sexson v. Servaas*, 33 F.3d 799, 803 (7th Cir. 1994), fares even worse. In that case, the state defendants *successfully removed* by asserting a VRA defense against a redistricting challenge; remand was only required because, at trial, the state defendants "essentially abandoned their affirmative defense." *Id.* at 803. The Seventh Circuit stated:

> We have not been asked to review the district court's decision to allow removal in the first place. Therefore, we make no statement whether the affirmative defense presented a sufficient "colorable claim" to warrant removal, and do not comment on the court's subsequent exercise of jurisdiction. We have been asked only to review the propriety of the remand.

*Id.* at 803 n.2. That holding is irrelevant here. Besides, that case, like *Stephenson* and *Senators v. Gardner*, 2002 WL 1072305, at *1 (D.N.H. May 29, 2002), and *Brown v. Florida*, 208 F. Supp. 2d 1344, 1351 (S.D. Fla. 2002), involved state redistricting criteria that might or might not impact minority voting strength, so the conflict was speculative. By contrast, dropping BVAP unquestionably impacts minority opportunity to elect in crossover districts.

Plaintiffs also complain (at 17) that "it is Plaintiffs, not Legislative Defendants, who seek relief from intentional discrimination in this case." But this reflects only the misguided view that what is good for Democratic Party vote share is good for the world. That is not so. To enhance Democratic voting strength, the State Defendants must diminish that of other groups. *Gaffney v. Cummings*, 412 U.S. 735, 753 (1973). One of those is the minority community. Creating two new seats where white Democrats can win means taking away an existing seat where an African American-preferred candidate can win. Federal law imposes a prohibition on that tradeoff, which trumps Plaintiffs' asserted state-law rights and supports removal.

### 2. The Federal-Court Order Enforcing the Equal Protection Clause

A separate and independent basis for removal lies in the Middle District of North Carolina's *Covington* final judgment, which ordered the State Defendants to use in future elections many of the districts challenged in this case. In *Covington*, 28 districts were invalidated because race (i.e., the goal of creating majority-minority districts) predominated and the State Defendants did not collect sufficient data to justify BVAP of 50% or more. At the remedial stage, the Middle District of North Carolina supervised the State Defendants' enactment of the 2017 plans (challenged here), which redrew 116 districts, and the Court supplemented a handful of those districts with districts drawn by a special master. The Court ordered the state to use "the 2017 Plans for use in future elections in the State." *Covington*, 283 F. Supp. 3d at 458.

A conflict between state law and a federal-court order enforcing equal-protection law qualifies as a conflict under Section 1443(2). *See, e.g.*, *Buffalo Teachers Fed'n*, 477 F. Supp. at 694. For example, in *Alonzo*, the court found a conflict between a federal consent decree requiring a city's use of one districting map and the plaintiffs' advocacy for "some other system" because "*[a]ny challenge* of the City's use of this system in its elections necessarily implicates the rights of all voters…and could change the balance of rights that the federal court found required the 5-3-1 system." 68 F.3d at 946 (emphasis added). The conflict here is equally plain: the *Covington* court ordered use of the 2017 Plans as an equal-protection remedy, and now Plaintiffs demand that the State Defendants use some other yet-to-be-created plans.[8]

Plaintiffs respond by mischaracterizing the *Covington* litigation. First, they claim (at 17) that the *Covington* court did *not* order that the 2017 Plans be used in their entirety, apparently on

---

[8] Although the *Covington* order may not immunize the 2017 Plans from attack, *cf. Abbot*, 138 S. Ct. at 2327, it at least creates a colorable conflict for purposes of removal. If any court is to order North Carolina to depart from plans a federal court ordered it to use, it should be a federal court.

the belief that only the special-master-drawn remedial districts are mandated by that order. That argument flunks the plain-language test: "Therefore, the Court will approve and adopt the remaining remedial districts in the 2017 Plans for use in future elections in the State." *Covington*, 283 F. Supp. 3d at 458. The "remaining" districts are the *legislatively* enacted "remedial" districts, not the special-master-drawn districts.

Second, Plaintiffs contend (at 17–19) that the Supreme Court in *Covington* held that the district court lacked power to apply state law in a remedial plan and that state law must be applied only in North Carolina court, not in federal court. That is false. It held only that the Middle District of North Carolina committed clear error in addressing portions of the state it did not need to address to remedy the equal-protection violations the *Covington* plaintiffs pleaded and proved. Plaintiffs fail to distinguish between the legislative remedial districts and the *non*-remedial districts in Wake and Mecklenburg Counties. Most districts redrawn in the 2017 plans were remedies to the equal-protection violation identified in *Covington*; a handful of districts in Wake and Mecklenburg Counties were also redrawn out of legislative discretion. The Supreme Court found clear error in the Middle District of North Carolina's rejection of the districts in "Wake and Mecklenburg Counties," which the Supreme Court held "had nothing to do" with the invalidated districts. *North Carolina v. Covington*, 138 S. Ct. 2548, 2554 (2018). As to *those* districts—and only those districts—the district court's remedial order was reversed. But that ruling had no bearing on the legislatively drawn remedial districts that are challenged here.

The Supreme Court did *not* prohibit federal courts from imposing state law as to districts actually required to be remedied under the equal-protection liability ruling. And a holding of that

nature would have been odd because it would have allowed, e.g., the state to unnecessarily violate the WCP in drawing remedial districts. *Covington* did not adopt such a position.[9]

Third, Plaintiffs assert that the state court may order a violation of the *Covington* final judgment because of state courts' role in "'supervision of redistricting.'" Pls.' Mem., ECF No. 6, at 25 (quoting *Growe v. Emison*, 507 U.S. at 34). But state courts' role in no way eviscerates removal under Section 1443(2), and Plaintiffs cite no precedent for their view that a state court may order a violation of a federal-court order. The *Covington* court did not order the State Defendants to use "infinite variations" of possible districts, Pls.' Mem., ECF No. 6, at 19; it ordered them to use the 2017 remedial plans. But Plaintiffs demand that those plans *not* be used. That is a square conflict between state and federal law providing for equal rights.

### 3. The Voting Rights Act

Plaintiffs' demand that the State Defendants dismantle "packed" Democratic districts creates yet further conflict with federal law because many of these districts enable the minority community to elect its preferred candidates. As a result, even unintentionally dismantling them—were that even possible—would create a conflict under VRA § 2. Although no Section 2 plaintiff could force the state to create crossover districts, *see Strickland*, 556 U.S. at 19–20, the Supreme Court in *Strickland* made clear that a state can cite crossover districts in its plan as a *defense* to a VRA § 2 claim seeking a majority-minority district. *Id.* at 24 ("States can—and in proper cases should—defend against alleged § 2 violations by pointing to crossover voting patterns and to effective crossover districts.").

These districts are therefore critical under Section 2. That is especially so since separate federal-court rulings have squeezed North Carolina into a tight corner. On the one hand, the

---

[9] For the same reason, estoppel does not apply. *See* below (§ III).

*Covington* court found that the state erred in creating majority-minority districts without sufficient evidence of legally significant racially polarized voting to justify 50% BVAP districts. On the other hand, the Fourth Circuit in 2016 found "that racially polarized voting between African Americans and whites remains prevalent in North Carolina." *N.C. State Conference of NAACP*, 831 F.3d at 255. These holdings place the state between the proverbial rock and hard place: Section 2 plaintiffs can cite the Fourth Circuit's finding of severe polarized voting and, presumably, mount evidence to support that finding, and racial-gerrymandering plaintiffs can cite *Covington*'s finding that North Carolina lacks sufficient evidence of legally significant polarized voting to justify 50% BVAP districts.[10] These rulings expose the state to "the competing hazards of liability under the Voting Rights Act and the Equal Protection Clause." *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 802 (2017) (quotations omitted).

The 2017 plans, however, navigate the tension between *Covington* and *NAACP* by maintaining approximately two dozen crossover districts of near or above 40% BVAP. These districts are a shield to VRA § 2 claims by affording the equal opportunity the statute guarantees. They also are a shield to racial-gerrymandering claims because (1) the General Assembly did not use racial data to create them and (2) they maintain BVAP levels identified by Dr. Lichtman's reports as appropriate to afford racial equality in voting at current levels of polarized and crossover voting. But Plaintiffs' demand that the State Defendants drop BVAP in these districts because they are (in Plaintiffs' view) "packed" with Democrats undermines this proper exercise of "legislative choice or discretion," *Strickland*, 556 U.S. at 23, and exposes the State to a VRA § 2 claim by any plaintiff willing and able to prove legally significant polarized voting.

---

[10] The problem is exacerbated insofar as "[c]ourts are split on the question of whether…the use of nonmutual offensive collateral estoppel [is available] against state or municipal governments." *DeCastro v. City of New York*, 278 F. Supp. 3d 753, 764 n.13 (S.D.N.Y. 2017).

Plaintiffs' sole response is that the State Defendants did not use race in constructing the crossover districts. Pls.' Mem., at 20. So what? There is no rule that intentionally drawn minority performing districts are protected but unintentionally drawn ones are unprotected. To the contrary, legislative intent plays no role whatsoever in the "effects" inquiry under VRA § 2. *See, e.g.*, *Strickland*, 556 U.S at 10; *Thornburg v. Gingles*, 478 U.S. 30, 62 (1986).

Plaintiffs' counsel should know this better than anyone because they have gone on the litigation circuit this cycle urging the federal courts to hold that states should ordinarily, if not exclusively, satisfy the VRA without intending to do so. That is exactly what Plaintiffs' counsel told the Supreme Court in challenging North Carolina's congressional districts:

> To be sure, there can be circumstances where a state draws a majority-minority district without triggering strict scrutiny. For example, a state might draw such a district as a natural result of complying with traditional redistricting principles.

Mot. to Affirm, *McCrory v. Harris* (U.S.) (No. 1501262), at 24. Crossover districts too can occur naturally as a result of non-racial criteria, and that occurred here. That North Carolina created them unintentionally should come as welcome news to Plaintiffs' lawyers, who have for years advocated this reform. The suggestion that a naturally occurring district loses VRA § 2 protection because race did *not* predominate is inexplicable, if not disingenuous.

Besides, Plaintiffs' argument ignores the legislative record. Although the General Assembly set no racial targets in crafting the crossover districts at the map-drawing stage, it considered racial demographics and Dr. Lichtman's polarized voting analyses at the deliberation and enactment stages. Dr. Lichtman's reports were entered into the legislative record as evidence that the naturally occurring crossover districts would likely perform.

## II.     REMOVAL IS PROPER UNDER SECTION 1441(a)

Besides Section 1443(2), removal is also proper under Section 1441(a) because the federal-law issues described above simply must be resolved for Plaintiffs to have a valid state-law claim, and that is so as a matter of *state* law. "[F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013). All of these elements are met here.

First, the federal issues are "necessarily raised" because demonstrating that federal law permits the demanded redistricting plan is an *affirmative* element of Plaintiffs' claim. A federal issue is necessarily raised where a state-law *prima facie* claim requires resolution of a federal issue, such as a "case within a case" where a federal-law element is a predicate of liability. *Id.* at 1065–66. That is so here because the North Carolina Constitution expressly provides that "no law or ordinance of the State in contravention or subversion" of federal law "can have any binding force," N.C. Const. Art. I, § 5, and the North Carolina Supreme Court interpreted this provision to mean "that compliance with federal law is not an implied, but rather an express condition to the enforceability of *every* provision in the State Constitution," *Stephenson v. Bartlett*, 355 N.C. 354, 375, 562 S.E.2d 377, 392 (2002). To prove that the North Carolina Constitution requires a districting scheme, Plaintiffs must first prove it compliant with *federal* law. *See id.* at 381–82, 562 S.E.2d at 396. That requires a case-within-a-case assessment of what the Equal Protection Clause, the Fifteenth Amendment, and the VRA require.[11] *See North*

---

[11] It also requires assessment of First Amendment dictates, given some lower courts' view that it prohibits redistricting "that disfavors supporters of a particular set of political beliefs[.]" *Common Cause v. Rucho*, 318 F. Supp. 3d 777, 927 (M.D.N.C. 2018). What Plaintiffs seek here is nothing less than a state-law requirement that the General Assembly use minority and Republican voters as pawns for Democratic Party gain.

*Carolina by & through N. Carolina Dep't of Admin. v. Alcoa Power Generating, Inc.*, 853 F.3d 140, 146 (4th Cir. 2017), *as amended* (Apr. 18, 2017) (finding this element met where predicate to showing state-law property right was proving it consistent with federal property rights); *Coventry Health Care, Inc. v. Caremark, Inc.*, 705 F. Supp. 2d 921, 928 (M.D. Tenn. 2010) (denying remand because substantial federal question existed based on, *inter alia*, Plaintiff's burden to prove "compliance with federal statute").[12]

Second, the applicability of the Equal Protection Clause, Fifteenth Amendment, and VRA are "actually disputed," as evidence by the parties' contrary positions in this very briefing. Plaintiffs remarkably contend (at 23) that it is not actually disputed because, they say, the State Defendants *agree* that Plaintiffs' hoped-for remedial plan can be consistent with federal law. If nothing else, this brief should put that inexplicable view to rest. Federal law and Plaintiffs' reading of state law require diametrically opposing courses of action.

Third, the federal issues are "substantial" in their "importance…to the federal system as a whole." *Gunn*, 568 U.S. at 260. It is difficult to imagine an issue more substantial to the federal system than a conflict over how the Civil War Amendments and VRA apply to voting procedures. *Cf. Ortiz v. Univ. of Med. & Dentistry of New Jersey*, 2009 WL 737046, at *8 (D.N.J. Mar. 18, 2009) ("An alleged violation of the United States Constitution is by definition substantial."). The conflict over whether the IRS "had failed to comply with certain federally imposed notice requirements" that the Supreme Court found to justify federal jurisdiction in *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005), can hardly claim a greater status in the federal system than can these issues. *Gunn*, 568 U.S. at 1066 (discussing

---

[12] Plaintiffs' cases are not on point. For example, *Hall v. Levinson*, 2016 WL 6238518, at *1 (E.D.N.C. Oct. 25, 2016), involved state-law claims "all arising from the alleged mismanagement and unlawful operation of" a charter school. That is irrelevant here.

*Grable*). And this is not a "hypothetical," "backward-looking case." *Id.* at 1066–67. It will determine whether voting districts approved by a federal court are compatible with a state theory the Plaintiffs only now belatedly raise.

Fourth, the Court can adjudicate this case without disrupting the appropriate balance of federal and state judicial power. Federal courts routinely adjudicate redistricting plans, and litigation over North Carolina's legislative plans has been ongoing in federal court for the better part of this decade—in fact, for the better part of 40 years. Moreover, that Section 1443(2) has justified removing redistricting litigation demonstrates that Congress did not anticipate that colorable conflicts between state and federal law would be adjudicated in state court.

Plaintiffs cite *Growe v. Emison*, 507 U.S. 25, 33 (1993), as requiring remand, but *Growe* said nothing on the subject. Plaintiffs' attorneys know this. They themselves argued in *Covington* that *Growe* does not require federal-court deference to a state court "that is merely <u>reviewing</u> the validity of a current map, as opposed to actually <u>redrawing</u> a map that has already been deemed valid." Ex. 4 at 5 (emphasis in original). The Middle District of North Carolina agreed with this argument. Ex. 5 at 4 (finding *Growe* irrelevant where "the state court proceeding has not even determined that any remediation is required"). Due to these arguments by their own lawyers, Plaintiffs' view that federal litigation cannot go forward if state court is an option was repudiated in North Carolina federal court this very cycle, as litigation in state and federal court proceeded on virtually identical claims on which North Carolina won in state court and lost in federal court. The Supreme Court held that the federal-court litigation in no way was required to yield to the state-court litigation. *Cooper v. Harris*, 137 S. Ct. 1455, 1467–68 (2017). The same lawyers who represent Plaintiffs here represented the federal-court litigants in all these cases, and they were not then of the view that federal litigation cannot proceed if state court is available.

24

Finally, Plaintiffs' position that consent of the other defendants is required for removal fails under the statute's plain-as-day text: "When a civil action is removed solely under section 1441(a), all defendants who have been properly joined and served must join in or consent to the removal of the action." 28 U.S.C. § 1446(b)(2)(a). Here, Section 1441(a) is not the sole basis; Section 1443(2) also supports removal. *See Brown*, 208 F. Supp. 2d at 1349. As stated above, Plaintiffs are wrong that Section 1443(2) does not apply. And, regardless, their argument that a ruling against removal under Section 1443(2) would require consent under Section 1441(a) renders the statutory text superfluous. Cases in which Section 1441(a) is joined with a separate, valid basis render removal under Section 1441(a) superfluous, as that separate basis would alone be sufficient for removal. The statute only makes sense where Section 1441(a) and other colorable bases are cite in the alternative and the other bases prove unsuccessful.

## III.    Judicial Estoppel Does Not Apply

Plaintiffs' judicial estoppel position is meritless. The elements of judicial estoppel are: (1) "the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation," and that position "must be one of fact as opposed to one of law or legal theory," (2) "the prior inconsistent position must have been accepted by the court," and (3) "the party against whom judicial estoppel is to be applied must have intentionally misled the court to gain unfair advantage." *Zinkand v. Brown*, 478 F.3d 634, 638 (4th Cir. 2007) (quotations omitted). Plaintiffs fail to establish any of these elements.

**Applicability of State Law.** Plaintiffs first cite (at 24–25) the State Defendants' assertions that a state-law challenge to districts redrawn in 2017 would be viable only in state court as contradicting "[t]heir demand now for a federal forum." But the argument is facially defective because those are statements "of law or legal theory"; estoppel requires a statement "of fact." *Zinkand*, 478 F.3d at 638. The position fails for this reason alone.

Besides, there is no inconsistency. The *Covington* statements concern the *Covington* plaintiffs' "state-law complaints about districts that had never before been challenged in [the *Covington*] litigation," Mem. in Supp. of Pls.' Emergency Mot. to Remand ("Pls.' Mem."), Ex. G, ECF No. 6-7, at 7, in other words, districts in Wake and Mecklenburg Counties that the *Covington* Court did not "hold…were racially gerrymandered," *id.* at 28. Properly understood, the State Defendants' *Covington* position was *not* that the *remedial* districts were immune from state-law objection in federal court, but that the Wake and Mecklenburg County alterations were outside the *Covington* court's purview.

More importantly, the State Defendants did not even hint that any remedial districts could be challenged under state-law principles directly conflicting with federal law or that, if faced with a conflict between federal equal-rights law and a proposed interpretation of state law, they would waive their right to removal. All of that was outside the dispute in *Covington*.[13]

What's more, the Supreme Court did *not* adopt the argument Plaintiffs attribute to the State Defendants. It held, applying a clear-error standard, only that "[o]nce the District Court had ensured that the racial gerrymanders at issue in this case were remedied, its proper role in North Carolina's legislative districting process was at an end." *Covington*, 138 S. Ct. at 2555. It did not reach sovereign immunity or the federal courts' power to apply state law to remedial districts. It held only that the Wake and Mecklenburg County alterations, which it viewed as unrelated to the remedial efforts, were outside the Middle District of North Carolina's remedial role.

---

[13] For that reason, there could have been no intent to mislead in *Covington* about the State Defendants' intentions on defending the districts beyond Wake and Mecklenburg Counties because no such defense was contemplated at the time.

**VRA Compliance and Evidence of Polarized Voting.** Plaintiffs also claim the State Defendants are estopped from asserting that the crossover districts are necessary or even appropriate or that voting is racially polarized in North Carolina. This position too is meritless.

As shown above, the State Defendants did not assert to the *Covington* Court that polarized voting does not exist, and Plaintiffs themselves admit it may exist. Pls.' Mem., at 21. The State Defendants in *Covington* made an assertion about the record before the legislature, observing that "[n]o information regarding legally sufficient racially polarized voting *was provided to the redistricting committees* to justify the use of race in drawing districts." Pls.' Mem. Ex. D, at 10 (emphasis added). That assertion was addressed to the *Covington* court's prior holding that a 50% BVAP target is unjustifiable without evidence before the General Assembly showing legally significant racially polarized voting. The State Defendants represented that no such evidence was presented to the General Assembly as of the 2017 remedial redistricting.

That is both true and irrelevant. The State's vulnerability under VRA § 2 turns, not on what was before the General Assembly in drafting the plans, but on what evidence can be presented in court in litigation. Similarly, the State's ability to defend a VRA § 2 claim depends, not on a showing of racial intent at the time of redistricting, but on objective evidence regarding voting patterns. Showing inconsistency requires showing no possibility of consistency. *Pegram v. Herdrich*, 530 U.S. 211, 228 n.8 (2000) (denying estoppel because "it could be argued" that allegedly inconsistent statements were "not necessarily co-extensive"); *Franco v. Selective Ins. Co.*, 184 F.3d 4, 8-9 (1st Cir. 1999); *Navarro-Ayala v. Hernandez-Colon*, 951 F.2d 1325, 1343-45 (1st Cir. 1991). These statements are inconsistent only to someone desperate for an argument.

## IV.    This Case Is Not Barred by Sovereign Immunity

Plaintiffs claim sovereign immunity prevents this case from proceeding in federal court and then promptly admit that removal waives sovereign immunity. Pls' Mem. at 25–26. Their

argument is that "private counsel for Legislative Defendants does not represent the State, cannot remove on behalf of the State and cannot waive the State's sovereign immunity." *Id.* at 26. But state law is to the contrary. It provides:

> [I]n any action in any North Carolina State court in which the validity or constitutionality of an act of the General Assembly or a provision of the North Carolina Constitution is challenged, the General Assembly, jointly through the Speaker of the House of Representatives and the President Pro Tempore of the Senate, constitutes the legislative branch of the State of North Carolina and the Governor constitutes the executive branch of the State of North Carolina, and when the State of North Carolina is named as a defendant in such cases, both the General Assembly and the Governor constitute the State of North Carolina.

N.C. Gen. Stat § 1-72.2(a). It further provides that, "as agents of the state," the State Defendants may hire "private counsel" to represent them in that role. *Id.* 1-72.2(b).

It necessarily follows that they can waive sovereign immunity, as *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 620 (2002), shows. Plaintiffs read *Lapides* to mean that only "the Attorney General has the power to waive sovereign immunity," Pls.' Mem., at 26, but *Lapides* held, not that only attorneys general in all 50 states may waive immunity, but that the attorney general of Georgia had power to waive immunity because a statute authorized him to represent the state in court. *See* 535 U.S. at 622. That is also true here. A state statute defines the State Defendants as the State and authorizes them to represent the State and hire counsel to that end. That settles the matter. *See City of Greensboro v. Guilford County Board of Elections*, 2018 WL 276688 at *6 (M.D.N.C. Jan 3, 2018) (finding that the North Carolina General Assembly and the Attorney General can act independently to waive sovereign immunity.)

Undeterred, Plaintiffs assert that, under N.C. Gen. Stat § 114-2(1) and (2), the North Carolina Attorney General is authorized to waive sovereign immunity. That may be so, but who cares? There is no rule that only one state actor may waive sovereign immunity. States may

divvy up their power as they wish. Here, both the Attorney General and the State Defendants are empowered to represent the state in litigation, and that authorization is sufficient.[14]

## V. Plaintiffs' Demand for Attorneys' Fees Is Itself Frivolous

An award of attorney fees is appropriate only where removal is unsupported by "an objectively reasonable basis." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005). The only assertion lacking an objectively reasonable basis is Plaintiffs' demand for attorneys' fees. *Cf. Smith v. Psychiatric Sols., Inc.*, 750 F.3d 1253, 1260 (11th Cir. 2014) (noting the well-established rule that a frivolous motion for sanctions is itself sanctionable).

Plaintiffs' counsel Edwin M. Speas knows this. He was the lawyer who attempted removal in *Stephenson*. Plaintiffs' purported amazement at the State Defendants' removal here is clearly theatrical. This is the third time in four redistricting cycles removal has been sought in a case like this. It succeeded in *Cavanaugh*. Although it failed in *Stephenson*, the Court called the case a "close call." 180 F. Supp. 2d at 785. It was entirely predictable and reasonable that this avenue, regarded as colorable by Plaintiffs' own lawyer, would be tested again here.

Indeed, Plaintiffs admit (at 9 n.2) that their remand motion conflicts with precedent of this Court, stated in *Cavanaugh*. Even if the Court chooses to disregard it (it should not), the State Defendants' reliance is no less reasonable simply because Plaintiffs disagree with that case. Nor does the *Stephenson* case defeat the objectively reasonable basis for removal when it referred to the question as "close" and when the asserted conflict between state and federal law here is far more direct than the vague allegation by Mr. Speas in *Stephenson*—in the face of the

---

[14] *Wright v. North Carolina*, 787 F.3d 256, 262 (4th Cir. 2015), is inapposite because (1) the case involved a suit against legislative leaders who did not waive immunity and (2) was issued prior to the enactment of relevant portions of N.C. Gen. Stat § 1-72.2.

*Stephenson* plaintiffs' presentation of an alternative map harmonizing state and federal law. Plaintiffs call *Stephenson* "strikingly similar," and *Stephenson* was a "close call."

In fact, Plaintiffs fail to cite a single analogous case where attorneys' fees were awarded. Their reliance on *League of Women Voters of Pennsylvania v. Pennsylvania*, 2018 WL 1787211, at *1 (E.D. Pa. Apr. 13, 2018), could not be further off base. The case did not involve the VRA, any racial issues, or Section 1443(2), and the removing party acted solely under Section 1441(a) without obtaining consent from other defendants. The only resemblance between that case and this is that it involved redistricting. Plaintiffs' other precedents deny attorneys' fees. *See, e.g.*, *Civil Serv. Comm'n*, 2002 WL 1677711, at *7; *Brown*, 208 F. Supp. at 1344.

Plaintiffs do practically nothing to explain why an objective basis is absent. They instead speculate (at 29) about motive, contending that the State Defendants intended to delay the case. First of all, the test is *objective*, not subjective. Secondly, the State Defendants removed the case only one week after Plaintiffs filed their Amended Complaint. By contrast, Plaintiffs waited over one year from the 2017 plans' enactment to file their case. Their delay is neither this Court's nor North Carolina's emergency. Moreover, the Federal Rules allow time for parties to decide whether to remove. The State Defendants were justified in using that time to assess their options, including by ensuring that removal was supported by precedent. As shown above, it is.

## CONCLUSION

Plaintiffs' motion should be denied in full. Moreover, in light of Plaintiffs' representation that "trillions" of maps could satisfy both their state-law theory and federal law, this Court in considering Plaintiffs' remand motion should direct Plaintiffs to file at least one of the "trillion" legislative districting plans for both the House and Senate that demonstrate compliance with Plaintiffs' state-law theory and federal law. In connection with that filing, the Court should direct Plaintiffs to file supporting documents and data sufficient to prove compliance with federal law.

30

This 28th day of December, 2018.

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

By: /s/Phillip J. Strach

E. Mark Braden (DC Bar 419915)
Trevor M. Stanley (DC Bar 77351)
Richard B. Raile (Virginia Bar 84340)
Baker & Hostetler
1050 Connecticut Ave Suite 1100
Washington DC, 20036
Phone 202-861-1500
Fax 202-861-1783

Phillip J. Strach
N.C. State Bar No. 29456
Michael McKnight
N.C. State Bar No. 36932
phil.strach@ogletreedeakins.com
michael.mcknight@ogletreedeakins.com
4208 Six Forks Road, Suite 1100
Raleigh, North Carolina 27609
Telephone: (919) 787-9700
Facsimile: (919) 783-9412

*Counsel for the Legislative Defendants and
State of North Carolina*

**CERTIFICATE OF SERVICE**

I hereby certify that, on this day, I electronically filed the forgoing **MEMORANDUM IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION TO REMAND** with the Clerk of Court using the CM/ECF system which will cause a copy of the same to be served on counsel of record for all parties in this matter.

This the 28th day of December, 2018.

By:     /s/Phillip J. Strach
        Phillip J. Strach
        N.C. State Bar No. 29456
        phil.strach@ogletreedeakins.com
        4208 Six Forks Road, Suite 1100
        Raleigh, North Carolina 27609
        Telephone:  (919) 787-9700
        Facsimile:  (919) 783-9412

        *Counsel for the Legislative Defendants and State of North Carolina*

32